# EXHIBIT 1

# LAW FIRM LEGAL FUNDING, CONSENSUAL EQUITABLE LIEN, ASSIGNMENT AND SECURITY AGREEMENT AND PERSONAL GUARANTEE

This Law Firm Legal Funding, Consensual Equitable Lien, Assignment And Security Agreement (the "Agreement") is made and effective as of the date accepted by TRANSFEREE defined as the date Agreement is signed by the Authorized Representative of Stillwell Madison, LLC (the "Effective Date") by and between Stillwell Madison, LLC, an Arizona limited liability company hereafter named TRANSFEREE, engaged in the business of making Legal Fundings, and Girardi & Keese, a California General Partnership dba Girardi/Keese, 1126 Wilshire Blvd, Los Angeles, CA 90017-1904 thereafter referred to as TRANSFEROR. TRANSFEROR and TRANSFEREE jointly referred to as the "Parties". With respect to the Agreement, DGMGT AZ, LLC, an Arizona limited liability company agrees to act as the relationship administrator between the Parties (the "ADMINISTRATOR").

BY THIS AGREEMENT, TRANSFEREE IS MAKING A LEGAL FUNDING TO TRANSFEROR TO BE USED FOR BUSINESS PURPOSES WHICH REPAYMENT IS BASED UPON THE SUCCESSFUL FUTURE OUTCOME OF THE CLIENT PORTFOLIO. TRANSFEROR HAS GRANTED A SECURITY INTEREST IN THE POTENTIAL FUTURE PROCEEDS FROM THE CLIENT PORTFOLIO TO TRANSFEREE BUT TRANSFEREE HAS ABSOLUTELY NO RIGHT TO AND WILL NOT MAKE ANY DECISIONS WITH RESPECT TO THE CONDUCT OF THE CLIENT PORTFOLIO OR ANY SETTLEMENT OR RESOLUTION THEREOF. THE RIGHT TO MAKE THOSE DECISIONS REMAINS SOLELY WITH TRANSFEROR AND/OR ITS LAW FIRM.

THIS AGREEMENT DEFINES ALL TERMS AND CONDITIONS OF THE LEGAL FUNDING BETWEEN TRANSFEROR AND TRANSFEREE.

**DEFINITIONS:** The following terms used throughout the Agreement and shall have the following meanings:

**"Account"**, means a right to payment of a monetary obligation, whether or not earned by performance.

**"Assignment"** means the TRANSFEROR immediately, totally, unconditionally, exclusively and irrevocably assigns, transfers, and conveys to TRANSFEREE all of TRANSFEROR'S control, right, title and interest in and to any and all claims of ownership including Proceeds and Payment Intangibles that are or may become due and payable to TRANSFEROR from the Client Portfolio or Proceedings. Such Assignment is effective as of the Assignment date.

**"Assignment Date"** means the date the event occurs where Proceeds from a Client Portfolio Case no longer are subject to a valid perfected security interest by the creditors listed in Schedule B, Exhibit B-1 Liens or Other Encumbrances On Payments Due To Transferor From Cases. Upon and simultaneously with the occurrence of such event, totally, unconditionally, exclusively, irrevocably and without the notice, TRANSFEROR grants TRANSFEREE the Assignment of Proceeds from such Client Portfolio Case. The Assignment Date is the same date as the Effective Date when, as of the Effective Date, a Client Portfolio Case is not secured by the creditors listed in Schedule B, Exhibit B-1.

**"Authorized Representative"** means a Person with binding authority to act on behalf of a Party; including but limited to the acceptance and execution of the Agreement, its Schedules, Exhibits, Modifications, Amendments, and such other supporting documents that may be required in accordance with the Agreement from time to time.

**"Bankrupt"** means a Person which has become the subject of an Order for Relief under the United States Bankruptcy Code, or has initiated, either in an original proceeding or by way of answer in any state insolvency or receivership proceeding, an action for liquidation arrangement, composition, readjustment, dissolution, or similar relief.

**"Case"** means Proceedings and Things in Action with respect to Clients, including all claims arising from the injury/incident/event including but not limited to a counter-claim, cross-claim, third party claim, whether

Copyright © 2015 Amalfi Management, LLC & Neoconomy, LLC. All Rights Reserved

individual or combined with any other claim, whether resolved by mediation, arbitration, or any other alternative dispute resolution method, whether resolved by jury trial, settlement, or any other formal or informal resolution method, and including all forms of compensation including punitive damages, compensatory damages, loss of consortium and/or companionship, economic and non-economic damages, future and present damages whether reduced to present day value or not.

**"Case Resolution"** means an absolute end to the lawsuit, litigation or settlement of a Client claim resulting in a Payment Intangible which generates proceeds.

**"Client"** means the Persons provided by TRANSFEROR with Cases which fees and expenses are or may become due payable to the TRANSFEROR as listed or from time to time may be added to the Client Portfolio as specified by Schedule B in accordance with the Agreement.

**"Client Portfolio" or "Portfolio"** means the Clients and their Cases consider incorporated into Schedule B in accordance with and subject to the terms and conditions of the Agreement.

**"Contingent"** means repayment by TRANSFEROR is based solely on the successful and possible future outcome of the Client Portfolio where no current asset exists.

**"Controlled Account"** means a checking or interest bearing account subject to instruction agreed to by the Parties in accordance with the Agreement and set-up to receive Proceeds in the TRANSFEROR's name. TRANSFEROR agrees not to use this account for any other purpose other than to receive, hold cash from Proceeds, and to disburse such cash subject to the terms and restrictions of the Agreement, including but not limited to Schedule A Exhibit A-4 Disbursement of Funds.

**"Default"** means the following:

I.     Failure to pay in accordance with the provisions of this Agreement, including but not limited to avoiding or attempting to circumvent payment to TRANSFEREE as Proceeds become available to TRANSFEROR;

II.    Abandonment of any Client by TRANSFEROR that results in no similar replacement Client approved by TRANSFEREE, unless such Client is specifically exempted in Schedule B from such requirement;

III.   TRANSFEROR ceases to or is restricted from operating as a law firm, the practice of law or disallowed from receiving or sharing Legal Fees;

IV.    TRANSFEROR or any Owner withdraws monies or otherwise transfer to or pledges to another Person any monies in the Controlled Account without the written authorization of the TRANSFEREE;

V.     Intentional non-disclosure or concealment of (a) information that could have a material adverse effect on the value of a Client's Case, such information shall include but is not limited to, liability issues, damages, causation or pre-existing conditions and/or medical conditions/treatments or any court rulings that could have an adverse effect on the value of the Case; (b) Legal fundings to TRANSFEROR that remain unpaid that were provided by other Legal Funding companies or an individual other than TRANSFEREE which provide money either before (non-disclosed fraud) or after this agreement (breach);

VI.    Loss of TRANSFEREE'S priority position, for any reason, to receive payments from the Client Portfolio or any portion thereof;

VII.   TRANSFEROR not timely notifying or failing to notify TRANSFEREE as required by the Agreement, including but not limited to Sections 3, 8 and 11 notification requirements;

VIII.  Fraudulent activities by the TRANSFEROR or named signatories to the Agreement;

IX.    TRANSFEROR fails to notice TRANSFEREE of any settlement of Client Portfolio or to provide the proper notice to any appropriate Person, including but not limited to court, settlement masters, defendants and their counsel, insurance companies or other Persons to establish and maintain any third party administrator services or other arrangement to providing

Copyright © 2015 Amalfi Management, LLC & Neoconomy, LLC. All Rights Reserved

Payments of Proceeds to TRANSFEREE as required by the Agreement, such that the TRANSFEREE's interests and payments are administrated for the benefit of the TRANSFEREE in accordance with the Agreement;

X.    Failure of TRANSFEROR to provide and direct co-counsel and other third parties or their Successor Persons who may receive Proceeds to irrevocably execute Instructions in accordance with Agreement;

XI.    The commencement of any Bankruptcy or insolvency proceeding by the TRANSFEROR or TRANSFEROR is found by court order to be insolvent or Bankrupt, whether through an involuntary or voluntary proceeding;

XII.    The commencement of any Bankruptcy or insolvency proceeding by any Owner where any Owner is found by court order to be insolvent or Bankrupt, whether through an involuntary or voluntary proceeding, which prevents the Transferor from bringing the Client Portfolio to final resolution and TRANSFEREE receiving TRANSFEREE Payments in accordance with the Agreement from such resolution;

XIII.    The appointment of a receiver to manage the assets of TRANSFEROR;

XIV.    Judgments against any Owner in excess of $100,000;

XV.    TRANSFEROR or any Owner who is an attorney is suspended or disbarred from the practice of law or otherwise suffers the loss of license or ability or right to practice law;

XVI.    The indictment, conviction or arrest of any owner for a serious crime, including but not limited to violent, property and financial crimes or commission of an act constituting common law fraud or any crime which could reasonably be expected to have an adverse impact on the TRANSFEROR, its business or assets;

XVII.    The death of any Owner that results in successor Person unacceptable to TRANSFEREE or cannot be accepted by all Parties;

XVIII.    TRANSFEROR approves changes to the creditor agreements listed in Schedule B, Exhibit B-2; or does not pay its obligations under and as required by such agreements.

XIX.    Any breach of the covenants representations, or warranties contained in this Agreement.

**"Effective Date"** the date the TRANSFEREE's authorized representative accepts and executes the Agreement as signed and accepted by TRANSFEROR's authorized representatives.

**"Equitable Lien"** arises from an express contract where the Parties indicate intent to charge particular property as security for an obligation. An equitable lien has (i) a debt or obligation owing by one person to another; (ii) a "res" or specific property to which the debt or obligation attaches; (iii) an intent, express or implied, that the property serve a security for the payment of the debt or obligation; and (iv) a lack of an adequate or complete remedy by an action at law. As a matter of contract law, an Equitable Lien becomes mature and legally enforceable with prior Notice to TRANSFEROR of the Legal Funding.

**"General Intangible"** means any personal property, including things in action, other than accounts, chattel paper, commercial tort claims, deposit accounts, documents, goods, instruments, investment property, letter of credit rights, letters of credit, money, oil, gas, or other minerals before extraction. The term includes Payment Intangibles and software.

**"Instructions"** means TRANSFEROR's irrevocable written directions, in accordance with the Agreement, given to third parties.

**"Lawsuit"** means a claim for damages that you possess against the defendant and the action that you have filed to collect damages from the Case Defendant(s).

**"Legal Funding"** means money pre-paid by TRANSFEREE to the TRANSFEROR in anticipation of TRANSFEROR'S receipt payment from certain future and pending Proceeds which may arise from settlement, judgment or other conclusion resulting from the Proceedings.

Copyright © 2015 Amalfi Management, LLC & Neoconomy, LLC. All Rights Reserved

**"Legal Fee"** means the portion of the Payments due to TRANSFEROR from Clients or co-counsels, including but not limited to any contingent, quantum meruit, or hourly rate fees, collected by TRANSFEROR or co-counsel from Proceeds, after deducting payments made to referring attorneys and associated outside counsel pursuant to a fee sharing agreement or arrangement (whether or not in writing) disclosed to the TRANSFEREE, which disclosure is incorporated into the Agreement prior to the Agreement Effective Date or approved in writing by TRANSFEREE after the Agreement effective date. For avoidance of doubt, if TRANSFEROR does not disclose such fee sharing agreement or arrangement as stated in this definition, then such payments that would have been made by TRANSFEROR from payments collected by TRANSFEROR from Proceeds made to referring attorneys and associated outside counsel pursuant to a fee sharing agreement or arrangement shall not be so paid and become a Payment due to TRANSFEREE in accordance with the Agreement.

**"Loan"** means a debt or obligation for which there is an absolute entitlement to repayment.

**"Owner"** means a Person which has ownership interest in the TRANSFEROR, such ownership interest may include, but not limited to a sole proprietor, partnership, membership or shareholder interest.

**"Monetary Obligation"** means an obligation to pay or receive money.

**"Payment"** means money or anything of value paid to satisfy obligations.

**"Payment Intangible"** means a general intangible under which the account debtor's principal obligation is a monetary obligation and the contractual right to payment is sufficiently liquidated.

**"Person"** means any natural person (if married, husband and wife), company, proprietorship, limited partnership, general partnership, limited liability partnership, limited liability corporation, corporation, joint venture, association, or other organization irrespective of whether it is a legal entity.

**"Proceeds"** means money, Payment Intangibles or anything of value that TRANSFEROR is due from Proceedings from any source, whether paid by single or multiple payors, including but not limited to payments from (i) the Client; (ii) co-counsel, any other third parties or their successor Persons; (iii) defendants and their law firms; (iv) claims processors; (v) insurers; (vi) trustees; and (vii) court stipulations.

**"Proceedings"** means any legal or civil claim for damages or any other compensation that Clients possess against the Case defendants or from Related Proceedings.

**"Related Proceedings"** means any claim or causes of action with the same or substantially the same operative facts or allegations arising out of the Proceedings including but not limited to filing in a different jurisdiction, adding additional Persons, and/or asserting a claim for legal malpractice, fraud, or breach arising from the handling or mishandling of the underlying Case.

**"Schedule"** means the attachments to the Agreement labeled "Schedule". Each Schedule may include the Schedule's associated Exhibit(s), e.g. Schedule A Includes Exhibits beginning with A-1; Schedule B includes Exhibits beginning with Exhibit B-1, and so on. A reference to a Schedule also is a reference to the Exhibits associated with such Schedule, unless such reference also specifies a Schedule's Exhibit, then such reference is to such Exhibit. All Schedules are incorporated within and part of the Agreement.

**"Thing in Action"** means any claim, debt or obligation upon which a future recovery may be made in Proceedings.

**"TRANSFEREE"** means the Person named as TRANSFEREE in the first paragraph of the Agreement.

**"TRANSFEROR"** means the Person referred to as the TRANSFEROR in the first paragraph of the Agreement.

Copyright © 2015 Amalfi Management, LLC & Neoconomy, LLC. All Rights Reserved

"**TRANSFEREE Payment**" means in the event TRANSFEROR receives Legal Fee Payments and expense reimbursement Payments from Proceeds, TRANSFEREE shall in accordance with the Agreement **receive 100% of such Payments**, including but not limited to the terms and conditions as set forth in Schedule A, until such time that TRANSFEROR has fully satisfied its Agreement obligations to TRANSFEREE; except if TRANSFEROR is in default of the Agreement, then TRANSFEROR shall pay all of such Payments to TRANSFEREE from the Proceeds from the Client Portfolio until TRANSFEROR has fully satisfied its Agreement obligations, including but not limited to satisfaction of remedies, penalties and all other payments that may become due to TRANSFEREE as a result of such TRANSFEREE Agreement Default. For the avoidance of doubt, the Monthly Maintenance Fee as stated in Schedule A Exhibit A-3 Monthly Maintenance Fees are paid from the TRANSFEREE's operating account are not TRANSFEREE Payments and do not reduced the amount owed by TRANSFEROR with respect to repayment of the Legal Funding and its accrued Premium as stated in Schedule A Exhibit A-1 Premium Accrual and Legal Funding Payment Obligation.

## RECITALS:

Whereas, TRANSFEROR has been retained as legal counsel in the Client Portfolio and has signed agreements with Clients and has or may in the future enter into co-counsel or other fee sharing agreements with other law firms or lawyers;

Whereas, TRANSFEROR is desirous of obtaining Legal Funding from TRANSFEREE to pay for it business purposes only including but not limited to Client costs and other associated expenses attendant to operating a law practice;

Whereas, TRANSFEROR is aware of the fees associated with Legal Funding and has considered all other alternative avenues of commercial funding including loans from banks and other Persons that lend money;

Whereas, TRANSFEROR desires to obtain this Legal Funding from TRANSFEREE pursuant to this Agreement in order to enable TRANSFEROR to acquire new Clients, better service TRANSFEROR'S Clients and pay for operating expenses during the pendency of the Client Portfolio and TRANSFEROR has no assets against which they can or desire to borrow;

Whereas, the Parties acknowledge that the ADMINISTRATOR has brought the Parties together solely for the business purposes contemplated by the Agreement; that the Parties recognized the ADMINISTRATOR and its affiliates have a unique and confidential business relationship with TRANSFEROR such that TRANSFEREE shall not conduct any further business with TRANSFEROR not specifically allowed by the Agreement or circumvent the Agreement to do so; the Parties desire the relationship between the Parties be administered by the ADMINISTRATOR such that all communications between the Parties shall be made through the ADMINISTRATOR and not directly between the parties unless otherwise stated in the Agreement;

Whereas, in order to afford TRANSFEROR sufficient funds to acquire new Clients, adequately service the Clients, to prosecute the Client Portfolio and carry on its operations, TRANSFEREE has agreed to provide Legal Funding for business purposes to TRANSFEROR in consideration for an equitable lien on, and Assignment of, the Proceeds which may arise from the Proceedings and any Payment Intangible arising from the Client Portfolio. TRANSFEREE acknowledges that the outcome of the Proceedings is uncertain, unpredictable, and involves risks beyond the Parties' control which could result in no payment or recovery of Proceeds by the TRANSFEROR against the Defendant(s) or others arising out of Proceedings; and

Whereas, TRANSFEROR and its duly authorized representative has authority to enter into this Agreement.

## COVENANTS:

Copyright © 2015 Amalfi Management, LLC & Neoconomy, LLC. All Rights Reserved

Now, THEREFORE, in consideration of the sum as stated in Schedule A and other good and valuable consideration, the receipt and acceptability of which is hereby acknowledged, TRANSFEREE and TRANSFEROR do hereby agree as follows:

1.      TRANSFEROR and TRANSFEREE hereby incorporate the Recitals and Definitions into the terms and conditions of this Agreement by this reference. TRANSFEROR acknowledges and agrees that the foregoing Recitals and Definitions are true and correct and, in particular, that TRANSFEROR has been informed by TRANSFEREE and is aware that alternative methods of financial assistance including, among others, credit card advances, bank loans, or personal loans from family or friends, may be available to TRANSFEROR and provide TRANSFEROR with more favorable rates, fees, repayment schedules, or other terms. Notwithstanding such alternative methods of financial assistance, TRANSFEROR acknowledges and agrees that obtaining Legal Funding from TRANSFEREE is voluntary, is in the best interest of TRANSFEROR, and will greatly assist TRANSFEROR to better service TRANSFEROR'S clients and pay expenses during the pendency of this Client Portfolio.

2.      TRANSFEROR agrees to the Assignment. TRANSFEROR warrants, represents, and covenants to TRANSFEREE that, as of the Effective Date TRANSFEROR shall not assign any right, title and interest in the future Proceeds or Payment Intangible from the Client Portfolio or any related proceedings to any other Person unless TRANSFEREE has approved and TRANSFEREE has approved in writing to such action by TRANSFEROR. TRANSFEROR also agrees to cause all Assigned Proceeds or Payment Intangible from the Client Portfolio or Proceedings to be paid to TRANSFEREE to the extent of the maximum amount referenced in Schedule A. TRANSFEROR has a valid (i) client retainer, (ii) co-counsel, or (iii) other fee sharing agreement on all Proceeds pledged in Schedule B and all such payment obligations to TRANSFEROR are fully disclosed, valid and enforceable.

3.      TRANSFEROR hereby also grants to TRANSFEREE a security interest in all General Intangibles, including any Thing in Action or Payment Intangible, associated with or arising from the Client Portfolio, Proceedings, or TRANSFEROR'S rights therein subject to an Assignment, to the extent of the maximum amount referenced in Schedule A to secure the conveyance and payments described in this Agreement. TRANSFEROR hereby authorizes and agrees to cooperate with TRANSFEREE to file a UCC1 Financing Statement, Consent Judgment if included in Agreement as a Schedule, and other documents as well as notifying any, co-counsels, appropriate courts, defendants, their counsels, insurance companies, settlement masters and other interested Persons as may be desired by TRANSFEREE to perfect its security interest in all such General Intangibles. TRANSFEROR acknowledges and agrees that this Agreement creates a contractual right for TRANSFEREE to receive TRANSFEREE Payment in accordance with the Agreement from future Proceeds and Payment Intangible from the Client Portfolio or Proceedings whenever any such Case or Proceeding settles or is reduced to a judgment and, as such, at that time, automatically and immediately becomes a perfected security interest in a Payment Intangible or an Account regardless of whether any UCC-1 Financing Statement is filed. TRANSFEROR acknowledges and agrees that at the time the TRANSFEROR'S Payment Intangible or becomes a perfected security interest, it then becomes Proceeds from which TRANSFEREE shall receive TRANSFEREE PAYMENT.

4.      TRANSFEROR understands the above-mentioned Legal Funding provided by the TRANSFEREE to be a pre-payment of TRANSFEROR's possible recovery of Proceeds or Payment Intangible and such Legal Funding shall be used exclusively for TRANSFEROR's business purposes. TRANSFEREE shall not provide funding until such time that all itemized TRANSFEREE's expenses have been reimbursed and all documents requested by TRANSFEREE are executed to the TRANSFEREE's satisfaction. TRANSFEREE acknowledges it is providing Legal Funding for the certain future Proceeds or Payment Intangible which may arise from the Proceedings.

When all amounts required to be paid to TRANSFEREE pursuant to the Agreement, have been paid in full, TRANSFEROR shall owe no additional payment to TRANSFEREE. TRANSFEROR understands and agrees that, in the event TRANSFEROR is paid settlement Proceeds from one of potential multiples sources or at multiple times (whether there are multiple defendants, claims or lawsuits, co-counsels or insurers), TRANSFEREE

Copyright © 2015 Amalfi Management, LLC & Neoconomy, LLC. All Rights Reserved

shall receive the TRANSFEREE Payment in accordance with the Agreement until TRANSFEREE is paid in full. In the event that such amounts paid to the TRANSFEREE are not sufficient to satisfy the amounts owed to TRANSFEREE and Client Cases remain unresolved, TRANSFEREE shall be entitled to continue to receive TRANSFEREE Payment which, upon receipt, such amount paid to the TRANSFEREE will be first applied to reduce the Premium until reduced to zero then the balance of such amount paid to the TRANSFEREE, if any, will be applied to reduce the Legal Funding until reduced to zero. TRANSFEROR may request in writing, after each such Payment, that TRANSFEREE prepare a revised Schedule A showing the remaining total balance owed by TRANSFEROR to TRANSFEREE.

If, at their sole discretion, both TRANSFEREE and the ADMINISTRATOR approve future Legal Fundings to TRANSFEROR and TRANSFEROR accepts such additional Legal Fundings, then, in addition to the TRANSFEREE Payment process defined in this section, Schedule A, Exhibit A-5 will determine the allocation of TRANSFEREE Payments among existing and such future additional TRANSFEROR Legal Fundings agreements. Such future fundings, if any, shall be agreed to by the Parties and may be incorporated into the Agreement as an amendment or by completion of a separate funding agreement. For the avoidance of doubt, TRANSFEREE Payments may be applied at the sole discretion of the TRANSFEREE to one, several or all TRANSFEROR Legal Fundings agreements with TRANSFEREE in accordance with such Legal Fundings agreements.

TRANSFEROR understands, acknowledges, and agrees that TRANSFEREE shall be entitled to receive TRANSFEREE Payments from any Proceeds or Payment Intangible in accordance with the Agreement until TRANSFEREE is paid in full for all amounts owed to TRANSFEREE under this Agreement. TRANSFEROR also understands acknowledges, and agrees that TRANSFEROR shall not dispose of, encumber, or pledge as security all or any portion of the Proceeds, Payment Intangible, or any other interest in the Client Portfolio or claims from Proceedings unless (i) TRANSFEREE has approved and TRANSFEREE has agreed to such subordination or disposal in Schedule B. or (ii) until TRANSFEREE is first paid in full for all amounts owed to TRANSFEREE under this Agreement.

5.      The Parties acknowledge and agree that this Agreement is expressly intended to transfer, convey and relinquish control over only a specified portion of the Proceeds which may result from the Client Portfolio or Proceedings. Prior to the resolution of any Case in the Client Portfolio, TRANSFEREE AND ADMINISTRATOR agree that they shall have no right to and will not make any decisions with respect to the conduct of the underlying civil actions or claims or any settlements or resolution thereof and that the right to make those decisions remains solely with TRANSFEROR.

6.      TRANSFEROR acknowledges that this lien in addition to an Assignment also becomes a mature, equitable lien enforceable under basic contract law and that any Court, a Settlement Master of a QSF, Third Party Administrator, co-counsel, the defendant's and/or their counsel or insurance company may be notified of this lien and could be requested to protect the interests of Transferee and/or disburse the Proceeds in accordance with the Agreement.

7.      TRANSFEROR acknowledges and agrees that the Legal Funding provided herein shall be used by TRANSFEROR only for business purposes which generally include expenses related to Cases and Proceedings, acquiring additional Cases, expenses associated with operating a law practice during the pendency of the Cases and payments as stated in the Agreement.

8.      TRANSFEROR understands and agrees to the following (i) timeframes to notice ADMINISTRATOR of specified events; and (ii) other specified conditions and actions:

(a) TRANSFEROR understands and agrees that it shall provide written notice to ADMINISTRATOR within five (5) business days if TRANSFEROR is (i) discharged, (ii) acquires co-counsel or other fee sharing arrangement, or (iii) otherwise relieved of its responsibilities to any Client(s) in any of the Cases or Proceedings and that TRANSFEROR'S obligations under this Agreement shall remain in full force and effect.

Copyright © 2015 Amalfi Management, LLC & Neoconomy, LLC. All Rights Reserved

(b) TRANSFEROR understands and agrees that it shall provide written notice to ADMINISTRATOR within five (5) business days if the creditor agreements listed in Schedule B, Exhibit B-2 (i) have been changed or modified; (ii) the TRANSFEROR requests or is made aware of a request to change or modify such agreements; (iii) TRANSFEROR does not pay amount due under and as required by such agreements; or commits an act that is a default of any such agreement.

(c) TRANSFEROR understands and agrees that it shall provide written notice to ADMINISTRATOR within five (5) business days in the event any attorney who is a partner, shareholder, member, employee or associate counsel of TRANSFEROR leaves the TRANSFEROR, whether voluntarily or by resignation, dismissal, retirement or otherwise; and that any Proceeds which may result from the Client Portfolio or Proceedings that may be claimed by such attorney shall remain the property of the TRANSFEROR unless such requirement contradicts an agreement between such attorney and the TRANSFEROR, or in absence of such an agreement, such requirement is determined to be professionally unethical by the Parties. For the avoidance of doubt, regardless of the foregoing, TRANSFEROR agrees that no portion of said Proceeds shall be released, paid, or distributed to said attorney until all Legal Fees from said Client have been paid in full to TRANSFEREE in accordance with the Agreement. TRANSFEREE'S security interest in the Proceeds and Payment Intangible shall also continue unaffected by TRANSFEROR'S discharge of such attorney.

(d) TRANSFEROR understands and agrees (i) TRANSFEROR shall be responsible to keep ADMINISTRATOR apprised of the status of all Clients and their Cases; (ii) that TRANSFEROR shall provide written notice to ADMINISTRATOR within five (5) business days in the event that a Client is no longer is represented by the TRANSFEROR or TRANSFEROR's co-counsel for any reason other than the Client's Case is settled or resolved, and TRANSFEROR shall immediately replace the Client's (unless such Client is specifically exempted in Schedule B from such requirement) with Client's with Cases of like kind and value acceptable to the TRANSFEREE such that TRANSFEREE will be placed in the same or similar position as TRANSFEREE prior to loss of such Client; (iii) TRANSFEREE shall have the right in accordance with this Agreement to protect its interest in such Clients and their Cases though all legal remedies including, but not limited to, notifying any attorneys or Persons involved in the continuation of the Client's Case ensuring that TRANSFEREE receives all amounts due to TRANSFEREE in accordance with the Agreement; and (iv) TRANSFEROR shall also take any action and sign any document reasonably requested by TRANSFEREE to enable TRANSFEREE to protect and enforce TRANSFEREE's rights under this Agreement with respect to any new attorney or creditor of such Client.

(e) TRANSFEROR understands and irrevocably agrees that it shall (i) provide written notice to ADMINISTRATOR within 48 hours in the event TRANSFEROR is unable to practice law for any reason (ii) upon such event, all Client Portfolio Clients will be referred by TRANSFEROR or by TRANSFEROR's successor controlling Person or Persons in accordance with the Succession Agreement Schedule or, if unable to perform such Succession Agreement to the TRANSFEREE's sole satisfaction, then to other counsel acceptable to TRANSFEREE, which shall become the counsel for TRANSFEROR's Clients upon Clients' acceptance of such counsel, however such referral shall not become effective and operative if there is a successor Person to the TRANSFEROR which is acceptable to the TRANSFEREE, provided such Person agrees to be bound by, empowered to and able to fully comply with the Agreement. The TRANSFEREE shall not refuse a reasonable successor Person, who in the opinion of the TRANSFEREE is qualified to fully execute the terms and conditions of the Agreement.

(f) TRANSFEROR agrees to release to ADMINISTRATOR, within 48 hours after request by ADMINISTRATOR unless ADMINISTRATOR agrees to a written extension, any/all information, files, records and documents for the duration of this Agreement regarding the subject matter and status of any Client and their Case, except TRANSFEROR shall not be required to release those portions of a Client's file which are subject to a confidentiality agreement that prohibits TRANSFEROR from forwarding copies of such Case files or disclosing the same to the ADMINISTRATOR unless ADMINISTRATOR complies with the confidentiality requirements to release such information to the

Copyright © 2015 Amalfi Management, LLC & Neoconomy, LLC. All Rights Reserved

ADMINISTRATOR. To the extent ADMINISTRATOR or TRANSFEREE receives information deemed confidential by TRANSFEROR then ADMINISTRATOR or TRANSFEREE shall treat such information as confidential and shall receive and review these materials solely in the limited capacity necessary for the initial review and underwriting process as well as the ongoing execution and maintenance of this Agreement. In that regard, TRANSFEROR shall make available to ADMINISTRATOR the files for all of the Clients and their Cases upon reasonable notice so that ADMINISTRATOR can perform an onsite audit of each Case if ADMINISTRATOR elects to do so. The cost of such audit shall be reimbursed by TRANSFEROR. Furthermore, TRANSFEROR shall immediately notify ADMINISTRATOR by both fax at (480) 522-1199 or phone at (480) 515-3698 of any settlement, judgment, appeal or verdict or other conclusion of any of the Cases or other related proceedings in order for TRANSFEREE to take any action reasonably required by TRANSFEREE to protect and enforce TRANSFEREE'S rights under this Agreement. TRANSFEROR further agrees to provide TRANSFEROR's annual Financial statements (audited or unaudited) for each year the Legal Funding is outstanding to ADMINISTRATOR. Within fourteen days of request, TRANSFEROR will provide all related bank statements and trust account statements for each month that the Legal Funding is outstanding to ADMINISTRATOR. Nothing in this paragraph will require the TRANSFEROR to produce any confidential information, attorney-client information, work product information or any other Client information deemed to be prohibited by the applicable code of legal ethics.

(g) TRANSFEROR understands and agrees that it shall provide written notice to ADMINISTRATOR within 5 business days after a Client has entered into a Master Settlement Agreement or otherwise has agreed to a settlement; and then TRANSFEROR shall insure all Proceeds including amounts due to TRANSFEREE are collected in accordance with the Agreement, including but not limited to Schedule A.

(h) TRANSFEROR understands and agrees that it shall provide reports to ADMINISTRATOR, upon ADMINISTRATOR's request, in a form acceptable the ADMINISTRATOR and within 5 days after such request unless such timeframe is extended by the ADMINISTRATOR. Unless otherwise agreed to by ADMINISTRATOR, the TRANSFEROR shall send a report to ADMINISTRATOR detailing all the Client Cases and their Proceedings showing the current status of each Case, whether any settlement discussions have taken place, whether any offers have been made, and when TRANSFEROR anticipates that each Case will resolve. If TRANSFEREE learns that the report has material errors or omissions, TRANSFEREE may proceed as if a Default has occurred.

(i) TRANSFEROR understands and agrees that ADMINISTRATOR may audit the client Case portfolio twice per year unless TRANSFEROR is default of the Agreement, then ADMINISTRATOR may audit the client Case portfolio more frequently as requested by TRANSFEREE until such time the default is cured. Such audits may require review of Case information at the TRANSFEROR's site and typical travel and related costs for such audits shall be paid by the TRANSFEROR as required by the ADMINISTRATOR.

(j) TRANSFEROR understands and agrees that the Legal Funding advanced by TRANSFEREE to TRANSFEROR has been provided for TRANSFEROR's business purposes and TRANSFEROR shall exclusively and only use such funding for business purposes.

(k) TRANSFEROR acknowledges and agrees each and all Schedules, Exhibits, addendums or other attachments attached to this Agreement and referred to herein is hereby incorporated in this Agreement by reference. TRANSFEROR also agrees to execute each for the foregoing Schedules where indicated and required and that they are doing so voluntarily, freely, and without duress. TRANSFEROR agrees that by executing the Agreement, TRANSFEROR does so with prior knowledge of the Agreement and its Schedules, Exhibits, addendums or other attachments. TRANSFEROR understands and agrees that the executed Agreement with each of the executed Schedules needs to be provided to ADMINISTRATOR for TRANFEREE's review and decision to accept or not accept the Agreement where such decision is at the sole discretion of the TRANSFEREE.

Copyright © 2015 Amalfi Management, LLC & Neoconomy, LLC. All Rights Reserved

9.      By signing this Agreement, TRANSFEROR warrants, represents, and covenants to TRANSFEREE that TRANSFEROR (i) has not filed a personal or business Bankruptcy within the previous two years; (ii) is not currently in the process of filing any form of Bankruptcy; and (iii) has not consulted with a counsel concerning personal or TRANSFEROR Bankruptcy within the previous 365 days, unless such consultation has been disclosed in writing to the TRANSFEREE. In the event that TRANSFEROR files any Bankruptcy proceeding subsequent to entering into this Agreement, TRANSFEROR shall promptly notify ADMINISTRATOR of that fact in writing. In addition, if the TRANSFEROR files Bankruptcy proceedings prior to the payoff of all amounts required to be paid to TRANSFEREE pursuant to this Agreement, TRANSFEROR agrees to notify the Bankruptcy court that the TRANSFEROR previously assigned the Client Portfolio Proceeds to the extent of the maximum amount stated in Schedule A pursuant to this Agreement, that TRANSFEROR no longer owns those Proceeds and that those Client Portfolio Proceeds to the extent of the maximum amount referenced in Schedule A are not available as part of any Bankruptcy estate, and that TRANSFEREE is a secured creditor and has a priority position to the Client Portfolio Proceeds superior to any other creditor as a result of this Agreement unless TRANSFEREE has approved and TRANSFEREE has agreed to such subordination in Schedule B. TRANSFEROR acknowledges and agrees that TRANSFEREE has provided Legal Funding(s) to TRANSFEROR in return for TRANSFEROR'S Assignment of the Client Portfolio Proceeds and that TRANSFEROR's obligations to TRANSFEREE pursuant to this Agreement shall not be discharged, voided, or reduced in any way as a result of any Bankruptcy proceeding.

10.     TRANSFEROR acknowledges TRANSFEREE and ADMINISTRATOR initially authored the Agreement. TRANSFEROR acknowledges it is a law firm with resources and legal knowledge to review and interpret the Agreement or to seek qualified counsel to do so. Moreover, all terms of the Agreement were subject to negotiation between the Parties, with the final terms representing a meeting of the minds. Thus TRANSFEREE and ADMINISTRATOR are not the draftsmen of the Agreement and the rule of construction that ambiguities be resolved against the draftsmen do not apply to TRANSFEREE, TRANSFEROR or ADMINISTRATOR. TRANSFEREE, TRANSFEROR and ADMINISTRATOR shall keep the Agreement confidential except (i) between the Parties, their advisers who may be involved with the transactions contemplated by the Agreement provided such advisors are not in the business of providing legal funding or related services; (ii) under a confidentiality agreement in support of due diligence requests with respect to the TRANSFEREE's business activity; (iii) as required by law, regulatory requests; or to the extent any such information has become available in public domain. Any unauthorized use, reproduction, or transmittal of the Agreement whatsoever shall constitute copyright infringement and shall render the infringer liable to prosecution under the law. Attorneys, their firms and all employees of the firm are issued a 'Limited Use Permit' to use the Agreement to complete the process of the Legal Funding from the initial gathering of client information to the final execution of this Assignment and Consensual Equity Lien and Security Agreement. All file documents created by TRANSFEREE and ADMINISTRATOR shall be considered Amalfi Management, LLC and Neoconomy, LLC Proprietary Intellectual Property and confidential by all Parties and ADMINISTRATOR involved in this Agreement including the processes leading to approving the TRANSFEROR for a Legal Funding. Further, if the Legal Funding contemplated by this Agreement is made subsequent to a prior Legal Funding, the date of this Legal Funding shall relate back to the date of the first Legal Funding for purposes of establishing priority of payment. In addition, the Parties agree that any prior agreements shall be controlled by any subsequent change in the language of this Agreement to the extent the prior agreement(s) conflicts.

11.     This Agreement constitutes the entire agreement between the Parties. There are no representations, warranties, covenants, or obligation except as set forth herein. This Agreement supersedes all prior agreements, understandings, negotiations and discussions, written or oral, of the Parties, relating to any transaction contemplated by this Agreement. This Agreement shall be binding on and inure to the benefit of the Parties, their heirs, trustees, executors or any other successor-in-interest including another co-counsel who may obtain or assert control over the TRANSFEROR's assets for any reason including but not limited to disability (physical or mental), a decline in health or death. Also by executing the Agreement, TRANSFEROR, at the request of TRANSFEREE with approval from the ADMINISTRATOR, agrees to exercise a Power of Appointment with which TRANSFEROR and/or any representative of TRANSFEROR will be empowered to the extent necessary to complete the Transfer that is the subject of this agreement. In the

Copyright © 2015 Amalfi Management, LLC & Neoconomy, LLC. All Rights Reserved

event one or more of the covenants, terms or conditions of this Agreement shall for any reason be held to be invalid or unenforceable in any respect, such invalidity or unenforceability shall not affect the validity, liability, or enforceability of any other covenant, term or condition in this Agreement.

12.    TRANSFEROR represents, warrants, and covenants unto TRANSFEREE that, as of the date of this Agreement,

(a)   The Client Portfolio Cases and Proceedings to be meritorious and executed in good faith;

(b)   TRANSFEROR Clients have complete right, title and interest in and to the claims set forth in Client Portfolio and Proceedings and TRANSFEROR has received no money, anything else of value, entered into an undisclosed agreement or taken any undisclosed action that would diminish the value of any the Client Cases;

(c)   TRANSFEROR has not assigned or encumbered the Proceeds, Payment Intangible, or any other similar rights or assets from the Client Portfolio or other related proceedings, other than agreed to and so specified in the Agreement;

(d)   TRANSFEROR stipulates that all amounts required to be paid to TRANSFEREE pursuant to this Agreement are not subordinated to any other liens or claims of any other Person other than agreed to and so specified in the Agreement;

(e)   TRANSFEROR shall have the obligation to cure or remedy any unintentional breach of (a) through (d) of this section by replacing Cases, unless such Case is specifically exempted in Schedule B from such requirement, in the Client Portfolio with similar Cases of like kind and value acceptable to the TRANSFEREE within ten days of the TRANSFEROR's communication of such breach to ADMINISTRATOR. The cure will only be effective after TRANSFEREE, at its sole, discretion, accepts the replacement Cases in writing.

(f)   All current liens, assignments, co-counsel agreements and fee sharing arrangements, encumbrances or security interest of any kind or nature in or relating to Proceeds, Payment Intangible, or any other similar rights or assets from the Client Portfolio or Proceedings are listed in Schedule B;

(g)   All Agreement financial and other terms have been are accurately and clearly stated by TRANSFEREE to TRANSFEROR;

(h)   TRANSFEROR, to the extent required by the Agreement to be completed at time of closing, shall in accordance with the Agreement instruct co-counsels, Defendants, their insurers and counsel, third party administrators, escrow agents and settlement administrators to honor the provisions regarding payment of Client Portfolio proceeds as set forth in the Agreement such that there are no other agreements verbal, electronic or otherwise that modify such payment terms;

(i)   TRANSFEROR has paid all of its federal, state, and local taxes through the date of execution of this agreement or has made and disclosed provisions for the payment;

(j)   TRANSFEROR has disclosed to TRANSFEREE all material information about the Clients and their Cases as requested by the TRANSFEREE;

(k)   There are no Bankruptcy or insolvency actions in progress involving TRANSFEROR, any equity holder of TRANSFEROR or Persons with controlling interests of such equity holder;

(l)   All financial disclosures made to TRANSFEREE are complete and fairly characterize the financial position of TRANSFEROR;

Copyright © 2015 Amalfi Management, LLC & Neoconomy, LLC. All Rights Reserved

(m) TRANSFEROR and all of its lawyers representing TRANSFEROR's Clients are in compliance with Bar, state and federal regulations to practice law and have not been indicted on any matters related to the practice of law, or are not presently subject to any investigation for any material disciplinary action by any state or federal court or authority (including any attorney registration & disciplinary commission or independent bar association) with regulatory powers or duties over attorneys;

(n) TRANSFEROR has full power and authority to make, execute, and perform this Agreement;

13.     TRANSFEROR hereby waives any defenses to payment of all amounts required to be paid to TRANSFEREE pursuant to this Agreement. TRANSFEROR understands the Agreement's Instructions regarding payments due TRANSFEREE and such Instructions under this Agreement are irrevocable without which TRANSFEREE would not have agreed to provide the Legal Funding. TRANSFEROR hereby agrees to make Payments in amounts that are in full and complete compliance with this Agreement and not to seek to avoid payment of any such amounts by interfering with payment of or encouraging, cooperating with, instructing, or authorizing any Person to delay payment or not to pay or distribute any Proceeds from the Client Portfolio or Proceedings as required by the Agreement. TRANSFEROR shall also further cooperate with TRANSFEREE in procuring payment of all amounts required to be paid to TRANSFEREE under this Agreement.

14.     In the event that TRANSFEROR terminates, materially defaults or otherwise breaches the covenants, conditions or terms of this Agreement, and fails to cure such Default in accordance with the Agreement, TRANSFEREE shall at its discretion exercise any or all remedies available to enforce the Agreement and to collect all amounts due TRANSFEREE, including but not limited to recovering costs from TRANSFEROR of amounts for attorney fees and other expenses to make TRANSFEREE whole. TRANSFEROR expressly acknowledges that in the event of termination or Default which is not or cannot be cured in accordance with the Agreement, the anticipated loss to TRANSFEREE in such an event will be estimated to be the amount set forth as liquidated damages and such estimated value is reasonable and not imposed as a penalty. The Parties agree that liquidated damages to TRANSFEREE shall be in the amount of 20% of the Schedule A total amounts due to TRANSFEREE which shall be in addition to the total amount due TRANSFEREE as set forth in Schedule A.

15.     Any and all claims, counterclaims, demands, causes of action, disputes, or controversies under this Agreement or the alleged breach of any provision hereof (all of which are referred to as "Disputed Claims"), whether such Disputed Claims arise at law or in equity, under US state or federal law, or the law of any other nation or state, for damages or any other relief, shall be resolved in the manner set forth below:

(a) The Parties to this Agreement agree that all Disputed Claims, which shall include any dispute, controversy or claim that may arise between or among them in connection with, arising out of, or otherwise relating to this Agreement or the application, implementation, validity or breach of this Agreement or any provision of this Agreement (including, without limitation, claims based on contract, tort or statute), shall be finally, conclusively and exclusively settled by binding arbitration in Phoenix, Arizona in accordance with the arbitration rules (the "Rules") of the National Arbitration Forum (NAF) or JAMS or any successor thereto then in effect. **THE PARTIES HEREBY EXPRESSLY WAIVE THEIR RIGHT TO SEEK REMEDIES IN COURT, INCLUDING THE RIGHT TO TRIAL BY JURY, WITH RESPECT TO ANY MATTER SUBJECT TO ARBITRATION PURSUANT TO THIS AGREEMENT. THE PARTIES AGREE THAT THERE SHALL BE NO AUTHORITY FOR ANY CLAIMS TO BE ARBITRATED ON A CLASS ACTION OR PRIVATE ATTORNEY GENERAL BASIS. FURTHERMORE, ARBITRATION CAN ONLY DECIDE EACH PARTY'S CLAIMS AND MAY NOT CONSOLIDATE OR JOIN THE CLAIMS OF OTHER PERSONS THAT MAY HAVE SIMILAR CLAIMS.** Any Party may bring an action, including, without limitation, a summary or expedited proceeding in any court having jurisdiction, to compel arbitration of any dispute, controversy or claim to which the provisions hereof apply. The initiation and conduct of arbitration shall be as set forth in the Rules, which Rules are incorporated in this Agreement by reference with the same effect as if they were set forth in this Agreement.

Copyright © 2015 Amalfi Management, LLC & Neoconomy, LLC. All Rights Reserved

(b) The arbitration shall be administered by the NAF or JAMS. If the NAF and JAMS is unable or legally precluded from administering the arbitration, then the Parties shall agree upon an alternative arbitration organization, provided that, if the Parties cannot agree, such organization shall be selected by a judge of the United States District Court for the District that includes Phoenix, Arizona.

(c) All arbitration hearings shall be commenced within thirty (30) days after arbitration is initiated pursuant to the Rules, unless, upon a showing of good cause by a Party to the arbitration, the arbitrator permits the extension of the commencement of such hearing; provided, however, that any such extension shall not be longer than thirty (30) days.

(d) All claims presented for arbitration shall be particularly identified and the Parties to the arbitration shall each prepare a statement of their position with recommended courses of action. These statements of position and recommended courses of action shall be submitted to the arbitrator. The arbitrator shall not be empowered to make decisions beyond the scope of the position papers.

(e) The arbitration proceeding will be governed by the substantive laws of the State of Arizona and will be conducted in accordance with such procedures as shall be fixed for such purpose by the arbitrator. The Parties shall preserve their right to assert and to avail himself of the attorney-client and attorney-work product privileges, and any other privileges to which they may be entitled pursuant to applicable law. No Party to the arbitration or any arbitrator may compel or require mediation and/or settlement conferences without the prior written consent of all such Parties and arbitrator.

(f) The arbitrator shall make an arbitration award as soon as possible after the later of the close of evidence or the submission of final briefs, and the award shall be made not later than thirty (30) days following submission of the matter. The finding and decision of the arbitrator shall be final and shall be binding upon the Parties. Judgment upon the arbitration award or decision may be entered in any court having jurisdiction thereof or application may be made to any such court for a judicial acceptance of the award and an order of enforcement, as the case may be. The arbitrator shall have the authority to assess liability for pre-award and post-award interest on the claims, attorneys' fees, expert witness fees and all other expenses of arbitration as such arbitrator shall deem appropriate based on the outcome of the claims arbitrated. Unless otherwise agreed by the Parties to the arbitration in writing, the arbitration award shall include findings of fact and conclusions of law.

(g) **EACH PARTY UNDERSTANDS AND AGREES THAT (i) THIS AGREEMENT CONTAINS THE REQUIREMENT TO ARBITRATE WITH RESPECT TO ANY DISPUTE OR NEED OF INTERPRETATION OF THIS AGREEMENT; (ii) EACH PARTY WILL NOT BE ABLE TO BRING A LAWSUIT AGAINST THE OTHER PARTY; (iii) THERE SHALL BE NO AUTHORITY FOR ANY CLAIMS TO BE ARBITRATED ON A CLASS ACTION OR PRIVATE ATTORNEY GENERAL BASIS; AND (iv) ARBITRATION CAN ONLY DECIDE THE PARTIES' CLAIMS AND MAY NOT CONSOLIDATE OR JOIN THE CLAIMS OF OTHER PERSONS THAT MAY HAVE SIMILAR CLAIMS.**

(h) TRANSFEROR understands that the "choice of laws", "forum", and "venue" clauses are critical in nature, and are essential to this Contract, and that they have not been placed in this Contract as mere "form" insertions and recitals.

(i) TRANSFEROR agrees to have all disputed amounts placed into an escrow account separate from the law firm's trust fund account until the dispute is resolved. The prevailing Party in the dispute shall be entitled to recover reasonable attorney fees, filing fees and costs associated with the efforts to collect.

16.     TRANSFEREE's rights and obligations under this agreement may be assigned, provided such assignment is approved in writing by the ADMINISTRATOR, without the consent of TRANSFEROR. TRANSFEROR's rights and obligations under this Agreement may not be assigned or transferred (whether

Copyright © 2015 Amalfi Management, LLC & Neoconomy, LLC. All Rights Reserved

voluntarily, by operation of law or otherwise) without the written consent of TRANSFEREE and ADMINISTRATOR, except for transfer by intestate due to TRANSFEROR'S death in which case TRANSFEROR's heirs, estate, executors and personal representatives will be bound by this Agreement. TRANSFEROR agrees that TRANSFEREE may share information that TRANSFEREE obtained about TRANSFEROR (whether from TRANSFEROR or any other Person) with potential assignees to whom TRANSFEREE may assign its rights and obligations under this Agreement, where such information is reasonably necessary to allow a potential assignee to make an informed decision whether to take assignment from TRANSFEREE, provided that TRANSFEREE enters into an appropriate confidentiality agreement with any such potential assignee.

17.     TRANSFEROR also understands and agrees that this agreement will be interpreted under Arizona law and that absent TRANSFEROR'S agreement to Arizona law, TRANSFEREE would not have entered into this Agreement.

18.     To the extent that TRANSFEROR engaged a consultant to assist in obtaining the legal funding, TRANSFEROR confirms and agrees that the consultant is an independent contractor and not an employee of TRANSFEREE, has no right or authority to bind TRANSFEREE, and TRANSFEREE and ADMINISTRATOR is not liable for any statements made by consultant. All commissions due consultant are owed by TRANSFEROR to consultant. If requested by TRANSFEROR, TRANSFEREE may, at TRANSFEREE's discretion, agree to pay TRANSFEROR's obligations owed consultant and, if so agreed by TRANSFEREE, TRANSFEROR consents to increasing the total amount to be funded to and owed by the TRANSFEROR by the amount TRANSFEREE agrees to pay consultant at TRANSFEROR's request.

19.     TRANSFEROR shall pay TRANSFEREE per the terms of this Agreement as presented in Schedule A. Any Payments made from the Legal Funding by TRANSFEREE on behalf of TRANSFEROR shall accrue Premium at the same Premium Rate as the balance of the Legal Funding. Premium shall accrue on the aggregate amount of the Legal Funding to TRANSFEROR. Payments made on behalf of TRANSFEROR from Legal Funding advanced to TRANSFEROR by TRANSFEREE shall be used only for business purposes and may include, but are not limited to payments due to TRANSFEREE, independent consultants referring TRANSFEROR to TRANSFEREE, banks, other funding Persons, lien holders and other business services or product providers which are specified by the Agreement to be paid. TRANSFEREE is not obligated to pay such expenses on behalf of TRANSFEROR but may agree to do so selecting any one or more of such expenses for any reason, and in doing so it may elect to consider only its own interests and will not be required to consider the effect of any such closure on TRANSFEROR under the Agreement.

20.     **Notices.** All notices authorized or required to be given pursuant to this Agreement shall be given in writing and either personally served on the Party to whom given with copy to ADMINISTRATOR, mailed postage prepaid, or sent by email or facsimile transmission (and also mailed within 24 hours thereafter), addressed to the Party's address, email address or facsimile number as it appears on the books of the Company. All notices shall be deemed given when personally delivered or, if mailed as provided in this section, on the second day after the date of mailing, or if sent by email or facsimile transmission, 24 hours after the time of dispatch.

Any Party and ADMINISTRATOR may change his address for the receipt of notices at any time by giving written notice thereof to Manager and the other Members in accordance with the terms of this section. The inability to deliver notice because of a changed address of which no notice was given, or the rejection or other refusal to accept any notice, shall be deemed to be the effective receipt of the Notice as of the date of such inability to deliver or the rejection or refusal to accept. Any notice to be given by any Party herein may be given by an agent for such Party.

Notification and other communication shall be sent to the Parties as follows:

        Notification or other communication required in writing:
          TRANSFEREE (send to ADMINISTRATOR): ALF Operations, Attn: DGMGT AZ LLC, 17700 North
          Pacesetter Way Scottsdale, AZ 85255

Copyright © 2015 Amalfi Management, LLC & Neoconomy, LLC. All Rights Reserved

TRANSFEROR: Girardi/Keese, 1126 Wilshire Blvd, Los Angeles, CA 90017-1904
Other communications:
ADMINISTRATOR:
Phone: (480) 563-0087 Email: ahald@alfoperations.com Fax: (480) 522-1199
TRANSFEROR:
Phone: (213) 977-0211 Email: tgirardi@girardikeese.com Fax: 213-481-1554

21.    **Severability.** Every provision of this Agreement is intended to be severable. If any term or provision is illegal or invalid for any reason whatsoever, such illegality or invalidity shall not affect the validity or legality of the remainder of this Agreement.

22.    **Parties and Successors in Interest**. Nothing in this Agreement, whether expressed or implied, is intended to confer upon any Person other than the Parties hereto and their respective heirs, representatives, successors and permitted assigns any rights or remedies under or by reason of this Agreement. Except as otherwise provided herein, all provisions of this Agreement shall be binding upon, inure to the benefit of, and be enforceable by and against the respective heirs, representatives, successors and permitted assigns of any of the Parties to this Agreement.

23.    **Entire Agreement**. This Agreement constitutes the entire agreement among or between the Parties, and supersedes any prior understandings and agreements, whether written or oral, with respect to the subject matter hereof.

24.    **Representation.** Each Party has been advised to obtain independent representation in connection with this Agreement

25.    **Counterparts**. This Agreement may be executed in counterparts, all of which taken together shall be deemed one original.

**IF THE AGREEMENT CONTAINS ANY BLANK SPACES WHICH ARE NOT INDICATED TO BE COMPLETED BY THE PARTIES, THIRD PARTIES OR NOTARY, TRANSFEROR IS ENTITLED TO A COMPLETELY FILLED IN COPY BEFORE TRANSFEROR SIGNS THE AGREEMENT. TRANSFEROR SHOULD OBTAIN THE ADVICE OF AN ATTORNEY. DEPENDING ON THE CIRCUMSTANCES, TRANSFEROR MAY WANT TO CONSULT A TAX, PUBLIC OR PRIVATE BENEFIT PLANNING, OR FINANCIAL PROFESSIONAL. TRANSFEROR ACKNOWLEDGES THE TRANSFEREE AND ADMINISTRATOR HAAVE PROVIDED NO TAX, PUBLIC OR PRIVATE BENEFIT PLANNING, OR FINANCIAL ADVICE REGARDING THIS TRANSACTION. TRANSFEROR HAS REVIEWED THE AGREEMENT IN ITS ENTIRETY PRIOR TO SIGNING AND HEREBY ACKNOWLEDGES THAT TRANSFEROR UNDERSTANDS THE TERMS OF THE AGREEMENT INCLUDING THAT THEAGREEMENT CONTAINS ARBITRATION PROVISIONS WHICH MAY BE ENFORCED BY THE PARTIES.**

### [SIGNATURES ON FOLLOWING PAGE]

Copyright © 2015 Amalfi Management, LLC & Neoconomy, LLC. All Rights Reserved

**Agreed and accepted on behalf of TRANSFEROR**

_____ Date: 3 / 31 /2016
**Signature of Thomas V. Girardi; its Authorized Representative to sign on behalf of Girardi & Keese, a California General Partnership dba Girardi/Keese**

**NOTARY**

STATE _California_   COUNTY _Los Angeles_

On this _31st_ day of _March_, 2016, before me personally came, the persons, Thomas V. Girardi who signed the foregoing LAW FIRM LEGAL FUNDING, CONSENSUAL EQUITABLE LIEN, ASSIGNMENT AND SECURITY AGREEMENT known to me personally to be such, and acknowledged that the above is her act and deed and that the facts stated herein are true.

_____ My Commission Expires: _May 15, 2019_
Notary Public

SHIRLEEN H. FUJIMOTO
COMM. # 2107442
NOTARY PUBLIC • CALIFORNIA
LOS ANGELES COUNTY
Comm. Exp. MAY 15, 2019

**On behalf of TRANSFEREE**

_____ Date: 04 / 01 /2016
**Signature of Jay Holland, Member and Authorized Representative of Stillwell Madison, LLC**

**On behalf of ADMINISTRATOR**

_____ Date: 04 / 01 /2016
**Signature of Alan Hald, Authorized Representative of DGMGT AZ, LLC**

Copyright © 2015 Amalfi Management, LLC & Neoconomy, LLC. All Rights Reserved

# SCHEDULE A - FUNDING APPROVAL AND REPAYMENT SCHEDULE

TRANSFEREE has approved Legal Funding for TRANSFEROR in the estimated funding amount of **$5,110,440.38**, as stated in Schedule C Client Funding Disclosure. Prior to funding, with disclosure to TRANSFEREE, such funding amount and associated fees and payments may be adjusted or corrected by TRANSFEROR. TRANSFEROR agrees to accept such funding as disclosed in Exhibit A-1 and related conditions as discussed and disclosed in Exhibits A-2, A-3, A-4 and A-5 to Schedule A.

**TRANSFEROR agrees that any and all TRANSFEREE Payments shall be made to TRANSFEREE, in accordance with the Agreement including but not limited to:**

    a.  Having all Proceeds received into a controlled bank account which shall be the TRANSFEROR's trust account separate from the attorney's own funds where such trust account is in conformance with the State Bar of California Rules of Professional Conduct Rule 4-100 Preserving Identity of Funds and Property of a Client.

    b.  In accordance with the Agreement, TRANSFEROR shall make Payments to TRANSFEREE from the TRANSFEROR's trust account.

    c.  With respect to each Legal Funding, unless TRANSFEREE Payments have satisfied the TRANSFEROR's obligations to TRANSFEREE, TRANSFEREE shall be entitled to receive TRANSFEREE Payment which, upon receipt, such amount paid to the TRANSFEREE will be first applied in accordance with the Agreement to reduce the Premium owed until reduced to zero then the balance of TRANSFEREE Payment, if any, will be applied in accordance with the Agreement to reduce the Legal Funding until reduced to zero. TRANSFEROR may request in writing, after each such Payment, that ADMINISTRATOR prepare a new Schedule A showing the remaining total balance owed by TRANSFEROR to TRANSFEREE.

For the avoidance of doubt, TRANSFEREE Payments shall include but not be limited to, (i) all Legal Fees and expense reimbursement due to TRANSFEROR in accordance with the Agreement (ii) all Payments due to TRANSFEROR from co-counsel and any other fee sharing arrangements, plus (iii) all other Payments due to TRANSFEROR where such payments are from co-counsel representing Clients or administrative Persons facilitating Payments to Clients which are disclosed in Schedule B-1 List of Clients but where such Payments are not allocated to specified Clients.

Provided TRANSFEROR is not in Default of the Agreement, TRANSFEROR, may deduct from TRANSFEREE Payments, (i) TRANSFEROR's third party payment obligations contracted by the TRANSFEROR in writing which have been disclosed in writing to the TRANSFEREE prior to TRANSFEREE's Agreement acceptance or by written consent of TRANSFEREE after such Agreement acceptance; however (ii) if TRANSFEROR is in Default of the Agreement, such that TRANSFEREE, at its sole discretion, does not provide a Default waiver or a remedy in writing (which remedy is satisfied by TRANSAFEROR), then such deductions from TRANSFEREE Payments are disallowed.

**Exhibit A-1** discloses the total payment due at the end of the monthly periods including the repayment of the Legal Funding and accrued investment charges in accordance with the Agreement.
**Exhibit A-2** discussed Additional Fundings
**Exhibit A-3** discloses the Monthly Maintenance Fee
**Exhibit A-4** discusses the Disbursement of Funds
**Exhibit A-5** discusses Assignment of Proceeds and Allocation of Payments Among Multiple TRANSFEROR Legal Fundings

**Valid Offers for Client Legal Funding:** Any and all verbal, written or other communications with TRANSFEROR or ADMINISTRATOR staff members are not valid Legal Funding offers; valid Legal Funding offers are only made at the time lien documents are delivered to the TRANSFEROR. Future and additional

Copyright © 2015 Amalfi Management, LLC & Neoconomy, LLC. All Rights Reserved

Legal Funding offers are always subject to the internal review by TRANSFEREE and ADMINISTRATOR and are not valid until lien documents are delivered to the TRANSFEROR. A valid Legal Funding offer is not a commitment to pay funds until such time that the lien documents are completely and properly executed, returned to ADMINISTRATOR and accepted by TRANSFEREE. Such acceptance will be deemed to have occurred upon the releasing of money by TRANSFEREE to the TRANSFEROR.

**This offer will be a valid offer until 5:00 pm MST on 04-10-2016 and will be withdrawn thereafter. If this above offer meets with your approval, sign and date below and FedEx this and all other executed documents back to us.**

**Agreed and accepted on behalf of TRANSFEROR**

_____Date: _3_ / _5/_ /2016

**Signature of Thomas V. Girardi; its Authorized Representative to sign on behalf of Girardi & Keese, a California General Partnership dba Girardi/Keese**

Copyright © 2015 Amalfi Management, LLC & Neoconomy, LLC. All Rights Reserved

## Exhibit A-1
## Premium Accrual and Legal Funding Payment Obligation

The per month accrued investment premium amount("Premium") is calculated as the Legal Funding amount times the monthly Premium Rate times the number of months in the calculation period. The monthly Premium Rate for the first six month periods after funding is 2.0% (24.0% annualized Premium Rate) and continues at such monthly Premium Rate until the TRANSFEROR's obligations under the Agreement are fully satisfied. The following table provides an estimate of the amount due including the Legal Funding repayment and cumulative investment charges at the end of each month period over the first 36 six months at the monthly Premium Rate. Investment charges will continue to accrue after 36 months and are not shown in the table. Actual amounts will vary from below table based on actual advance amount and total settlement days. The first month period begins as of the issue date on the Legal Funding check or wire transfer payable to the TRANSFEROR in accordance with the Agreement.

| Month Period [1] | 2.0% | Month Period | 2.0% |
|---|---|---|---|
| **1 to 6** | $5,723,693.22 | 22 | $7,359,034.14 |
| 7 | $5,825,902.03 | 23 | $7,461,242.95 |
| 8 | $5,928,110.84 | 24 | $7,563,451.76 |
| 9 | $6,030,319.64 | 25 | $7,665,660.56 |
| 10 | $6,132,528.45 | 26 | $7,767,869.37 |
| 11 | $6,234,737.26 | 27 | $7,870,078.18 |
| 12 | $6,336,946.07 | 28 | $7,972,286.99 |
| 13 | $6,439,154.87 | 29 | $8,074,495.79 |
| 14 | $6,541,363.68 | 30 | $8,176,704.60 |
| 15 | $6,643,572.49 | 31 | $8,278,913.41 |
| 16 | $6,745,781.30 | 32 | $8,381,122.22 |
| 17 | $6,847,990.10 | 33 | $8,483,331.02 |
| 18 | $6,950,198.91 | 34 | $8,585,539.83 |
| 19 | $7,052,407.72 | 35 | $8,687,748.64 |
| 20 | $7,154,616.53 | 36 | $8,789,957.45 |
| 21 | $7,256,825.33 | | |

**Agreed and accepted on behalf of TRANSFEROR**



_____**Date:** 3 / 31 /2016
**Signature of Thomas V. Girardi; its Authorized Representative to sign on behalf of Girardi & Keese, a California General Partnership dba Girardi/Keese**

---

[1]The term "month period" means from the start date to one day less than the start date of the following calendar month i.e. from 2-17-16 to 3-16-16, with the next period beginning 3-17-16. The usage of the term "month period" where X=the # of month periods and "date the Agreement" = 2-17-16, in a phrase, "six month period after the date the Agreement" means a period starting 2-17-16 and ending in the future sixth calendar month on 8-16-16, with the next period beginning 8-17-16.

If payment is made before the end of a month period, the amount due is calculated as the total payments due in all prior month periods plus the payment due for the entire payment period in which the payment is made multiplied by the following ratio calculated as the number of days from and including the start date of month period in which the payment is made and ending on and including the payment date, divided by the total number of days in the month period in which the payment is made. For example, if PAYMENT is made 11-9-16 and the month period start date is 10-17-16, the end date of the month period is 11-16-16 then the PAYMENT = total payments due in all prior month periods + payment due for the entire payment period in which the payment is made times (24 days divided by 31 days).

Copyright © 2015 Amalfi Management, LLC & Neoconomy, LLC. All Rights Reserved

**Exhibit A-2**
**Additional Fundings**

If TRANSFEROR requests an additional funding at a future date, consideration of such additional Legal Funding is at the sole discretion of the TRANSFEREE and ADMINISTRATOR. TRANSFEROR understands and agrees that this Agreement or any statements made by TRANSFEREE or ADMINISTRATOR shall not be interpreted as a commitment, promise or assurance to provide an additional Legal Funding. Such additional Legal Funding, if offered by TRANSFEREE and approved by ADMINISTRATOR may be offered as an amendment to the Agreement or as a separate consensual equitable lien, assignment, and security agreement with terms and conditions, including but not limited to Funding amount, Premium Rate and Monthly Maintenance Fee, different from the Agreement, which determinations are at the sole discretion of the TRANSFEREE and ADMINISTRATOR.

TRANSFEROR agrees that, with completing of the current fundings, sufficient funding has been provided by the TRANSFEREE to TRANSFEROR and that the Assignment and related security interests shall not be released by the TRANSFEREE until such time that all amounts required to be paid to TRANSFEREE pursuant to the Agreement, have been paid in full.

**Agreed and accepted on behalf of TRANSFEROR**

Date: 3 / 31 /2016

**Signature of Thomas V. Girardi; its Authorized Representative to sign on behalf of Girardi & Keese, a California General Partnership dba Girardi/Keese**

Copyright © 2015 Amalfi Management, LLC & Neoconomy, LLC. All Rights Reserved

# Exhibit A-3
# Monthly Maintenance Fee

The TRANSFEREE shall pay no Monthly Maintenance Fee to TRANSFEROR with respect to this first funding.

**Agreed and accepted on behalf of TRANSFEROR**

_____**Date:** _3_ / _3_ /2016
**Signature of Thomas V. Girardi; its Authorized Representative to sign on behalf of Girardi & Keese, a California General Partnership dba Girardi/Keese**

Copyright © 2015 Amalfi Management, LLC & Neoconomy, LLC. All Rights Reserved

## Exhibit A-4
## Disbursement of Funds

Provided the Agreement has been properly and completely executed by the TRANSFEROR, then TRANSFEREE shall consider, at its sole discretion, whether to accept the Agreement, and if so accepted and executed by TRANSFEREE the TRANSFEREE or ADMINISTRATOR shall issue checks or wire funds within 5 business days thereafter to pay fees and/or payments being made on TRANSFEROR's behalf at TRANSFEROR's request and to pay the TRANSFEROR for the net cash balance of the funding amount after issuing such payments and fees as stated in Schedule C Client Funding Disclosure. Such fees and payments can be adjusted or corrected by TRANSFEREE or ADMINISTRATOR with disclosure to TRANSFEROR prior to funding. However, as required by Schedule titled Irrevocable Letters Of Instructions, unless TRANSFEREE at its sole discretion elects in writing to waive such requirement in part or in its entirety, TRANSFEREE shall not release any funding payments to TRANSFEROR until such time TRANSFEREE has received Irrevocable Letters of Instructions from all Partnering Firms signed by the persons with authority to acknowledge and accept such Instructions on behalf of such Partnering Firms.


**Agreed and accepted on behalf of TRANSFEROR**

_____Date: ___3__/_3/_/2016

**Signature of Thomas V. Girardi; its Authorized Representative to sign on behalf of Girardi & Keese, a California General Partnership dba Girardi/Keese**

Copyright © 2015 Amalfi Management, LLC & Neoconomy, LLC. All Rights Reserved

## EXHIBIT A-5
## MULTIPLE LEGAL FUNDINGS ASSIGNMENT OF PROCEEDS PORTFOLIO AND ALLOCATION OF TRANSFEREE PAYMENTS

TRANSFEROR understands and agrees that if TRANSFEROR requests and, at TRANSFEREE's and ADMINISTRATOR sole discretion, is approved for additional Legal Fundings, the Client Portfolios from each and all such Legal Fundings will be combined and collectively (without duplication of Clients, except where duplicate Clients have different Cases or have same Cases with separately filed claims) do not have the same Cases) be assigned, transferred, and conveyed to TRANSFEREE including all of TRANSFEROR'S control, right, title and interest in and to any and all obligations now existing or in the future including future Proceeds and Payment Intangibles of TRANSFEROR resulting from the Client Portfolio or Proceedings.

TRANSFEROR understands and agrees when the TRANSFEROR receives Proceeds from one or more Legal Fundings, which may be at multiple times from any of a number of sources, including but not limited to co-counsel, defendants, claims, lawsuits, or insurers, and then TRANSFEROR shall insure:

    a. TRANSFEREE receives TRANFEREE Payments from each and all Legal Fundings' Client Portfolios Proceeds until all TRANSFEREE Legal Fundings and associated Premium due in accordance with each and all such Legal Funding Agreements are paid in full and the TRANSFEREE's obligations for all Agreements are fully satisfied.

    b. All TRANSFEREE Payments from Proceeds received by TRANSFEREE will be first allocated to payment of the Legal Funding with the lowest Premium Rate, irrespective of the Legal Funding agreement effective date, until such Legal Funding is paid in full;

    c. Thereafter any remaining TRANSFEREE Payments shall then be allocated to each subsequent unpaid Legal Funding with the lowest Premium Rate, irrespective of the Legal Funding agreement effective date, until all Legal Funding are paid in full and the TRANSFEREE's obligations from all Agreements are fully satisfied, after which TRANSFEROR is released from any further payment obligations.

TRANSFEROR understands and agrees to pay when due multiple Monthly Maintenance Fees from multiple Legal Fundings. If requested by TRANSFEROR, TRANSFEREE will recalculate and make payment adjustments to allow all multiple Monthly Maintenance Fees to be combined into a single Monthly Maintenance Fee payment due on the same numerical dates in successive calendar months.

**Agreed and accepted on behalf of TRANSFEROR**

_____ Date: _3_ / _31_ /2016
**Signature of Thomas V. Girardi; its Authorized Representative to sign on behalf of Girardi & Keese, a California General Partnership dba Girardi/Keese**

Copyright © 2015 Amalfi Management, LLC & Neoconomy, LLC. All Rights Reserved

# SCHEDULE B
# TRANSFEROR LIST OF CLIENTS AND ENCUMBRANCES

The Clients Cases collectively defined as the Client Portfolio are specified and incorporated into the Agreement as Exhibit B-1 List of Clients. The TRANSFEROR confirms that Exhibit B-2 Liens or Other Encumbrances on Payments Due to Transferor list all encumbrances on payments that are or may become due to TRANSFEROR under the Agreement.

TRANSFEROR agrees that any Clients which according to the Agreement should have been included in Exhibit B-1 List of Clients as of the Effective Date but omitted or otherwise not included from such List and are to be later added to such List, including but not limited to Clients replaced in accordance with the Agreement, are to be considered incorporated into the Exhibit B-1 List of Clients whether or not such Clients are in a current update of such List. From time-to-time, when requested by TRANSFEREE, the TRANSFEROR shall update Exhibit B-1 List of Clients with Clients not entered or otherwise modified from such prior List.

**Exhibit B-1 List of Clients, if not included within the Agreement, may be prepared as a separate document with the title: "Exhibit B-1 List of Clients" and is incorporated as part of the Agreement.**

The TRANSFEROR agrees that the broadest and most inclusive interpretation of the TRANSFEROR's provided Client designations shall apply to the extent there is a dispute over the interpretation of such designations, including, but not limited to, Client Identification Code ("ID Code") Client Last Names with different forenames, spellings or changed names; Clients having multiple Sub-Category designations whether they are MDL's or other unnamed litigation categories; incorrect retainer dates or multiple retainers agreements; and incorrect or multiple ID Codes. TRANSFEROR confirms that Client ID Codes have been applied consistently to all documentation made available by TRANSFEROR to ADMINISTRATOR such that each Client ID Code only refers to the same specific Client.

TRANSFEROR represents, in addition to other TRANSFEROR's representations:

  a.  The TRANSFEROR has executed agreements to represent each of the Clients and their Cases, as referenced by a unique ID Code assigned by TRANSFEROR.

  b.  Each Client listed in the Client Portfolio has contractually agreed to pay, upon resolution of such Client Case, the percentage contingency fees (% Fee) as stated in the Exhibit B-1 List of Clients plus reimbursed expenses.

  c.  No Client has asked for or taken actions that could lead to TRANSFEROR's removal as the counsel for such Client or to the dismissal of the Client Case.

  d.  There are no other co-counsel fees or fees from other arrangements due other than the co-counsel fees disclosed in Exhibit B-1 List of Clients.

  e.  The TRANSFEROR shall pay TRANSFEREE Payments to TRANSFEREE, in accordance with the Agreement, from the Legal Fees due to TRANSFEROR from the Proceeds of resolved Exhibit B-1 List of Clients and;

  f.  TRANSFEROR confirms information provided by TRANSFEROR in Exhibit B-1 List of Clients is correct, factual and consistent with the TRANSFEROR's records, that TRANSFEROR shall notify ADMINISTRATOR; provide ADMINISTRATOR a corrected version of or corrections to the current Exhibit B-1 List of Clients within five business days after TRANSFEROR has identified any such inconsistencies or errors; and such inconsistencies or errors if deemed not material by the TRANSFEREE shall not be consider an Agreement Default if corrected as stated.

Copyright © 2015 Amalfi Management, LLC & Neoconomy, LLC. All Rights Reserved

g. With respect to encumbrances of Proceeds or other TRANSFEROR assets, TRANSFEROR has (i) verified all encumbrances listed in Exhibit B-2 and corrected errors; (ii) listed all other existing Liens and Loans, including cash advances or loans by another company and any other encumbrances; (iii) listed any other anticipated or future encumbrances, including but not limited to statutory and any other consensual written liens, assignments or other encumbrances to be perfected on or after the date of this Agreement.

**Agreed and accepted on behalf of TRANSFEROR**

_____**Date:** \_3\_ / \_31\_ /2016

**Signature of Thomas V. Girardi; its Authorized Representative to sign on behalf of Girardi & Keese, a California General Partnership dba Girardi/Keese**

Copyright © 2015 Amalfi Management, LLC & Neoconomy, LLC. All Rights Reserved

# EXHIBIT B-1 LIST OF CLIENTS

The Cases and Clients collectively defined as the Portfolio of Clients are specified and incorporated into the Agreement as Exhibit B-1 Lists of Cases. Proceeds from Clients listed in Exhibit B-1 List of Clients are secured in accordance with the Agreement. Such Cases and Clients have been provided by TRANSFEROR and are included in the Portfolio of Clients as follows:

1. All Shell v Acosta mass tort action case clients $45,500,000 in estimated TRANSFEROR proceeds approximate 1,491 individual Plaintiffs. (Dole Food Co. Inc. et al. v. Superior Court of Los Angeles County, case number B262044, in the California Court of Appeals, Second Appellate District: and Adelino Acosta et al v. Shell Oil Company, et al L.A. Superior Ct. No.053643; and City of Carson v. Shell Oil Company et al, L.A. Super. Ct. No. BC499369 and related cases). Defendants include the Shell Oil, Equiline Enterprises LLC dba Shell Oil Products US and Barclay-Hollander-Curci, now a Dole subsidiary.
   a. As appended to Schedule B, Exhibit B-1, the Adelino Acosta, et al, vs Shell Oil Company, et al and related cases; the State of California, ex rel City of Carson v Shell Oil Company et al; and Shell Oil Company v Barclay Hollander Corporation Settlement Agreement (the "Shell Oil Cases") and TRANSFEROR's list of 1491 clients.
   b. As appended to this Schedule B, Exhibit B-1, a list of $9,562,560.78 Shell Oil Case expense reimbursements due TRANSFEROR from future Case settlement payments ($6,600,466.54 itemized by TRANSFEROR expense categories plus $2,962,094.24 Kurtzman Carson Consultants LLC invoice)
2. Barclay Hollander case clients estimated legal fees of $12,000,000 and cost reimbursements of $3,000,000; related to Shell Oil settlement.
3. All Avandia case clients - $17,514,518 in Cash proceeds. Named defendant is Smith Kline Beecham Corp., d.b.a. GlaxoSmithKline (GSK). Final SETTLEMENT payment stages with TRANSFEROR proceeds available in near future from cash placed in escrow by defendant.
4. All TXI Riverside Cement with estimated $12,000,000 in legal fees ($6,000,000 to TRANSFEROR) and TRANSFEROR cost reimbursements of $2,051,716; settled with defendants Riverside Cement Company, TXI Riverside, Inc., TXI California, Inc., Riverside Cement Holdings Company, Beazer West, Inc., Beazer West of California, Inc., Beazer West Cement Company, Hanson Aggregates West, Inc., Amcord, Inc. Gifford-Hill & Co., Inc. and Hanson Pipe & Precast, Inc.
5. All Byetta case clients estimated $6,000,000 in legal fees and $710,550 in cost reimbursements; Defendants include Merc, Brystal Myers Squib, Eli Lilly & Co., Amylin Pharmaceuticals, and Novo Norrdisk A/S with California case filed in Los Angeles in regard to the various lawsuits in California.
6. All Zometa case clients estimated $5,000,000 in legal fees and $5,387,512 in cost reimbursements. The named defendant is Novartis Pharmaceutical Corporation.
7. All Actos case clients estimated $5,000,000 in legal fees and costs. Defendants include Takeda Pharmaceuticals America Inc., Takeda Pharmaceuticals North America Inc., Takeda Pharmaceutical Company Limited and Eli Lilly and Company.

The TRANSFEROR shall provide, upon ADMINISTRATOR's request, the Case type, Client File No. (ID#), Client retainer fee %, co-counsel and co-counsel % fee sharing for the Portfolio of Cases to TRANSFEREE in an acceptable electronic format (preferably Microsoft Excel spreadsheet) to include to be organized by ADMINISTRATOR into Exhibit B-1 Lists of Clients.

**Agreed and accepted on behalf of TRANSFEROR**

Date: 3 / 31 /2016

**Signature of Thomas V. Girardi; its Authorized Representative to sign on behalf of Girardi & Keese, a California General Partnership dba Girardi/Keese**

Copyright © 2015 Amalfi Management, LLC & Neoconomy, LLC. All Rights Reserved

**As appended to this Schedule B, Exhibit B-1, the Adelino Acosta, et al, vs Shell Oil Company, et al and related cases; the State of California, ex rel City of Carson v Shell Oil Company et al; and Shell Oil Company v Barclay Hollander Corporation Settlement Agreement (Shell Oil Cases) and TRANSFEROR's list of 1491 clients**

## SETTLEMENT AGREEMENT

This Settlement Agreement (the "**Agreement**") is entered into as of November 10, 2014 (the "**Effective Date**") between (i) Shell Oil Company and Equilon Enterprises LLC (collectively, "**Shell**"), and (ii) the law firm of Girardi Keese on behalf of all Plaintiffs (as defined in Section 1 below). Shell and Girardi Keese, on behalf of all Plaintiffs, are referred to herein collectively as the "**Parties**" and individually as a "**Party**."

### 1.   DEFINITIONS

1.1.     The term "**Action(s)**" shall refer to (i) the lead case captioned *Adelino Acosta, et al. v. Shell Oil Company, et al.*, Los Angeles Superior Court ("LASC") Case No. NC053643, and all related actions, including LASC Case Nos. NC053684, NC053766, BC433429, BC433430, BC433656, BC433657, BC454472 and BC520744; and (ii) the related action captioned *The People of the State of California, ex rel. City of Carson v. Shell Oil Company, et al.*, LASC Case No. BC499369. The term "Actions" does not encompass the related action captioned *Shell Oil Company v. Barclay Hollander Corporation, et al.*, LASC Case No. BC544786.

1.2.     The term "**Carousel Tract**" shall mean the tract of land located in the City of Carson between Panama Street to the east, Marbella Street to the west, Lomita Street to the south and 244th Street to the north, containing 285 single-family homes commonly referred to as the "Carousel neighborhood tract" and formerly known as the "Kast property."

1.3.     The term "**Claim(s)**" shall mean any and all claims of injury, loss or damage of whatsoever nature a Plaintiff has or may acquire against Shell arising from, related to or in any way pertaining to the events described in the Actions, or that have been or could have been asserted in the Action(s), whether presently known or unknown, developed or undeveloped, discovered or undiscovered, foreseen or unforeseen, matured or unmatured, accrued or not accrued, or now recognized by law or that may be created or recognized in the future by statute, regulation, rule, judicial decision or in any other manner.

The term "**Claim(s)**" shall also encompass any and all claims of whatsoever nature, whether presently known or unknown, developed or undeveloped, discovered or undiscovered, foreseen or unforeseen, matured or unmatured, accrued or not accrued, or now recognized by law or that may be created or recognized in the future by statute, rule, judicial decision or in any other manner, a Plaintiff has or may acquire against Shell arising from, related to or in any pertaining to the selection and implementation of work directed by the Los Angeles Regional Water Quality Control Board ("**Water Board**") pursuant to the Cleanup and Abatement Order No. R4-2011-0046 ("**CAO**") and all related orders or directives of the Water Board.

1.4.     The term "**Effective Date**" for this Agreement means November 10, 2014.

1.5.     The term "**Individual Release**" shall mean the separate "Release of All Claims of Individual Releasor" and accompanying "Medicare Information Declaration" and, where

1

applicable, the "Covenant and Agreement for Access" in the forms shown in Attachment A and Exhibits 1 and 2 thereto, to be signed by each settling Plaintiff.

1.6.     The terms **"Plaintiff"** and **"Plaintiffs"** shall mean all individual clients represented by Girardi Keese, solely or in association with other counsel, who are named plaintiffs in the Actions as listed on Attachment B, hereto, including those who allegedly reside or resided in, or otherwise spent time in or around, the Carousel Tract and/or in adjacent neighborhoods in Carson, California, including, without limitation, the Monterey Pines and Island Avenue neighborhoods.

1.7.     The term **"Released Claims"** shall mean all Claims, including as set forth in the Individual Release, of all Plaintiffs.

1.8.     The term **"Releasors"** shall mean all Plaintiffs who sign a "Release of All Claims of Claims of Individual Releasor," in the form shown in Attachment A hereto.

1.9.     The term **"Settlement Funds"** shall mean the aggregate amount specified in Section 3, below.

1.10.   The term **"Settling Minors' Compromises"** shall mean the settlements of all minor Releasors.

## 2.     RECITALS

2.1.     Shell has denied and continues to deny any liability, wrongdoing or responsibility for any Claim(s).  In deciding to enter into this Agreement, Plaintiffs and Shell have considered the uncertainties, delays, expenses and exigencies of the litigation process, including trials and appeals, and have concluded that settlement is preferred to continuing to litigate these disputed Claim(s) by and between them.

2.2.     Girardi Keese has evaluated individually the Claim(s) of each Plaintiff from a settlement perspective, considering the nature and extent of each Plaintiff's alleged injury, damages and losses, and the alleged liability of Shell.  Girardi Keese represents and warrants that it has authority to fully settle and dismiss with prejudice all Claims on behalf of all Plaintiffs.

2.3.     The Parties desire to fully settle and resolve all disputes between Plaintiffs and Shell, including those asserted in, or related directly or indirectly to, the Actions.

2.4.     Shell, Girardi Keese and Plaintiffs intend that the payment made by Shell pursuant to the terms and conditions of this Agreement and the Individual Releases will fully and completely settle any and all Plaintiffs' Claims against Shell including, without limitation, any liens, subrogated interests or other encumbrances of any third parties, including, but not limited to, government entities, health care providers, lien holders, insurance carriers, health maintenance organizations, and Plaintiffs' counsel, including associated or prior counsel.

2.5.     Nothing in this Agreement shall preclude, alter or affect Plaintiffs' rights relative to, or their legal actions against, other parties to the Actions, or relative to other persons or entities, including, but not limited to, non-settling defendants in the Actions. All such rights and actions are fully preserved.

2.6.     Nothing in this Agreement shall alter or affect Shell Oil Company's rights relative to, or its legal actions against other persons or entities, including, but not limited to, non-settling defendants in the Actions and in the related action for indemnity and other relief captioned *Shell Oil Company v. Barclay Hollander Corporation, et al.*, LASC Case No. BC544786.

### 3.     SETTLEMENT TERMS

3.1.     **List of Plaintiffs.** Prior to the execution hereof, Girardi Keese has provided to Shell a list of all Plaintiffs. This list is attached to and incorporated in the Agreement as Attachment B. Girardi Keese represents and warrants that the Plaintiffs identified on Attachment B are all of the individuals represented by Girardi Keese, solely or in association now or in the past with other counsel, with respect to any existing and/or potential Claim(s) against Shell. Girardi Keese is not aware of any other individuals who are not represented by Girardi Keese (or in association with Girardi Keese) who are asserting Claim(s), or currently possess Claim(s) which they have not asserted, against Shell. Girardi Keese also represents and warrants that it has authority as counsel of record to negotiate and enter this Agreement on behalf of all Plaintiffs.

3.2.     **Full and Final Settlement.** In exchange for the good and valuable consideration and terms set forth in this Agreement, Shell agrees to pay a total sum of ninety million dollars ($90,000,000.00) in full and final settlement of all Claims of all Plaintiffs in the Actions. The Settlement Funds will be distributed in accordance with Section 3.5 herein.

3.3.     **Allocation of Settlement Funds.** Girardi Keese shall be solely responsible for determining the process by which the Settlement Funds are allocated between and among all Plaintiffs identified in Attachment B. Girardi Keese has requested, and the Court has approved, the appointment of Justice Edward A. Panelli (Ret.) as Special Master for purposes of the settlement allocation process. Shell has not had, nor will have, any involvement in, or liability related to, that allocation process. Girardi Keese and/or the Special Master shall promptly provide Shell with the allocation determinations upon their completion.

3.4.     **Execution of Individual Releases.** Girardi Keese shall obtain from each Plaintiff identified in Attachment B a full and complete, signed Individual Release (including the Medicare Information Declaration) in the form attached as Attachment A (and Exhibits 1 and 2 thereto) to this Agreement.

3.5.     **Transmission of Settlement Funds.** Shell shall deliver 90% of the Settlement Funds to the Girardi Keese client trust account, Account No. 4110425859, at Torrey Pines Bank located at 601 W. 5th Street, Suite 100, Los Angeles, California 90071 (with wiring instructions having been provided) within ten (10) business days after the following conditions are satisfied: (i) Girardi Keese delivers to Shell's counsel full and complete, signed Individual Releases from

3

90% or more of the Plaintiffs identified in Attachment B; (ii) a final order has been issued approving all Settling Minors' Compromises; (iii) a final order has been issued determining this settlement to be in good faith; (iv) Girardi Keese satisfies any and all applicable reporting requirements under the Medicare Secondary Payer Act of 1980 ("MSP") and Section 111 of the Medicare, Medicaid, and SCHIP Extension Act of 2007 ("MMSEA"); and (v) Girardi Keese has filed with the Court executed requests for dismissal with prejudice of all Actions in their entirety against Shell, with the Parties to each bear their own fees and costs. The Parties shall utilize best efforts to satisfy these conditions within thirty (30) days of the Effective Date.

It shall thereafter remain the ongoing obligation of Girardi Keese to secure full and complete, signed Individual Releases for all of the remaining Plaintiffs. Shell shall deliver to the Girardi Keese Client Trust Account, Account No. 4110425859, at Torrey Pines Bank located at 601 W. 5th Street, Suite 100, Los Angeles, California 90071, the remaining 10% of the Settlement Funds within ten (10) business days after Girardi Keese delivers to Shell full and complete, signed Individual Releases for at least one half of the remaining Plaintiffs (which equates to an additional 5% of the total Plaintiffs who are the subject of this Settlement).

It shall continue to remain the obligation of Girardi Keese to secure full and complete, signed Individual Releases for all of the remaining Plaintiffs. To the extent Girardi Keese is unable, despite its best efforts, to deliver a full and complete, signed Individual Release on behalf of one or more of the remaining Plaintiffs within ninety (90) days of the Effective Date, Girardi Keese shall provide a description of its efforts to the Special Master for consideration and follow up as may be appropriate. The portion of the Remaining Funds allocated to one or more Plaintiffs who fail to return their full and complete, signed Individual Release shall be held by Girardi Keese in its client trust account pending receipt of the full and complete, signed Individual Release from said Plaintiff(s). Girardi Keese and Thomas V. Girardi in his personal capacity shall defend, indemnify and hold Shell harmless against any claim(s) that may be asserted by any Plaintiff who has not returned his or her full and complete, signed Individual Release after the Actions are dismissed with prejudice.

3.6.    **Cooperation in Water Board Proceedings.** Plaintiffs, Girardi Keese, and their authorized representatives and/or retained consultants agree to cooperate in good faith in the ongoing regulatory proceedings overseen by the Water Board. Plaintiffs, Girardi Keese, and their authorized representatives and/or retained consultants shall not interfere with, or in any way attempt to adversely influence, (i) the ongoing approval process for the revised Remedial Action Plan, Human Health Risk Assessment, and Feasibility Study (collectively, the "RAP"), (ii) the California Environmental Quality Act (CEQA) process to evaluate the potential environmental and other impacts of the RAP, and/or (iii) the implementation of the RAP once approved. Plaintiffs agree to waive and release any rights to challenge any decision of the Water Board in evaluating and approving the RAP for the Carousel Tract, including, but not limited to, any rights to challenge the Environmental Impact Report (EIR) under CEQA. Plaintiffs, Girardi Keese, and their authorized representatives and/or retained consultants agree to refrain from providing written or oral comments regarding the RAP, the EIR, and/or any plans or reports implementing the RAP; this does not, however, preclude individual Plaintiffs themselves from participating in good faith in the ongoing regulatory proceedings overseen by the Water Board.

4

This Agreement shall not affect or impact any Plaintiff's eligibility for relocation benefits as set forth in the RAP's Relocation Plan, pending approval of the RAP.

Plaintiffs acknowledge and understand that this Agreement fully and fairly addresses and compensates them for any and all claims against Shell for alleged nuisance, inconvenience, noise, dust, interference and/or any other RAP-related impacts created by the alleged contamination of the Carousel Tract and implementation of the RAP in the Carousel Tract and surrounding areas.

3.7.    **Access for Investigation and RAP Implementation.**  As a condition of this Agreement, all Plaintiffs shall provide Shell and its contractors and subcontractors with full access to their properties in the Carousel neighborhood, the Monterey Pines neighborhood, the Island Avenue neighborhood (and any other properties in the area as needed), for purposes of conducting any and all work, including sampling activities and any and all other work, directed by the Water Board or successor agencies pursuant to the CAO and all related orders or directives of the Water Board or successor agencies. Shell's work on the Carousel project shall continue to be done only in accordance with Water Board-approved work plans. Such access shall run with the land and be recorded and binding on future owners.

As a condition of this Agreement, all Plaintiffs shall provide Shell and its contractors and subcontractors with full access to their properties in the Carousel neighborhood, the Monterey Pines neighborhood, the Island Avenue neighborhood (and any other properties in the area as needed), for purposes of implementing the RAP, upon its approval by the Water Board. Shell's work on the Carousel project to implement the RAP shall be done only in accordance with Water Board-approved work plans and/or remedial design and implementation plans. Such access shall run with the land and be recorded and binding on future owners.

3.8.    **Removal of Signage.**  Within ten (10) days of the Effective Date, Plaintiffs shall remove any and all signs posted or otherwise displayed on their properties in the Carousel Tract, including, but not limited to, in yards and common areas, that refer to, reflect upon or relate to Shell or any Shell-related entities.

3.9.    **Cooperation in Reporting to CMS.**  Girardi Keese and Plaintiffs acknowledge that under the Medicare Secondary Payer Act of 1980 ("MSP") and Section 111 of the Medicare, Medicaid, and SCHIP Extension Act of 2007 ("MMSEA"), Shell may be required to report to the Centers for Medicare & Medicaid Services ("CMS") certain settlements entered into with Medicare beneficiaries. CMS may seek reimbursement for those portions of a settlement that are duplicative of certain amounts already paid through Medicare.

Girardi Keese and Plaintiffs agree to cooperate with Shell to determine whether any given Plaintiff's Claims are such that Shell must report to CMS any settlement reached with that Plaintiff. All Releasors shall complete and sign the Medicare Information Declaration attached as Exhibit 1 to their Individual Releases, to assist Shell in initially determining whether their Claims require reporting. Girardi Keese agrees to use its best efforts to obtain from Releasors all Medicare Information Declarations to determine whether each Releasor's Claims are such that settlement thereof must be reported to CMS.

5

3.10.   Liens.   Girardi Keese and Plaintiffs shall be solely responsible for liens, subrogation interests, or other encumbrances arising from or related to any of their Claims.

Girardi Keese and Plaintiffs further agree to satisfy, pursuant to and consistent with the MSP and MMSEA, any and all known medical liens and/or claims arising from medical expenses, including liens by any health care provider, Medicare, Medicaid, or any other third party incurred as a result of the incidents that form the basis of the Action(s), prior to or concurrently with the distribution of any Settlement Funds to Plaintiffs.   Girardi Keese and Plaintiffs specifically agree that if Medicare is entitled to any portion of a given Plaintiff's settlement distribution, Medicare will be paid its portion prior to or concurrently with any payment to that Plaintiff. Girard Keese also agrees that it will provide Shell with documentation indicating that any and all liens that Medicare may have against the Settlement Fund or any individual Plaintiff's settlement have been paid, preferably in the form of communications from Medicare acknowledging payment in satisfaction of its final demands.

3.11.   **Indemnification.**   Girardi Keese and Mr. Thomas V. Girardi, in his personal capacity, agree and covenant to release, indemnify, defend and hold harmless Shell from any liens or claims (including subrogation claims), including any fines or penalties, that may arise or have arisen in favor of any financial institution, health care provider, doctor, hospital, health insurer, HMO, Medicare, Medicaid or other insurer, or any third party, by operation of law or equity for medical expenses, disability benefits, or any other charges or expenses directly or indirectly related to the incidents that form the basis of the Action(s).   Plaintiffs also waive any private causes of action they may have now or in the future under 42 U.S.C. § 1395y(b)(3)(A), in connection with any Medicare liens that may exist now or in the future against this settlement.

Girardi Keese and Thomas V. Girardi, in his personal capacity, agree to release, indemnify, and hold harmless Shell from any liens or claims (including subrogation claims), including any fines or penalties, that may arise or have arisen in favor of Medicare, MediCal, or any other health care provider by operation of law or equity for medical expenses, disability benefits, or any other charges or expenses directly or indirectly related to the incidents that form the basis of the Action(s).   The Parties understand that a portion of the individual settlement payment to each Plaintiff will be set aside by Girardi Keese, under the supervision of the Special Master, for the purpose of satisfying any such liens or claims.   If the amounts set aside for this purpose are inadequate to resolve any such liens or claims, responsibility for such liens or claims will lie solely with Girardi Keese and Thomas V. Girardi, in his personal capacity.

3.12.   **Determination of Good Faith Settlement.**   This settlement is conditioned upon a determination by the Los Angeles Superior Court that this settlement was entered into in good faith within the meaning of California Code of Civil Procedure Section 877.6. The Parties agree to fully cooperate in the prosecution of such motion, including, but not limited to, by filing declaration(s) in support of this motion, and appearing at any hearing on this motion.

3.13.   **Settlement Agreement and Mutual Release with the City of Carson.**   This settlement is further conditioned upon (i) the dismissal with prejudice of the related action captioned *The People of the State of California, ex rel. City of Carson v. Shell Oil Company, et*

6

*al.*, LASC Case No. BC499369 as stated in Section 3.5, above; and (ii) the execution of the Settlement Agreement and Mutual Release by and between Shell and the City of Carson on its own behalf and on behalf of the People of the State of California, *ex rel.* City of Carson.

3.14.  **Individual Releases of Minors.**  Upon execution of this Agreement, Girardi Keese shall promptly prepare, submit, resolve and obtain court approval of Settling Minors' Compromises.

3.15.  **Accord and Satisfaction.**  The sums paid to Releasors from the Settlement Funds shall represent a complete accord and satisfaction of all Claims of the Releasors.

3.16.  **Effect of California Civil Code Section 1542.**  Girardi Keese acknowledges that it will advise Plaintiffs of the terms and effect of California Civil Code Section 1542, which provides as follows:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

The releases to be signed by settling Plaintiffs shall include an affirmation by the settling Plaintiffs that they are aware of said Code section and expressly waive any rights that they may have thereunder, as well as under any similar provisions of the laws of any other jurisdiction.

3.17.  **Responsibilities of Plaintiffs' Counsel.**  Girardi Keese represents and warrants that it will explain or cause to be explained to each Plaintiff the provisions and legal effect of the Agreement and, to all Plaintiffs identified in Attachment B, the provisions of the Individual Releases, in the form of Attachment A, prior to such Releasors' execution of their Individual Releases.

3.18.  **Enforcement of Agreement.**  If any Party hereto should institute any action at law or in equity to enforce the terms of this Agreement, or to seek relief for a breach thereof, the prevailing party shall be entitled to an award of reasonable attorney's fees and costs. The Parties agree that the Los Angeles Superior Court shall be the only court which may take personal and/or subject-matter jurisdiction over any such action at law or in equity.

## 4.  ADDITIONAL TERMS

4.1.  **No Admission of Liability.**  This Agreement is entered into solely by way of compromise and settlement. Neither this Agreement nor any exhibit, document, or instrument delivered hereunder, nor any statement, transaction, or proceeding in connection with the negotiation, execution or implementation of this Agreement, is intended to be or shall be construed as evidence of an admission or concession by Shell of any fault, liability, or

7

wrongdoing, or of the truth of any allegations asserted by any Plaintiff against Shell in the Actions.

4.2. **Entire Agreement and Construction.** This Agreement and the Individual Release from each settling Releasor constitute the entire agreement between the Parties and supersede all other prior or contemporaneous agreements and understandings between the Parties, whether written or oral. This Agreement and any Individual Release may be amended or modified only by a written instrument executed by the parties to be bound thereby. The Parties understand and agree that each and every term and condition of this Agreement has been mutually negotiated, prepared and drafted, and if at any time the Parties desire or are required to interpret or construe any such term or condition or any agreement or instrument subject thereto, no consideration shall be given to the issue of which Party actually prepared, drafted or requested any term or condition.

4.3. **Confidentiality.** The Parties hereby agree to hold in strict confidence the terms of this Agreement and the Individual Releases, including the amount of the Settlement Funds, the amount paid to each individual Plaintiff and all of the negotiations culminating in the Agreement (collectively, "**Confidential Material**"), and agree not to disclose such Confidential Material to any other person or entity other than to their financial and/or tax advisors and for Medicare reporting purposes, except (i) upon the Parties' prior written consent; or (ii) in response to a judicial order. In the event that any person or entity, including, but not limited to, a judicial or other governmental forum, makes a request to receive Confidential Material or invokes a process to obtain Confidential Material, the Parties agree to cooperate in preventing such disclosure and to provide prompt written notice of such fact to each other within five (5) business days after receiving the request to provide an opportunity to contest such request.

4.4. **Notification of Disclosure of Confidential Material.** If it is necessary to disclose Confidential Material to obtain a court order finding that the Agreement was entered into in good faith, or approving any minor Plaintiffs' settlements, the Parties shall seek to file the Confidential Material under seal. If the relevant court will not allow filing under seal, then the Parties shall follow such procedures with respect to the Confidential Material as they may obtain from such court, including, without limitation, the exclusion from any record of proceedings of the amount of the Settlement Funds or the amount thereof to be distributed to any Plaintiff (if such procedure is permitted by such court).

4.5. **No Disclosure or Publication of Confidential Material.** Except as expressly provided above, none of the Parties, their counsel or their representatives shall in any way disclose or publicize the Confidential Material, or cause the Confidential Material to be disclosed or publicized to any third person, entity or organization including, but not limited to, any federal, state or local government agencies or officials, to community or neighborhood residents, in community or neighborhood meetings, or in any news or communications medium including, but not limited to, newspapers, magazines, pamphlets, brochures, journals, recordings, radio, video, television, e-mail, text messages, websites, the Internet or any legal publication, bar journal or any publication of any kind whatsoever. Except as expressly provided above, the Parties and their representatives agree that their comments on the Confidential Material, including the Agreement and the Individual Releases, will be restricted exclusively to the following: (i) a

8

settlement has been entered into by the Parties; (ii) the settlement was mutually agreed upon by the Parties; (iii) the settlement was found satisfactory by the Parties; (iv) the identity and number of Plaintiffs; (v) the identity of Shell; and (vi) that the settlement resolves all issues between the Parties in the Actions.  All other comments and disclosures on any aspect of the Confidential Material, including the Agreement and the Individual Releases, shall be made only after consultation with and prior written approval by the Parties.

Nothing in this Agreement shall alter or affect Shell's ability to disclose or otherwise introduce any Confidential Material, under seal and/or subject to an appropriate protective order or other protections as needed, in related judicial proceedings, including, without limitation, in the related action for indemnity and other relief captioned *Shell Oil Company v. Barclay Hollander Corporation, et al.*, LASC Case No. BC544786.

4.6.    **Remedies for Release of Confidential Material.**    Should any Party or its authorized representatives release any Confidential Material, such person acknowledges that damages alone will not provide an adequate remedy and, therefore, agrees that the other Part(ies) in addition to seeking damages, may move for a preliminary and permanent injunction against the breaching person or persons, together or individually, prohibiting any further violation of the terms and conditions of this Agreement.  If any Party brings an action alleging breach of the confidentiality requirements of this Agreement, then the prevailing Party in that action shall be entitled to recover reasonable attorney's fees and related expenses incurred with respect to such action.

4.7.    **Notice by Parties.**    All notices and other communications under this Agreement shall be in writing and shall be deemed to have been duly given as of the date such notices or other communications are (i) delivered by hand; (ii) sent by facsimile with receipt confirmed, provided that a copy is mailed on the same date by registered mail, return receipt requested; or (iii) received by the addressee, if sent by Express Mail, FedEx or other express delivery service with receipt requested; in each case, to the appropriate addresses and/or facsimile numbers set forth below (or to such other addresses and facsimile numbers as a Party may designate as to itself by notice to the other Party):

(a)    If to Shell:

Shell Oil Company
Attention:  Cisselon Nichols Hurd, Esq.
P.O. Box 2463
Houston, Texas 77252-2463
Fax:  713.241.1427

and

Morgan, Lewis & Bockius LLP
Attention: Deanne L. Miller, Esq.
300 South Grand Avenue
Suite 2200

9

Los Angeles, CA 90071-3132
Fax: 213.612.2501

(b)     If to Girardi Keese on behalf of Plaintiffs:

Girardi Keese
Attention: Robert Finnerty, Esq.
1126 Wilshire Boulevard
Los Angeles, CA 90017
Fax: 213.481.1554

4.8.     **Jurisdiction to Enforcement Settlement.**  Pursuant to California Code of Civil Procedure Section 664.6, the Parties shall jointly request that the Honorable William F. Highberger of the Los Angeles Superior Court retain jurisdiction over the Parties and the Actions for purposes of finalizing and enforcing the Agreement, including, without limitation, the provisions requiring cooperation in the ongoing regulatory proceedings overseen by the Water Board, access to properties, and implementation of the RAP.

4.9.     **Governing Law.**  The Agreement and the Individual Releases shall be construed according to the laws of the State of California as applied to contracts entered into in that state.

4.10.    **Waiver of Inconsistent Provisions of Law.**  To the fullest extent permitted by applicable law, each Party waives any provision of law (including the common law) that renders any provision of this Agreement invalid, illegal, or unenforceable in any respect.

4.11.    **Severability.**  In the event that any provision in or obligation under this Agreement is determined to be invalid, illegal, or unenforceable in the applicable jurisdiction, the validity, legality, and enforceability of all other provisions in or obligations under this Agreement shall not be affected or impaired in any way.

4.12.    **Headings.**  The headings used herein are intended for convenience of reference only and are not intended to be a part of, or to affect the meaning or interpretation of, this Agreement.

4.13.    **References.**  As used in this Agreement or any Attachment hereto, the words "include" and "including," and words of similar import, are not limiting and shall be construed to be followed by the words "without limitation." The definitions contained in this Agreement or any Attachment hereto are applicable to the singular as well as the plural forms of such terms. The words "herein," "hereof," and "hereunder," and other words of similar import, refer to the Agreement in its entirety, rather than to only the particular portion of the Agreement.

4.14.    **No Third-Party Beneficiaries; Assignment.**  No provision of this Agreement or any Attachment thereto is intended to create any third-party beneficiary to this Agreement. This Agreement shall be binding upon, and inure to the benefit of, each Party's successors and permitted assigns. Shell shall be permitted to assign this Agreement and its rights, interests, or obligations hereunder. Any rights, interests, or obligations that Plaintiffs have under the

10

Agreement and/or their Individual Releases are personal to them and are not assignable, and may not otherwise be transferred, sold or given away without prior written consent from Shell. Any assignment or transfer in violation of this provision shall be null and void *ab initio*.

4.15. **No Implied Waiver.** Except where a specific period of action or inaction is expressly provided herein, no failure on the part of a Party to exercise, and no delay on the part of a Party in exercising, any right, power or privilege under this Agreement shall operate as a waiver thereof; nor shall any waiver on the part of a Party of any such right, power, or privilege, or any single or partial exercise of any such right, power, or privilege, preclude any other or further exercise thereof or the exercise of any other right, power, or privilege; nor shall any waiver on the part of a Party, on any particular occasion or in any particular instance, of any particular right, power, or privilege operate as a waiver of such right, power, or privilege on any other occasion or in any other instance.

4.16. **Time of the Essence.** Time is of the essence with respect to all provisions of this Agreement that specify a time for performance.

4.17. **Further Assurances.** From time to time following the execution of this Agreement, each Party shall take such reasonable actions consistent with the terms of the Agreement as may reasonably be requested by the other Party, and otherwise reasonably cooperate with the other Party in a manner consistent with the terms of this Agreement as reasonably requested by such other Party in order to effectuate the intent and purposes of this Agreement and to carry out the terms herein.

4.18. **Electronic Signatures and Counterparts.** This Agreement and any amendments thereto, to the extent signed and delivered electronically or by facsimile, shall be treated in all manner and respects as an original agreement, and shall be considered to have the same binding legal effect as if it were the original signed version thereof, delivered in person. This Agreement may be executed in any number of counterparts, each of which shall be an original and all of which shall constitute one and the same instrument.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date set forth above.

Dated: _Nov 12, 2014_               **GIRARDI KEESE**                    _11/14/14_

                                   By: _____
                                       Thomas V. Girardi
                                       Attorneys for Plaintiffs

Dated: 11/12/14       SHELL OIL COMPANY

By: _____
      Signature

      James C. Smith
      Name

      General Manager Trustee Support
      Title & U.S. Country Controller

Dated: _____    EQUILON ENTERPRISES LLC

By: _____
      Signature

      _____
      Name

      _____
      Title

12

Dated: _____        SHELL OIL COMPANY

                             By: _____
                                 Signature

                                 _____
                                 Name

                                 _____
                                 Title

Dated: 10/10/14              EQUILON ENTERPRISES LLC

                             By: _____
                                 Signature

                                 Jose Maria Liwardi
                                 Name

                                 VP Portfolio Equilon
                                 Title

12

| # | Client Last Name | Client First Name | Client Representative |
|---|---|---|---|
| 1 | 1st Samoan Congregational Christian Church | of Harbor City | Robin Agapay |
| 2 | 1st United Methodist Church of Wilmington | | Leslie J. Powell |
| 3 | Acebedo | Gilbert | |
| 4 | Acosta | Adelino | |
| 5 | Acosta | Estrelita | |
| 6 | Acosta | Felicitas | Wilhelmina R. Acosta |
| 7 | Acosta | Manuel | |
| 8 | Acosta | Oliver | Wilhelmina R. Acosta |
| 9 | Acosta | Wilhelmina | |
| 10 | Acosta Jr. | Angel | |
| 11 | Adams | Kiron | Tonya V Randle |
| 12 | Adolfo | Nhutdung Ha | |
| 13 | Aguero | Carlos | |
| 14 | Aguero | Patricia | |
| 15 | Aguilar | Anthony | |
| 16 | Aguilar | Martha | |
| 17 | Alarcon | Jackie | |
| 18 | Alarcon | Richard | |
| 19 | Alarcon | Shelby | Richard Alarcon |
| 20 | Alexander | Gary | |
| 21 | Allen | Robert | |
| 22 | Allen II | Robert | |
| 23 | Allingham-Bray | Genevieve | Kathleen Ponce |
| 24 | Allswang | Bruce | |
| 25 | Allswang | Pamela | |
| 26 | Alvarado | Armando | |
| 27 | Alvarado | Aurora | |
| 28 | Alvarado | Benny | |
| 29 | Alvarado | Carmen | |
| 30 | Alvarado | Chloe-Symone | Michelle Alvarado |
| 31 | Alvarado | Christopher | |
| 32 | Alvarado | Crystal | |
| 33 | Alvarado | Diego | Emily Alvarado |
| 34 | Alvarado | Emily | |
| 35 | Alvarado | Jessica | |
| 36 | Alvarado | Kaden | Ginger Alvarado |
| 37 | Alvarado | Kaylin | Ginger Alvarado |
| 38 | Alvarado | Krystal | |
| 39 | Alvarado | Lillian | Sabrina L. Alvarado |
| 40 | Alvarado | Michelle | |
| 41 | Alvarado | Rigoberto | |
| 42 | Alvarado | Robert | Sabrina L. Alvarado |
| 43 | Alvarado | Rosa | |
| 44 | Alvarado | Sabrina | |

| 45 | Alvarado | Sofia | Emily Alvarado |
|----|----------|-------|----------------|
| 46 | Alvarado III | Benny | |
| 47 | Alvarado IV | Benny | Sabrina L. Alvarado |
| 48 | Alvarado Jr. | Rigoberto | |
| 49 | Alvarado Sr. | Frederico | |
| 50 | Alvarez | Allen | Francisco Javier Alvarez III |
| 51 | Alvarez | Andrea | Francisco Javier Alvarez III |
| 52 | Alvarez | Andrew | |
| 53 | Alvarez | Katherine | |
| 54 | Alvarez | Martin | |
| 55 | Alvarez | Rosa | |
| 56 | Alvarez | Teresa | |
| 57 | Alvarez III | Francisco | |
| 58 | Alvarez Jr. | Francisco | |
| 59 | Amaya | Esperanza | Jesus R. Amaya |
| 60 | Amesqua | Richard | |
| 61 | Amezcua | Andres | Melchor Amezcua |
| 62 | Amezcua | Lorena | |
| 63 | Amezcua | Marcos | |
| 64 | Amezcua | Maria | |
| 65 | Amezcua | Maria Elena | Melchor Amezcua |
| 66 | Amezcua | Melchor | |
| 67 | Amezcua | Tanya | |
| 68 | Amezcua Garcia | Marciano | Melchor Amezcua |
| 69 | Ancheta | Hector | |
| 70 | Ancheta | Teresa | |
| 71 | Anghileri | Inocencio | Sandra Anghileri |
| 72 | Ansaldi | Chatelaine | Crystal Valdes |
| 73 | Antol | Georgette | |
| 74 | Aquino | Jovita | |
| 75 | Aquino | Kathleen | |
| 76 | Aquino | Kristine | Jovita Aquino |
| 77 | Aquino | Renato | |
| 78 | Arizpe | Arthur | |
| 79 | Arizpe | Blanca | |
| 80 | Arnado | Alfred | |
| 81 | Arnado | Angelina | |
| 82 | Arnado | Danilo | |
| 83 | Arnado | Edmund | |
| 84 | Arnado | Edward | |
| 85 | Arnado | Michael | |
| 86 | Arquette | Anna | |
| 87 | Arquette | Brianna | Debbie Arquette |
| 88 | Arquette | Debbie | |
| 89 | Arquette | Frank | |
| 90 | Arredondo | Adrian | Sergio Arredondo |
| 91 | Arredondo | Alejandra | |

| 92 | Arredondo | Sergio | |
| 93 | Arredondo | Vincent | Sergio Arredondo |
| 94 | Arrizon | Ruby | |
| 95 | Arvizu | Manuel | |
| 96 | Arvizu | Rosie | |
| 97 | Ashkar | Brenda | |
| 98 | Ashkar | Steven | |
| 99 | Atuatasi | John | |
| 100 | Atuatasi | Meleta | |
| 101 | Atuatasi | Melanie | |
| 102 | Avila | Nelia | |
| 103 | Avila | Renato | |
| 104 | Ayers | Linda | |
| 105 | Ayers - Steburg | Vicki | |
| 106 | Baemayr | Hans | |
| 107 | Baemayr | Leticia | |
| 108 | Balderas | Jessica | |
| 109 | Balderas | Juan | |
| 110 | Balderas | Martha | |
| 111 | Ballardo | Albert | Sylvia Ballardo |
| 112 | Balmaseda | Beatriz | |
| 113 | Balmaseda | Isabelo | |
| 114 | Banda | Linda | |
| 115 | Banuelos | Danielle | |
| 116 | Banuelos | Mark | |
| 117 | Banuelos | Mary Ann | |
| 118 | Banuelos | Richard | |
| 119 | Barnett | Jean | Diana Huerta |
| 120 | Barona | Carlos | |
| 121 | Barona | Joshua | Teresa Ancheta |
| 122 | Bartolome | Ana | |
| 123 | Basco-Wooldridge | Rodilyn | |
| 124 | Bason | Britny | |
| 125 | Bason | Tony | |
| 126 | Bason Jr. | Robert | |
| 127 | Bautista | Bianca | |
| 128 | Bautista | Christopher | |
| 129 | Bautista | David | |
| 130 | Bautista | Jaime | |
| 131 | Bautista | Marilyn | |
| 132 | Bautista | Victor | |
| 133 | Bedolla | Gloria | |
| 134 | Bejarano | Alejandro | |
| 135 | Bejarano | Cristina | |
| 136 | Benkhaled | Virginia | |
| 137 | Berg | David | Janell Kay Berg |
| 138 | Berg | Janelle | |

| 139 | Bertulano Alvarado | Ginger | |
| 140 | Beyer | Fred | |
| 141 | Bird | Christina | |
| 142 | Bollinger | Andrea | |
| 143 | Bollinger | Carmen | |
| 144 | Bollinger | Nicole | |
| 145 | Bollinger | Paul | |
| 146 | Bondoc | Joievee | |
| 147 | Bondoc | Josephine | Vicente Bondoc |
| 148 | Bondoc | Vicente | Vincent Bundalian |
| 149 | Bonilla | Cynthia | |
| 150 | Bonilla | Jasmine | Cynthia Bonilla |
| 151 | Bonilla | Nickolas | |
| 152 | Bonilla | Priscilla | Cynthia Bonilla |
| 153 | Bonilla Jr. | Nickolas | Cynthia Bonilla |
| 154 | Bo-Umali | Adrenalyn | Christopher Umali |
| 155 | Bray | Joseph | Kathleen Ponce |
| 156 | Bromley-Sagato | Asenath | |
| 157 | Brown | Bradley | |
| 158 | Brown | Delilah | |
| 159 | Brown | Michael | |
| 160 | Bunal | Brianna | Cynlie Bunal |
| 161 | Bunal | Ma Alma | |
| 162 | Bundalian | Vincent | |
| 163 | Bundy | Justin | |
| 164 | Burke | Diedre | |
| 165 | Burris | Justin | |
| 166 | Cabanas | Genesis | |
| 167 | Cabaron | Mary Ann | |
| 168 | Cabaron | Rey | |
| 169 | Cabaron | Reyann | |
| 170 | Cabello | Abelardo | |
| 171 | Cabello | Alejandra | Abelardo Cabello |
| 172 | Cabello | Consuelo | |
| 173 | Cabello | Crystal | Abelardo Cabello |
| 174 | Cabello | Marta | |
| 175 | Cabrera | Blanca | |
| 176 | Cabrera | Brenda | |
| 177 | Cabrera | Juan | |
| 178 | Caceres | Dennis | |
| 179 | Caceres | Domingo | |
| 180 | Caceres | Kimberly | Domingo Caceres |
| 181 | Camagong | Donnie | |
| 182 | Camagong | Irene | |
| 183 | Camegla | Roberto | |
| 184 | Campbell | Blanche | |
| 185 | Campbell | Russell | |

| 186 | Carandang | Allison | |
| 187 | Carandang | Amber | Serce Carandang |
| 188 | Carandang | Reynaldo | |
| 189 | Carandang | Serce | |
| 190 | Carrera | Matthew | Bessie Irene Lopez |
| 191 | Carrera- Jr. | Javier | Bessie Irene Lopez |
| 192 | Carrillo | Eric | |
| 193 | Carrillo | Guillermina | |
| 194 | Carrillo | Jasmine | Eric A. Carrillo |
| 195 | Carrillo | Romina | |
| 196 | Carson | City of | |
| 197 | Carter | Naomi | |
| 198 | Casino | Merlita | |
| 199 | Casino | Oscar | |
| 200 | Castaneda | Eden | |
| 201 | Castaneda | Joseph | Paul A. Castaneda |
| 202 | Castaneda | Paul | Paul A. Castaneda |
| 203 | Castaneda | Paul | |
| 204 | Castaneda | Susan | |
| 205 | Castorena | Refugio | |
| 206 | Castorena | Santa | |
| 207 | Castruita | Ariana | Raul Castruita |
| 208 | Castruita | Raul | |
| 209 | Castruita Jr. | Raul | Raul Castruita |
| 210 | Catoera | Wileen | |
| 211 | Cervantes | Blanca | Yolanda Cervantes-Ramirez |
| 212 | Cervantes Ramirez | Yolanda | |
| 213 | Chacon | David | |
| 214 | Chacon | Joann | |
| 215 | Chacon- Jr. | David | |
| 216 | Chairez | Jose | Rosvel Chairez |
| 217 | Chairez | Rosvel | |
| 218 | Chairez | Rosvel | Rosvel Chairez |
| 219 | Chavarria | Matthew | Andrea Gomes |
| 220 | Chavez | Daisy | Jose Chavez |
| 221 | Chavez | Damian | David Chavez Sr. |
| 222 | Chavez | David | |
| 223 | Chavez | Destiny | David Chavez Sr. |
| 224 | Chavez | Herlinda | |
| 225 | Chavez | Jacob | Jenivieve Ramirez |
| 226 | Chavez | Jose | |
| 227 | Chavez | Melissa | |
| 228 | Chavez- Jr. | David | David Chavez Sr. |
| 229 | Chun | Natalee | |
| 230 | Cienfuegos | Frank | |
| 231 | Cienfuegos | Joseiah | Frank Cienfuegos |
| 232 | Cienfuegos | Kiana | Frank Cienfuegos |

| | | | |
|---|---|---|---|
| 233 | Cienfuegos | Sonia | |
| 234 | Cienfuegos | Tatiana | Frank Cienfuegos |
| 235 | Collins | Jeri | |
| 236 | Collins | Jordan | |
| 237 | Collins | Madison | Jeri Collins |
| 238 | Collins | Rian | |
| 239 | Collins | Toml | |
| 240 | Contreras | John | |
| 241 | Contreras | Lasaro | Mary Ann Banuelos |
| 242 | Contreras | Nicolasa | Mary Ann Banuelos |
| 243 | Cordoza | Elizabeth | Veronica Rivas |
| 244 | Cortez | Ana | |
| 245 | Cortez | Dalena | |
| 246 | Cortez | Jose | |
| 247 | Cortez | Kimberly | Ana I. Cortez |
| 248 | Cortez | Maria | Ana I Cortez |
| 249 | Cortez Jr. | Jose | |
| 250 | Costigan | Jordan | |
| 251 | Counts | Anthony | Araseli Vargas |
| 252 | Counts | Leticia | |
| 253 | Covarrubias | Daniel | |
| 254 | Covarrubias - Lara | Rosa | |
| 255 | Crain | Dick | |
| 256 | Crain | Yvonne | |
| 257 | Crichton | Erik | |
| 258 | Crichton | Ian | |
| 259 | Crichton | Steven | |
| 260 | Crisostomo | Zachary | Melody Tandoc |
| 261 | Cuaresma | Albert | |
| 262 | Cuaresma | John | |
| 263 | Cuaresma | Michael | |
| 264 | Cuaresma | Ubalda | |
| 265 | Cunanan | Dan | |
| 266 | Cunanan | Danica | |
| 267 | Cunanan | Danielle Joy | Priscilla Ferrer |
| 268 | Curiel | Christopher | |
| 269 | Curiel | Frankie | Rosie A. Flores Curiel |
| 270 | Curiel | Isabel | Rosie Flores Curiel |
| 271 | Curiel | Rosie | |
| 272 | Curiel Jr. | Frank | |
| 273 | Daniel | Laurence | |
| 274 | David | Maureen | |
| 275 | David | Reynaldo | |
| 276 | David | Roberto | |
| 277 | Davis | Kamau | |
| 278 | Davis | Solina | |
| 279 | Davis Jr. | Clarence | |

| 280 | Dawson | Carmen | |
| 281 | Dayal | Ragina | |
| 282 | De La Cruz | Alfredo | |
| 283 | De La Cruz | Lucy | |
| 284 | De La Cruz | Maria | |
| 285 | De La Cruz Jr. | Alfredo | Maria De La Cruz |
| 286 | De La Rosa | Bobby | |
| 287 | De La Rosa | Daniel | Stephanie De La Rosa |
| 288 | De La Rosa | Samantha | Stephanie De La Rosa |
| 289 | De La Rosa | Stephanie | |
| 290 | De La Rosa Jr. | Bobby | Stephanie De La Rosa |
| 291 | De La Torre | Adrian | |
| 292 | De La Torre | Alvaro | |
| 293 | De La Torre | Eric | |
| 294 | De La Torre | Silvia | |
| 295 | De La Torre- Jr. | Alvaro | |
| 296 | De La Vara | Demi | Maria P. De La Vara |
| 297 | De La Vara | Maria | |
| 298 | De Los Reyes | Angeline | |
| 299 | De Macias | Eva | |
| 300 | De Sisto | Joseph David | |
| 301 | DeHaro | Andres | |
| 302 | DeHaro | Citlaly | |
| 303 | DeHaro | Martha | |
| 304 | DeHaro | Randu | |
| 305 | Dehart- Jr. | William | |
| 306 | Delfin | Janelle | Thelma Delfin |
| 307 | Delfin | Joel | |
| 308 | Delfin | Michael | |
| 309 | Delfin | Miguelito | |
| 310 | Delfin | Thelma | |
| 311 | Deming | David | Deborah Deming |
| 312 | Deming | Deborah | |
| 313 | Deseo | Arlene | |
| 314 | Deseo | Janelle-Regina | Arlene Deseo |
| 315 | Deseo- Jr | Reginald-Jojo | Arlene Deseo |
| 316 | Dewitt | Elvira | |
| 317 | Diaz | Delfina | |
| 318 | Diaz | Gina | |
| 319 | Diaz | Katrina | |
| 320 | Diaz | Linda | |
| 321 | Diaz | Louie | |
| 322 | Diaz | Michelle | |
| 323 | Diaz | Regina | |
| 324 | Diaz | Ruben | |
| 325 | Diaz- Jr. | Ruben | |
| 326 | Dillon | Rachelle | |

| 327 | Domenden | Emma | Angeline De Los Reyes |
| 328 | Domenden | Eric | |
| 329 | Domenden | Ernesto | |
| 330 | Domenden | Isaiah | Angeline De Los Reyes |
| 331 | Domenden | Quentin | Angeline De Los Reyes |
| 332 | Domenden | Rosita | |
| 333 | Domínguez | Felicisto | Thelma Delfin |
| 334 | Douthit | Charles | |
| 335 | Douthit | Charles F. | |
| 336 | Douthit | David | |
| 337 | Douthit | Emily | Maria Douthit |
| 338 | Douthit | Helen | Maria Douthit |
| 339 | Douthit | Maria | |
| 340 | Douthit | Patricia | |
| 341 | Douthit | Travis | Victoria Douthit |
| 342 | Douthit | Victoria | |
| 343 | Douthit Jr. | Charles | |
| 344 | Duarte | Consuelo | |
| 345 | Duarte | J. Guadalupe | |
| 346 | Dutch | Edward | |
| 347 | Echevarria | ~ Miguel | |
| 348 | Echevarria | Modesta | Miguel Echevarria |
| 349 | Echevarria | Omar | |
| 350 | Edney | Carol | |
| 351 | Edney- Jr. | Maurice | |
| 352 | Egbalic | Lucila | |
| 353 | Egbalic | Solomon | Lucila Egbalic |
| 354 | Eggers | Donald | |
| 355 | Eggers | Mary | |
| 356 | Eguchi | John | |
| 357 | Elmendorf | Michael | |
| 358 | Elmendorf | Robert | Carla McCague |
| 359 | Elmendorf Jr. | Carl | Carla McCague |
| 360 | Erwin | Kimberly | |
| 361 | Erwin | Kyle | Kimberly Erwin |
| 362 | Espanola | Pablo | |
| 363 | Espinoza | Victoria | Renee Cathleen Naval |
| 364 | Estrada | Steven | |
| 365 | Evans | Khl | |
| 366 | Evaristo | Everita | |
| 367 | Evaristo Jr. | Jose | |
| 368 | Fair | Rick | |
| 369 | Fair | Rita | Richard Allen Fair |
| 370 | Falo | Faiiluga | Melanie Atuatasi |
| 371 | Falo | Fuata Fred | Melanie Atuatasi |
| 372 | Falo | Manya | |
| 373 | Falo- Jr. | Fuata | |

| 374 | Farfan | Esther | |
| 375 | Farin | Adela | |
| 376 | Farin | Remigio | |
| 377 | Farin- Jr. | Remigio | |
| 378 | Feldt | John | Ruth Feldt |
| 379 | Feldt | Ruth | |
| 380 | Fernandez | Carmen | |
| 381 | Fernandez | Christine | |
| 382 | Fernandez | Christopher | |
| 383 | Fernandez | Concezion | |
| 384 | Fernandez | Frank | |
| 385 | Fernandez | Monica | |
| 386 | Fernandez | Nelda | |
| 387 | Fernandez | Royalene | Bernard Fernandez |
| 388 | Fernandez | Ruth | |
| 389 | Ferrer | Priscilla | |
| 390 | Flamengo | Breeonna | |
| 391 | Flamengo | Joseph | |
| 392 | Fierro | Alyssa | |
| 393 | Fierro | Eric | |
| 394 | Fierro | Krista | Yvonne Villarico-Fierro |
| 395 | Fierro | Marissa | Yvonne Villarico-Fierro |
| 396 | Figueroa | Inez | |
| 397 | Fimbres | Andrea | |
| 398 | Fimbres | Ralph | |
| 399 | Finke | Dominik | Maria-Teresa Finke |
| 400 | Finke | Francisco | Maria-Teresa Finke |
| 401 | Finke | Maria Teresa | |
| 402 | Finke | Rudolf | |
| 403 | Flores | Alejandro | |
| 404 | Flores | Bianca | |
| 405 | Flores | Ramon | |
| 406 | Flores | Raquel | |
| 407 | Flores | Sonya | |
| 408 | Flynn | Aleili | |
| 409 | Foster | Beatrice | |
| 410 | Foster | Gwenda | |
| 411 | Foster | Wendell | Beatrice Joan Foster |
| 412 | Fox | Pamela | |
| 413 | Franco | Reynaldo | |
| 414 | Frick | Jeff | |
| 415 | Frost | Cheri | |
| 416 | Fua | Vae | |
| 417 | Fualau | Miles | Sheila Sulu |
| 418 | Galan | Caitlin Jane | Jose Gerald T. Galan |
| 419 | Galan | Charlene Thel | |
| 420 | Galan | Jeanne Chantel | Jose Gerald T. Galan |

| | | | |
|---|---|---|---|
| 421 | Galan | Jose Gerald | |
| 422 | Galan | Joshua Caleb | Jose Gerald T. Galan |
| 423 | Gallegos | Isaiah | |
| 424 | Gallegos | Linda | |
| 425 | Gallegos | Shaelynn | Jessica Alvarado |
| 426 | Gallegos | Stacy | |
| 427 | Gallegos | Steven | |
| 428 | Galvan | Jazlene | Melissa Navarro |
| 429 | Ganteaune | Ramona | Stephanie Perez |
| 430 | Garcia | Abel | |
| 431 | Garcia | Ajay | Anthony Garcia |
| 432 | Garcia | Angel | Juan Angel Garcia |
| 433 | Garcia | Angel | |
| 434 | Garcia | Anthony | |
| 435 | Garcia | Brandie | |
| 436 | Garcia | Cassie | |
| 437 | Garcia | Cynthia | |
| 438 | Garcia | Daniel | |
| 439 | Garcia | Dennis | |
| 440 | Garcia | Emily | |
| 441 | Garcia | Hilaria | |
| 442 | Garcia | Juan | |
| 443 | Garcia | Lyanna | Anthony Garcia |
| 444 | Garcia | Mariko | |
| 445 | Garcia | Rosie | |
| 446 | Garcia | Sara | |
| 447 | Garcia | Sharon | |
| 448 | Garcia | Sylvia | |
| 449 | Garcia Jr | Daniel | |
| 450 | Gastelum | Yudith | |
| 451 | Gatlin | James | Shirley Gatlin |
| 452 | Gatlin | Jamie | |
| 453 | Gatlin | John | |
| 454 | Gatlin | Shirley | |
| 455 | Gatlin II | James | |
| 456 | Gayap | Jose | |
| 457 | Gayap | Marieta | |
| 458 | George | Emma | |
| 459 | George | Teichnique | |
| 460 | Gi | Edward | |
| 461 | Gi Phineas | Pafuti | |
| 462 | Glass | David | |
| 463 | Glass | Derek | |
| 464 | Glass | Vickie | |
| 465 | Glickman | Eugene | Marcell Glickman |
| 466 | Glickman | Marcell | |
| 467 | Golden | Rosalia | |

| 468 | Gomes | Alyssa | David Gomes |
|---|---|---|---|
| 469 | Gomes | Andrea | |
| 470 | Gomes | David | |
| 471 | Gomes | Gregory | |
| 472 | Gomes | Michael | |
| 473 | Gomes | Tawana | |
| 474 | Gomez | Ashley | |
| 475 | Gomez | Yvonne | |
| 476 | Gonzales | Albert | |
| 477 | Gonzales | Ana | |
| 478 | Gonzales | Cynthia | |
| 479 | Gonzales | Edmund | |
| 480 | Gonzales | Manuel | |
| 481 | Gonzales | Rianni | Crystal Valdes |
| 482 | Gonzalez | Clony | |
| 483 | Gonzalez | Jasmin | Eduardo Ochoa- Jr |
| 484 | Gonzalez | Ruth | |
| 485 | Govea | Ariana | Maricela Magana |
| 486 | Greer | Gary | Steve Roush (CPA) |
| 487 | Griffey | Renee | |
| 488 | Grizzell | Candice | |
| 489 | Groce | Dean | |
| 490 | Groce | Myra | |
| 491 | Guerrero | Brandon | Antonia Luna |
| 492 | Guerrero | George | |
| 493 | Guerrero | Vienna | Cynthia Gonzales |
| 494 | Guevara | Armando | |
| 495 | Guevara | Christina | Claudia Olivares |
| 496 | Guevara | Fabian | |
| 497 | Guevara | Josefina | |
| 498 | Guevara Jr. | Antonio | Claudia Olivares |
| 499 | Gurrola | Ariana | |
| 500 | Gutierrez | Annette | |
| 501 | Gutierrez | Breanna | Veronica Gutierrez |
| 502 | Gutierrez | Christopher | |
| 503 | Gutierrez | Emilia | |
| 504 | Gutierrez | Gary | |
| 505 | Gutierrez | Guadalupe | |
| 506 | Gutierrez | Irma | |
| 507 | Gutierrez | Irma | |
| 508 | Gutierrez | Kimberly | |
| 509 | Gutierrez | Martin | |
| 510 | Gutierrez | Michael | Victoria M. Posada |
| 511 | Gutierrez | Richard | |
| 512 | Gutierrez | Richard | |
| 513 | Gutierrez | Richard | |
| 514 | Gutierrez | Roberto | |

| 515 | Gutierrez | Shannon | |
| 516 | Gutierrez | Spencer | Gary Gutierrez |
| 517 | Gutierrez | Veronica | |
| 518 | Guzman | Bishop | Gina L Guzman |
| 519 | Guzman | Christian | |
| 520 | Guzman | Gina | |
| 521 | Guzman | Laura | |
| 522 | Guzman | Lori | |
| 523 | Hamilton | James | Shirley Hamilton |
| 524 | Hamilton | Shirley | |
| 525 | Hao | Nenita | |
| 526 | Hearn | Clifford | |
| 527 | Hearn | John | |
| 528 | Hearn | Marsha | |
| 529 | Henson | Pamela | |
| 530 | Heman IV | Robert | |
| 531 | Hernandez | Christian | |
| 532 | Hernandez | Enrique | Gladys Contreras |
| 533 | Hernandez | Nelma | |
| 534 | Hernandez | Olga | Gladys Contreras |
| 535 | Herrero | Arlene | |
| 536 | Herrero | Vito | |
| 537 | Hibbert | Clifton | |
| 538 | Hibbert | Deborah | |
| 539 | Hinshilwood | Don | |
| 540 | Hinshilwood | Gliceria | |
| 541 | Hinshilwood | Joy | Gliceria M. Hinshilwood |
| 542 | Hodge | Alexis | Kelly Hodge |
| 543 | Hodge | Kelly | |
| 544 | Hodge | Vincent | |
| 545 | Hoopingarner | Caryn | |
| 546 | Huerta | Albert | |
| 547 | Huerta | Irene | |
| 548 | Huerta | Lucy | |
| 549 | Huerta | Nico | Lucy Huerta |
| 550 | Huerto | Irene | |
| 551 | Huerto Sr. | Floro | Irene Huerto |
| 552 | Hughes | Sharon | |
| 553 | Ibarra | Eileen | |
| 554 | Ibekwe | Agatha | |
| 555 | Ibekwe | Augustine | |
| 556 | Ichikawa | Kyle | |
| 557 | Ifeacho | Chinyere | |
| 558 | Ifeacho | John | |
| 559 | Infantado | Ione | |
| 560 | Infantado | Kariz | |
| 561 | Infantado | Karla | |

| 562 | Infantado Mabalo | Karen | |
| 563 | Infantado Mabalo | Keian | Karen Infantado Mabalo |
| 564 | Ingrum | April | |
| 565 | Ingrum | Ashley | |
| 566 | Ingrum | Jeffrey | |
| 567 | Isa | Betty | |
| 568 | Isip | Jonathan | |
| 569 | Isip | Joshua Ryan | Wileen Catoera |
| 570 | Izmajtovich | Alfredo | |
| 571 | Izmajtovich | Alfredo | |
| 572 | Izmajtovich | Matilde | |
| 573 | Jackson | Mildred | |
| 574 | Jackson | Renarta | |
| 575 | Jamerson | Doris | |
| 576 | Jamerson | Kory | |
| 577 | Jamerson | Mikquel | |
| 578 | Jamerson | Sol | |
| 579 | James | Cesha | Editha James |
| 580 | James | Chedon | Sheldon James |
| 581 | James | Cherristan | Editha James |
| 582 | James | Chestan | Sheldon James |
| 583 | James | Editha | |
| 584 | James | Lisa | |
| 585 | James | Sheldon | |
| 586 | Jaramilla | Decely | |
| 587 | Jaramilla | Hailey | Marvin Jaramilla |
| 588 | Jaramilla | Marvin | |
| 589 | Jelenic | Jerry | |
| 590 | Jelenic | Krystal | |
| 591 | Jelenic | Tiffany | |
| 592 | Jelenic | Yolanda | |
| 593 | Jenkins-Jackson | Shyra | |
| 594 | Jimenez | Jose | |
| 595 | Jimenez | Kendra | |
| 596 | Jimenez | Raquel | |
| 597 | Jimenez- Jr. | Jose | |
| 598 | Johnson | Anna | |
| 599 | Kane | David | |
| 600 | Kane | Georgianna | |
| 601 | Kapoor | Amit | |
| 602 | Kapoor | Gehna | Amit Kapoor |
| 603 | Kapoor | Tani | |
| 604 | Kapoor | Yamya | Amit Kapoor |
| 605 | Karr | Carrie | |
| 606 | Karr | Dwight | |
| 607 | Karr | Irene | |
| 608 | Karr | Rebecca | |

| 609 | Keith | Brian | |
| 610 | Keith | Linda | |
| 611 | Keith III | Charles | |
| 612 | Keith Jr. | Charles | |
| 613 | Keith-Moreno | Amy | |
| 614 | Koval-Diaz | Christopher | |
| 615 | Koval-Diaz | Nicholas | Michelle Koval-Diaz |
| 616 | Labarda Jr. | Carlito | |
| 617 | Laforteza | Dennis | |
| 618 | Laforteza | Flordeliz | |
| 619 | Laforteza | Pamela | |
| 620 | Lal | Jasmine | Regina Dayal |
| 621 | Lal | Jowahir | |
| 622 | Lal | Manish | Regina Dayal |
| 623 | Lal | Rajiv | |
| 624 | Landingin | Josephine | |
| 625 | LaPonza | Linda | |
| 626 | Lara | Alejandro | |
| 627 | Lara | Jose | |
| 628 | Lara-Sanchez | Alma | |
| 629 | Larrieu | Dylan | |
| 630 | Larrieu | Geddy | |
| 631 | Larrieu | Gordon | |
| 632 | Larrieu | Marlie | Dylan J. Larrieu |
| 633 | Lasswell | Barbara | |
| 634 | Lasswell | Harold | |
| 635 | Lasswell | Jennifer | |
| 636 | Lasswell | Thomas | |
| 637 | Lasswell | Thomas | |
| 638 | Laxa | James | |
| 639 | Laxa-Salazar | Clare | |
| 640 | Lazaro | Lily | |
| 641 | Ledesma | Alda | |
| 642 | Leon | Frank | |
| 643 | Leon | Praxedes | |
| 644 | Leon | Richard | |
| 645 | Leon | Robert | |
| 646 | Leon Jr. | Luis | |
| 647 | Limosnero | Carly | Michael Limosnero |
| 648 | Limosnero | Maile | Michael Limosnero |
| 649 | Limosnero | Michael | |
| 650 | Limosnero | Ninette | |
| 651 | Lipsey | Christopher | |
| 652 | Lipsey | Cuinn | Wanda L. Weimer |
| 653 | Lipsey | Kenna | Wanda L. Weimer |
| 654 | Lira | Andrew | Miguel Lira |
| 655 | Lira | Guadalupe | |

| 656 | Lira | Miguel | |
| 657 | Lira | Miguel | Miguel Lira |
| 658 | Lira | Moises | Miguel Gonzalo Lira |
| 659 | Lira | Natalie | Miguel Lira |
| 660 | Lising | Anita | |
| 661 | Llanes | Gilda | Juan G. Llanes |
| 662 | Llanes | Juan | |
| 663 | Lofthouse | Victoria | |
| 664 | Lomeli | Anthony | |
| 665 | Lomeli | Ermelinda | |
| 666 | Lomeli | Henry | |
| 667 | Lomeli | Melinda | |
| 668 | Lomibao | Alfredo | |
| 669 | Lomibao | Cesar | Keiko Lomibao |
| 670 | Lomibao | Kieko | Mariko Garcia |
| 671 | Long | Kevin | |
| 672 | Long | Penny | |
| 673 | Long III | Charles | |
| 674 | Long Jr. | Charles | |
| 675 | Lopez | Alberto | |
| 676 | Lopez | Alma | |
| 677 | Lopez | Angel | Hector Lopez |
| 678 | Lopez | Arturo | |
| 679 | Lopez | Arturo | |
| 680 | Lopez | Bessie | |
| 681 | Lopez | Bridget | |
| 682 | Lopez | Brittany | |
| 683 | Lopez | Catherine | |
| 684 | Lopez | Catherine | |
| 685 | Lopez | Chrystina | |
| 686 | Lopez | David | |
| 687 | Lopez | Gloria | |
| 688 | Lopez | Hector | |
| 689 | Lopez | Johnny | |
| 690 | Lopez | Jose | |
| 691 | Lopez | Magdalena | |
| 692 | Lopez | Marissa | Catherine Lopez |
| 693 | Lopez | Mayra | |
| 694 | Lopez | Michelle | |
| 695 | Lopez | Ofelia | |
| 696 | Lopez | Reynaldo | Catherine E. Lopez |
| 697 | Lopez | Roxana | Hector Lopez |
| 698 | Lopez | Ruben | |
| 699 | Lopez | Vincent | |
| 700 | Lopez Jr. | Albert | |
| 701 | Lopez Jr. | Hector | Catherine E. Lopez |
| 702 | Lopez Jr. | Miguel | |

| 703 | Lopez-Fiamengo | Dyan | |
| 704 | Lopez-Lavalle | Absalon | |
| 705 | Lopez-Lavalle | Lilly | |
| 706 | Lopez-Lavalle | Marcella | |
| 707 | Lowe-Bason | Bobbie Angela | |
| 708 | Lowrey | Esther | Jesse Burl Lowrey |
| 709 | Lowrey | Jesse | |
| 710 | Lozano | Anthony | |
| 711 | Lozano | Monica | |
| 712 | Lozano | Stephanie | Monica Lozano |
| 713 | Lozano Jr. | Anthony | Monica Lozano |
| 714 | Lucero | Dolores | |
| 715 | Lucero | Ricky | |
| 716 | Lucero | Robert | |
| 717 | Lucero | Rudy | |
| 718 | Luhrsen | Allan | |
| 719 | Luhrsen | Andrew | |
| 720 | Luhrsen | Susan | |
| 721 | Luhrsen Jr. | Allan | |
| 722 | Luna | Antonia | |
| 723 | Luna | Brian | |
| 724 | Luna | Lorenza | |
| 725 | Mabalo | Froilan | |
| 726 | Macias | Joseph | |
| 727 | Macias | Maria | |
| 728 | Macias Arce | Noe | |
| 729 | Macias-Zuniga | Jesus | |
| 730 | MacLeod | David | |
| 731 | MacLeod | Malcolm | |
| 732 | MacLeod | Shaaron | |
| 733 | Madrid | Alfred | Anna V. Madrid |
| 734 | Madrid | Anna | |
| 735 | Madrid | Raul | Lisa Martinez |
| 736 | Madrid | Roselie | |
| 737 | Madrid Sr. | Louis | |
| 738 | Madrigal | Socorro | |
| 739 | Magallon | Esequiel | |
| 740 | Magallon | Karen | |
| 741 | Magallon | Lori | |
| 742 | Magallon-Hamlin | Karen | |
| 743 | Magana | Adam | |
| 744 | Magana | Adan | |
| 745 | Magana | Esther | |
| 746 | Magana | Hector | |
| 747 | Magana | Julia | Adam Magana |
| 748 | Magana | Julissa | Adam Magana |
| 749 | Magana | Makayla | Brenda Cabrera |

| 750 | Magana | Maricela | |
| 751 | Magana | Mario | |
| 752 | Magana | Nathan | Mario Magana |
| 753 | Magdaleno | Adolfo | |
| 754 | Magdaleno | Anabel | |
| 755 | Magdaleno | Benito | |
| 756 | Magdaleno | Daniel | Anabel Magdaleno |
| 757 | Magdaleno | Destiny | Anabel Magdaleno |
| 758 | Magdaleno | Marlene | Anabel Magdaleno |
| 759 | Magdaleno | Vitalina | |
| 760 | Maggay | Pedro | Terry Maggay |
| 761 | Maggio | Brandon | Vivian Maggio |
| 762 | Maggio | Vivian | |
| 763 | Maggio Jr. | Willie | |
| 764 | Magno | Bonifacio | Gil S. Magno |
| 765 | Magno | Gabrielle | |
| 766 | Magno | Gian-Paolo | Yasmin Magno |
| 767 | Magno | Gil | |
| 768 | Magno | Gilbert | |
| 769 | Magno | Yasmin | |
| 770 | Malik | Abdul | |
| 771 | Malik | Alazahn | Aneela Malik |
| 772 | Malik | Aneela | |
| 773 | Malik | Arbaaz | Aneela Malik |
| 774 | Malik | Farhan | Aneela Malik |
| 775 | Malik | Moneeba | Aneela Malik |
| 776 | Malunda | Amalia | |
| 777 | Malunda | Seymour | |
| 778 | Manansala | Joan | |
| 779 | Manansala | Joshua | |
| 780 | Manansala | Julieto | |
| 781 | Manansala | Yolanda | |
| 782 | Mancera | Carlos | |
| 783 | Mancera | Carson | Michelle Mancera |
| 784 | Mancera | Denielle | Michelle Mancera |
| 785 | Mancera | Matthew | Michelle Mancera |
| 786 | Mancera | Michelle | |
| 787 | Manjgotic | Ruzica | Jerry Jelenic |
| 788 | Marin | Ambar | |
| 789 | Marin | Aurora | |
| 790 | Marin | Felix | |
| 791 | Marin | Jose | |
| 792 | Martinez | Alejandro | |
| 793 | Martinez | Alex | Ramona Martinez |
| 794 | Martinez | Alexandra | Ramona Martinez |
| 795 | Martinez | Alexis | Ramona Martinez |
| 796 | Martinez | Anthony | Ramona Martinez |

| 797 | Martinez | Charisse | |
| 798 | Martinez | Christian | |
| 799 | Martinez | Cynthia | |
| 800 | Martinez | Fe | |
| 801 | Martinez | Gloria | |
| 802 | Martinez | Jesus | |
| 803 | Martinez | Lisa | |
| 804 | Martinez | Manuel | |
| 805 | Martinez | Maria | |
| 806 | Martinez | Marlon | |
| 807 | Martinez | Martin | |
| 808 | Martinez | Martin | Martin M. Martinez |
| 809 | Martinez | Maximillian | |
| 810 | Martinez | Miguel | |
| 811 | Martinez | Patricia | |
| 812 | Martinez | Ramona | |
| 813 | Martinez | Robert | |
| 814 | Martinez | Robert | |
| 815 | Martinez | Rocky | Martin M. Martinez |
| 816 | Martinez | Salvador | |
| 817 | Martinez | Sandra | |
| 818 | Martinez | Stephanie | |
| 819 | Martinez | Trinity | Kimberly Ramirez |
| 820 | Martinez | Victor | |
| 821 | Martinez III | Salvador | |
| 822 | Martinez-Rivera | Gloria | |
| 823 | Mascardo | Carmelita | |
| 824 | Mascardo | Josefino | |
| 825 | Mataalii | Corrina | |
| 826 | Mataalii | David | |
| 827 | Mataalii | Lauren | Stephen Mataalii |
| 828 | Mataalii | Stephen | |
| 829 | Matheson | Allister | |
| 830 | Matute | Brian | |
| 831 | Matute | Maria | |
| 832 | Matute | Raul | |
| 833 | Mayuga | Ernesto | |
| 834 | Mayuga | Gloria | |
| 835 | McAmis | James | Sara Crouson |
| 836 | McCague | Carla | |
| 837 | McCalip | Robert | Saralyn Pennington |
| 838 | McCarty | Billie | |
| 839 | McCarty | Max | |
| 840 | McCarty | Winfred | |
| 841 | McCollum | Lesley-Anne | |
| 842 | McEwan | Adelaide | David McEwan |
| 843 | McEwan | David | |

| | | | |
|---|---|---|---|
| 844 | McEwan | Ethan | David McEwan |
| 845 | McEwan | Jason | David McEwan |
| 846 | McEwan | Travis | |
| 847 | McGee | Billy | |
| 848 | McGee | Nina | |
| 849 | McGee | Shanah | |
| 850 | McGee | Yusef | |
| 851 | McGregor | Andrew | |
| 852 | Mendez | Carmela | |
| 853 | Mendez | Jose | |
| 854 | Mendez | Joseph | |
| 855 | Mendez | Juanita | |
| 856 | Mendez | June | |
| 857 | Mendez | Steven | |
| 858 | Mendoza Jr. | Carlos | |
| 859 | Mercado | Angeles | |
| 860 | Mercado | Nelia | |
| 861 | Mercado | Purificacion | Teresita Tan |
| 862 | Miller-Bason | Robbie | |
| 863 | Miramontes | Laura | |
| 864 | Miramontes | Vincent | Laura Miramontes |
| 865 | Miramontes Jr. | Alberto | |
| 866 | Miramontez | Brenda | |
| 867 | Miramontez | Cecilia | |
| 868 | Miramontez | LaToya | |
| 869 | Mitoma | Michael | |
| 870 | Moaaliitele | Esau | Georgianna Kane |
| 871 | Moaaliitele | Iakopo | Georgianna Kane |
| 872 | Moaaliitele | Lemauosamoa | Gorgianna Kane |
| 873 | Mohammad | Mirwaise | |
| 874 | Mohammad | Noor | |
| 875 | Mohammad | Omaid | Zary and Noor Muhammad |
| 876 | Mohammad | Zary | |
| 877 | Monge | Elizabeth | |
| 878 | Montgomery | Julie | |
| 879 | Montoya | Daniel | |
| 880 | Montoya | Lydia | |
| 881 | Montoya | Michael | |
| 882 | Montoya | Nick | |
| 883 | Montoya | Oliver | |
| 884 | Mora | Helen | |
| 885 | Mora Sr. | Roy | |
| 886 | Murillo | Ramon | |
| 887 | Muro | Carlos | Regina R. Taylor |
| 888 | Musick | Denise | |
| 889 | Myers | Mary | Mervin Myers |
| 890 | Myers | Mervin | |

| | | | |
|---|---|---|---|
| 891 | Nabayan | Amanda | |
| 892 | Nabayan | Celia | |
| 893 | Nabayan | Edward | |
| 894 | Nabayan | Leinea | |
| 895 | Nabayan | Valentina | |
| 896 | Nabayan Jr | Edward | |
| 897 | Nakasuji | Tadaharu | |
| 898 | Narvaez | Thelma | |
| 899 | Nava | Ceasar | |
| 900 | Nava | Vision | Yvette Velarde |
| 901 | Naval | Renee | |
| 902 | Naval | Richard | |
| 903 | Naval | Rosemary | |
| 904 | Naval | Rudy | |
| 905 | Navales | Jason | Jill Parago |
| 906 | Navarrete | Rosalba | |
| 907 | Navarrette | Eduardo | |
| 908 | Navarrette | Edward | Rosa M. Navarrette |
| 909 | Navarrette | Katrina | Rosa Navarrette |
| 910 | Navarrette | Rosa | |
| 911 | Navarrette | Sonia | Rosa M. Navarrette |
| 912 | Navarro | Carlos | |
| 913 | Navarro | Deborah | |
| 914 | Navarro | Debra | |
| 915 | Navarro | Jaquelline | |
| 916 | Navarro | Melissa | |
| 917 | Navarro | Rudy | |
| 918 | Navarro Sr. | Rudy | |
| 919 | Negri | Juana | Silvia De La Torre |
| 920 | Nelson | Dorothy | |
| 921 | Nguyen | Marc | |
| 922 | Nguyen | Minh Brian | |
| 923 | Nieto | Steven | |
| 924 | Nino-Castillo | Maria | |
| 925 | Nombrado | Elizardo | |
| 926 | Nombrado | Jobert | Mary Jean Nombrado |
| 927 | Nombrado | Mary Jean | |
| 928 | Norfleet-McEwan | Karen | |
| 929 | Noriega | Elizabeth | |
| 930 | Noriega | Jacklyn | |
| 931 | Noriega | Jaime | |
| 932 | Noriega | Jaime | |
| 933 | Noriega | Kathleen | |
| 934 | Noriega | Martin | |
| 935 | Noriega | Ruben | |
| 936 | Noriega Jr. | Ruben | |
| 937 | Norwood | Barbara | |

| 938 | Norwood | Cameron | |
| 939 | Norwood | Candace | Cameron A. Norwood |
| 940 | Norwood | Jada | Barbara Norwood |
| 941 | Nunez | Martin | |
| 942 | Nunez | Michelle | |
| 943 | Nunez | Nichelle | |
| 944 | Oberlander | Ann | |
| 945 | O'Brien | Joy | |
| 946 | O'Brien | Taylor | Joy O'Brien |
| 947 | O'Brien- Jr. | Jack | |
| 948 | Ocacio | Christina | |
| 949 | Ocampo | Maria | |
| 950 | Ochoa | Alejandro | Eduardo Ochoa- Jr |
| 951 | Ochoa | Celia | Carmen Ogden |
| 952 | Ochoa | Daniel | |
| 953 | Ochoa | Eduardo | |
| 954 | Ochoa | Jose | Carmen Ogden |
| 955 | Ochoa | Kristy | |
| 956 | Ochoa | Luz | |
| 957 | Ochoa | Martha | |
| 958 | Ochoa | Rafael | |
| 959 | Ochoa | Rafael | |
| 960 | Ochoa | Sierra | Eduardo Ochoa- Jr |
| 961 | Ochoa Jr. | Eduardo | |
| 962 | Ogawa | Grace | |
| 963 | Ogawa | Michael | |
| 964 | Ogawa | Rikiya | |
| 965 | Ogden | James | William Ogden |
| 966 | Ogden | Sharon | |
| 967 | Ogden | William | |
| 968 | Oglesby | Belinda | |
| 969 | Oglesby | Halie | Belinda Oglesby |
| 970 | Oglesby | Jeffrey | |
| 971 | Oglesby | Kelsey | Belinda Oglesby |
| 972 | Oglesby | Ronnie | |
| 973 | Okamoto | Keane | |
| 974 | Okamoto | Kerrie | |
| 975 | Okumoto | Anna | |
| 976 | Olivares | Claudia | |
| 977 | Olivares | Jessica | Claudia Olivares |
| 978 | Olivares | Jesus | |
| 979 | Onwubere | Armstrong | |
| 980 | Onwubere | Delores | |
| 981 | Onwubere | Ebony | |
| 982 | Onwubere | Nina | |
| 983 | Onwubere | Yolanda | |
| 984 | Orloski | Brynne | |

| 985 | Orloski | Tamara | |
| 986 | Ortega | Christopher | Regina R. Taylor |
| 987 | Ortega | Clemencia | |
| 988 | Ortega | David | |
| 989 | Ortega | Leonard | |
| 990 | Ortega | Lorraine | |
| 991 | Ortega | Lupe | |
| 992 | Ortega | Monique | |
| 993 | Ortega | Ricardo | |
| 994 | Ortega | Richard | |
| 995 | Ortega | Tara | Ricardo Ortega Jr. |
| 996 | Ortega- Jr. | Pilar | |
| 997 | Ortega Jr. | Ricardo | |
| 998 | Osborne | Gayle | Linda Gallegos |
| 999 | Osborne | Gregory | Linda Gallegos |
| 1000 | Osborne | Max | |
| 1001 | Osborne | Nancy | |
| 1002 | Osuna | Erick | |
| 1003 | Osuna | Israel | |
| 1004 | Osuna | Maria | |
| 1005 | Pacheco | Elizabeth | |
| 1006 | Pacheco | Robert | Elizabeth Corrine Pacheco |
| 1007 | Padilla | Javier | |
| 1008 | Padilla | Nicolasa | |
| 1009 | Paguio | Edith | |
| 1010 | Paguio | Estela | |
| 1011 | Paguio | Jose Alvin | Estela Paguio |
| 1012 | Palicte | Darrell | |
| 1013 | Palicte | Daryn | |
| 1014 | Palicte | Henry | |
| 1015 | Palicte | Justina | |
| 1016 | Pantaleon | Imelda | |
| 1017 | Pantaleon | Patrick | |
| 1018 | Pantaleon | Praire | |
| 1019 | Parago | Dulce | |
| 1020 | Parago | Jade | |
| 1021 | Parago | Jill | |
| 1022 | Parago | John | |
| 1023 | Parago | Nathaniel | |
| 1024 | Parayno | Emma | |
| 1025 | Parayno | Mark | |
| 1026 | Patterson- Jr. | Johnny | Yvette Velarde |
| 1027 | Pendilla | Conrad | |
| 1028 | Pendilla | Dylan | |
| 1029 | Pendilla | Justin | |
| 1030 | Pendilla | Tiare | Conrad Pendilla |
| 1031 | Perez | Alejandro | |

| 1032 | Perez | Daniel | |
| 1033 | Perez | Diana | |
| 1034 | Perez | Guadalupe | |
| 1035 | Perez | Horacio | |
| 1036 | Perez | Jose | |
| 1037 | Perez | Michael | |
| 1038 | Perez | Michael | |
| 1039 | Perez | Ralph | |
| 1040 | Perez | Stephanie | |
| 1041 | Perkins | Alexandra | |
| 1042 | Perkins | Alicia | |
| 1043 | Perkins | Alicia | |
| 1044 | Perkins | Richard | |
| 1045 | Perkins Jr. | Richard | |
| 1046 | Petrouski | Wendy | |
| 1047 | Pfeiffer | Charles | Edeltraut Pfeiffer |
| 1048 | Phillips | Bobby | |
| 1049 | Phillips | Mar-Jana | Bobby Phillips |
| 1050 | Phillips | Rowena | |
| 1051 | Phillips II | Bobby | |
| 1052 | Phineas | Julie | |
| 1053 | Phineas | Magdalene | |
| 1054 | Piazza | Dominic | |
| 1055 | Piazza | Krystle | |
| 1056 | Piazza | Lourdes | |
| 1057 | Piazza | Stephanie | |
| 1058 | Pilato | Giovan | |
| 1059 | Pingatore | Yvonne | |
| 1060 | Platon | Nora | |
| 1061 | Ponce | James | |
| 1062 | Ponce | Lina | |
| 1063 | Ponce | Maria | |
| 1064 | Ponce | Rene | |
| 1065 | Ponce (Navarrete) | Kathleen | |
| 1066 | Posada | Christina | |
| 1067 | Posada | Juan | |
| 1068 | Posada | Victoria | |
| 1069 | Post | Barbara | |
| 1070 | Post | Kathy | |
| 1071 | Post | Stanley | Barbara Post |
| 1072 | Poyaoan | Ma. Cherry | |
| 1073 | Poyaoan | Rolando | |
| 1074 | Preciado | Alexandria | Veronica Rivas |
| 1075 | Preciado | Jesus | Veronica Rivas |
| 1076 | Priest | Carmen | |
| 1077 | Priest | Matthew | |
| 1078 | Priest | William | |

| 1079 | Pynn | Andrea | |
| 1080 | Quijada | Rachel | |
| 1081 | Quimson | Bailey | Leslie Quimson |
| 1082 | Quimson | Gloria | |
| 1083 | Quimson | Leslie | |
| 1084 | Quimson | Paul | |
| 1085 | Quimson | Rolando | |
| 1086 | Quimson | Shaun | Leslie Quimson |
| 1087 | Quimson Jr. | Rolando | |
| 1088 | Quinones | Brandy | |
| 1089 | Racanelli | Laura | |
| 1090 | Ramirez | Alejandro | |
| 1091 | Ramirez | Beatriz | |
| 1092 | Ramirez | Enrique | Christopher Gutierrez |
| 1093 | Ramirez | Frank | Natalie Ramirez |
| 1094 | Ramirez | Frederick | |
| 1095 | Ramirez | Jean | |
| 1096 | Ramirez | Jennivieve | |
| 1097 | Ramirez | Jessica | |
| 1098 | Ramirez | John | |
| 1099 | Ramirez | Joseph | |
| 1100 | Ramirez | Kimberly | |
| 1101 | Ramirez | Kristy | |
| 1102 | Ramirez | Marie | |
| 1103 | Ramirez | Megan | |
| 1104 | Ramirez | Michael | |
| 1105 | Ramirez | Mike | |
| 1106 | Ramirez | Natalie | |
| 1107 | Ramirez | Teresa | |
| 1108 | Ramirez | Theresa | |
| 1109 | Ramos | Daisy | |
| 1110 | Ramos | Faviola | |
| 1111 | Ramos | Mayra | |
| 1112 | Ramos | Natalia | Mayra Ramos |
| 1113 | Ramos | Rosa | |
| 1114 | Ramos | Roxanna | Salvador Ramos |
| 1115 | Ramos | Salvador | |
| 1116 | Ramos Jr. | Salvador | |
| 1117 | Randle | John | |
| 1118 | Randle | Tionya | |
| 1119 | Randle | Tonya | |
| 1120 | Randle Jr. | John | |
| 1121 | Ranie | Joe | |
| 1122 | Raya | Alex | |
| 1123 | Raya | Jose | |
| 1124 | Raya | Tomasa | |
| 1125 | Rendon | Maria | |

| 1126 | Rendon-Aguilar | Esther | |
| 1127 | Reserva | Douglas | |
| 1128 | Reserva | Rosemary | |
| 1129 | Reserva Jr. | Douglas | |
| 1130 | Reyes | Charito | |
| 1131 | Reyes | Ernesto | |
| 1132 | Reyes | Jeremy | |
| 1133 | Reyes | Jonathan | |
| 1134 | Reyes | Jonathan | |
| 1135 | Reyes | Joshua | Zerandy Reyes |
| 1136 | Reyes | Susan | |
| 1137 | Reyes | Taylor | |
| 1138 | Reyes | Vivian | |
| 1139 | Reyes | Zerandy | |
| 1140 | Reynoso | Yolanda | |
| 1141 | Rios | Arturo | |
| 1142 | Rios | Evelia | |
| 1143 | Rivas | Aaron | Sara Rivas |
| 1144 | Rivas | Aaron | Sara Rivas |
| 1145 | Rivas | Erin | Sara Rivas |
| 1146 | Rivas | Juanita | |
| 1147 | Rivas | Reynaldo | |
| 1148 | Rivas | Sara | |
| 1149 | Rivas | Veronica | |
| 1150 | Rivera | Deanna | |
| 1151 | Rivera | Ernesto | |
| 1152 | Rivera | James | |
| 1153 | Rivera | Lydia | |
| 1154 | Rivera | Steven | |
| 1155 | Robles | Crystal | |
| 1156 | Robles | Mario | |
| 1157 | Robles | Michael | Rita Robles |
| 1158 | Robles | Rita | |
| 1159 | Robles | Senorino | Kathleen Robles |
| 1160 | Rodriguez | Anabel | |
| 1161 | Rodriguez | Andrew | |
| 1162 | Rodriguez | Araceli | |
| 1163 | Rodriguez | Christina | |
| 1164 | Rodriguez | Daniel | |
| 1165 | Rodriguez | Daniel | Natalia Rodriguez |
| 1166 | Rodriguez | Emilio | Javier Rodriguez |
| 1167 | Rodriguez | Emma | |
| 1168 | Rodriguez | Enrique | |
| 1169 | Rodriguez | Esteban | |
| 1170 | Rodriguez | Esther | |
| 1171 | Rodriguez | Fredrick | |
| 1172 | Rodriguez | Helen | |

| 1173 | Rodriguez | Javier | |
| 1174 | Rodriguez | Jenny | |
| 1175 | Rodriguez | Jose | |
| 1176 | Rodriguez | Lorena | |
| 1177 | Rodriguez | Maria | Natalia Rodriguez |
| 1178 | Rodriguez | Maria | |
| 1179 | Rodriguez | Mary | |
| 1180 | Rodriguez | Natalia | |
| 1181 | Rodriguez | Pete | |
| 1182 | Rodriguez | Pilar | Enrique Rodriguez |
| 1183 | Rodriguez | Rebecca | Enrique Rodriguez |
| 1184 | Rodriguez | Ricardo | |
| 1185 | Rodriguez | Richard | |
| 1186 | Rodriguez | Roberto | Enrique Rodriguez |
| 1187 | Rodriguez | Sonia | |
| 1188 | Rodriguez | Susan | |
| 1189 | Roeder | Leo | |
| 1190 | Roeder | Nicholas | |
| 1191 | Roeder | Rose | |
| 1192 | Roeder | Sebastian | |
| 1193 | Romero | Andrew | Mona L. Zamora |
| 1194 | Romero | Iris | |
| 1195 | Romero | Mariah | Mona L. Zamora |
| 1196 | Romero | Reynaldo | |
| 1197 | Romero-Santos | Helen | |
| 1198 | Ron | Carolina | |
| 1199 | Ron | Vanessa | |
| 1200 | Rosales | Brooklynn | |
| 1201 | Rosales | Jacob | Nancy Osborne |
| 1202 | Rosales | Joey | |
| 1203 | Rosales | Reginald | |
| 1204 | Rosales | Richard | |
| 1205 | Rosales | Riley | Richard Rosales |
| 1206 | Rosales | Rita | |
| 1207 | Ruvalcaba | David | |
| 1208 | Ruvalcaba | Francisco | |
| 1209 | Ruvalcaba | Gina | |
| 1210 | Ruvalcaba | Racquel | |
| 1211 | Ruvalcaba | Robert | |
| 1212 | Ruvalcaba | Valerie | |
| 1213 | Ruvalcaba Jr. | Jose | |
| 1214 | Ruvalcaba Sr. | Jose | |
| 1215 | Saavedra | Cecily | |
| 1216 | Saffell | Carrie | |
| 1217 | Saffell | Jacob | Raymond Saffell |
| 1218 | Saffell | Luke | Raymond Saffell |
| 1219 | Saffell | Raymond | |

| 1220 | Sagisagi | Saline | Maleta Atuatasi |
|------|----------|--------|------------------|
| 1221 | Salazar | Joselito | |
| 1222 | Salazar | Ruth | |
| 1223 | Salinas | Evelyn | |
| 1224 | Salud | Edwardo | |
| 1225 | Salud | Evangelino | Leonida Salud |
| 1226 | Salud | Jonathan | |
| 1227 | Salud | Leonida | |
| 1228 | Salud | Mary | |
| 1229 | Salud | Mathew | |
| 1230 | Samson | Aurora | |
| 1231 | Samson | Eleazar | |
| 1232 | Samson | Emmanuel | |
| 1233 | San Antonio | Emma | |
| 1234 | San Luis | Arlene | |
| 1235 | San Pedro | Daniel | |
| 1236 | San Pedro | Erika | |
| 1237 | San Pedro | Megan | Daniel San Pedro |
| 1238 | Sanchez | Gilbert | Sally Sanchez |
| 1239 | Sanchez | Manuel | |
| 1240 | Sanchez | Sally | |
| 1241 | Sandman | Donald | |
| 1242 | Sandman | Lou Ann | |
| 1243 | Sandoval | Anthony | |
| 1244 | Sandoval | Rachel | |
| 1245 | Santana | Casara | |
| 1246 | Santillan | Rebecca | |
| 1247 | Santos | Bryan | |
| 1248 | Santos | Stephanie | |
| 1249 | Santos | Winifredo | |
| 1250 | Sapgoian | Maria | |
| 1251 | Satete | Beauty | |
| 1252 | Satete | Pearly | |
| 1253 | Sayre-Smith | George | |
| 1254 | Sayre-Smith | Joyce | |
| 1255 | Sciortino | Francesca | |
| 1256 | Sciortino | Piero | |
| 1257 | Sedillos | Felipe | |
| 1258 | Sedillos | Manuel | |
| 1259 | Sedillos | Vidal | |
| 1260 | Seelig | Maria | |
| 1261 | Segaud | Therese | |
| 1262 | Sepulveda | Brianna | Ramon Sepulveda |
| 1263 | Sepulveda | Ramon | |
| 1264 | Sepulveda | Roxana | |
| 1265 | Sepulveda | Xochitl | |
| 1266 | Sepulveda | Yudith | Yudith Gastelum |

| 1267 | Sepulveda- Jr. | Ramon | Ramon Sepulveda |
|------|----------------|-------|-----------------|
| 1268 | Serrano | Maria | |
| 1269 | Settles | Karyn | |
| 1270 | Sever | John | |
| 1271 | Sewell | Chanmalin | |
| 1272 | Shell Jr. | Lonnie | Alexandra Perkins |
| 1273 | Shoor | Aman | |
| 1274 | Silva | Jasmine | |
| 1275 | Silva | Jeremy | |
| 1276 | Silva | Jonathan | |
| 1277 | Silva | Joshua | |
| 1278 | Simons | Brad | |
| 1279 | Simons | Cheyenne | Christopher Simons |
| 1280 | Simons | Christopher | |
| 1281 | Simons | Constance | |
| 1282 | Simons | Robert | |
| 1283 | Slack | Kaitlyn | Kristy Sy |
| 1284 | Slack | Kyle | |
| 1285 | Smiley | Keverly | |
| 1286 | Smith | Freda | Mildred Jackson |
| 1287 | Smith | Helen | George Allen Sayre-Smith |
| 1288 | Smith | Orinio | |
| 1289 | Soria | Mila | |
| 1290 | Spaleta | Patricia | |
| 1291 | Steingrobe | Karl | |
| 1292 | Steward | Chadra | |
| 1293 | Steward | Erick | Erick Steward |
| 1294 | Steward | Erick | |
| 1295 | Steward | Errin | Erick Steward |
| 1296 | Stoudt | Kimberly | |
| 1297 | Stoudt | Nicholas | |
| 1298 | Stoudt | Patrick | |
| 1299 | Stoudt | Thomas | |
| 1300 | Suarez | Aaron | |
| 1301 | Suarez | Adriana | Lugarda Suarez |
| 1302 | Suarez | Alfred | |
| 1303 | Suarez | Angelica | |
| 1304 | Suarez | Celina | Lugarda Suarez |
| 1305 | Suarez | Jesus | |
| 1306 | Suarez | Jose | Lugarda Suarez |
| 1307 | Suarez | Lugarda | |
| 1308 | Suarez | Maribel | |
| 1309 | Suarez | Veronica | |
| 1310 | Suarez | Virginia | |
| 1311 | Suarez | Yesenia | Lugarda Suarez |
| 1312 | Suarez Jr. | Jesus | |
| 1313 | Sulu | Sheila | |

| 1314 | Swain | Aaron | Sheila Swain |
|------|-------|-------|--------------|
| 1315 | Swain | Brian | |
| 1316 | Swain | Joshua | Sheila Swain |
| 1317 | Swain | Sheila | |
| 1318 | Sy | Kristy | |
| 1319 | Talavera | Felipe | |
| 1320 | Talavera | Sanjuana | |
| 1321 | Talavera-Zamora | Felipe | |
| 1322 | Talavera-Zamora | Kelvin | Sanjauna Talavera |
| 1323 | Talavera-Zamora | Kimberly | Sanjuana Talavera |
| 1324 | Tan | April | |
| 1325 | Tan | Noel | |
| 1326 | Tan | Sid | |
| 1327 | Tan | Teresita | |
| 1328 | Tandoc | Melody | |
| 1329 | Tandoc | Mikaela | Melody Tandoc |
| 1330 | Tandoc | Roy | |
| 1331 | Tandoc | Yolanda | |
| 1332 | Tanner | Linda | |
| 1333 | Tapia | Anna | |
| 1334 | Tapia | Jose | |
| 1335 | Tate | Curtis | |
| 1336 | Taylor | Regina | |
| 1337 | Taylor | Sharla | |
| 1338 | Tejano | Maria Cecilia | |
| 1339 | Tejano Jr. | Percival | |
| 1340 | Terzis | Matthew | |
| 1341 | Tesoro | George | |
| 1342 | Tialavea | Dennis | |
| 1343 | Tialavea | Jayden | Jessica A. Ybarra |
| 1344 | Tiangco | Esperanza | Teodoro Tiangco |
| 1345 | Tiangco | Floro | Teodoro Tiangco |
| 1346 | Tiangco | Isabelita | |
| 1347 | Tiangco | Maria | |
| 1348 | Tiangco | Melanie | |
| 1349 | Tiangco | Teodoro | |
| 1350 | Tiangco | Theodore | |
| 1351 | Torino | Emily | |
| 1352 | Torino | Ervin | |
| 1353 | Torino | Estrella | |
| 1354 | Torino | Faustino | |
| 1355 | Torres | Andres | |
| 1356 | Torres | Anthony | |
| 1357 | Torres | Jesse | |
| 1358 | Torres | Jesse | |
| 1359 | Torres | Lorraine | |
| 1360 | Torres | Maria | |

| 1361 | Torres | Monique | Lorraine Torres |
|------|--------|---------|-----------------|
| 1362 | Torres | Robert | |
| 1363 | Torres | Sandra | |
| 1364 | Torres | Sarah | Renee Naval |
| 1365 | Torres- Jr. | David | |
| 1366 | Torres- Sr. | David | |
| 1367 | Torrez | Armando | |
| 1368 | Torrez | Bryan | Regina Torrez |
| 1369 | Torrez | Christopher | |
| 1370 | Torrez | Jake | |
| 1371 | Torrez | Regina | |
| 1372 | Townsley | James | |
| 1373 | Tran | Karol | Minh Tran |
| 1374 | Tran | Minh | |
| 1375 | Tran | Tracey | |
| 1376 | Trujillo | Amanda | |
| 1377 | Trujillo | Debbie | |
| 1378 | Trujillo | Donald | Ariana Gurrola |
| 1379 | Trujillo | Edward | |
| 1380 | Trujillo | Geneva | |
| 1381 | Trujillo | Jacqueline | |
| 1382 | Trujillo | Jennifer | |
| 1383 | Trujillo | Joshua | |
| 1384 | Trujillo | Julie | |
| 1385 | Trujillo | Richard | |
| 1386 | Trujillo | Teresa | |
| 1387 | Tupua | Femusuai | Sheila Sulu |
| 1388 | Tupua | Tualua | |
| 1389 | Tupua | Wallace | Sheila Sulu |
| 1390 | Umali | Amado | |
| 1391 | Umali | Andrea | |
| 1392 | Umali | Christopher | |
| 1393 | Umali | Randy | |
| 1394 | Umphlett-Patton | Christina | |
| 1395 | Valdes | Adolfo | |
| 1396 | Valdes | Alexa | Adolfo Valdes |
| 1397 | Valdes | Crystal | |
| 1398 | Valdes | Debora | |
| 1399 | Valdes | Isis | Adolfo Valdes |
| 1400 | Valdez | Erika | |
| 1401 | Valdez | Gilbert | |
| 1402 | Valdez | Irma | |
| 1403 | Valdez | Leticia | Sharleena Valdez |
| 1404 | Valdez | Melissa | |
| 1405 | Valdez | Michelle | |
| 1406 | Valdez | Sharleena | |
| 1407 | Valdivia | Alfredo | |

| 1408 | Valdivia-Chairez | Rose Marie | |
| 1409 | Varela | Juanita | |
| 1410 | Varela | Lanette | |
| 1411 | Varela | Paul | |
| 1412 | Vargas | Araseli | |
| 1413 | Vargas | Ariana | Araseli Vargas |
| 1414 | Vargas | Gabriella | Araseli Varges |
| 1415 | Vargas | Mike | |
| 1416 | Vasquez | Gilberto | |
| 1417 | Velarde-Nava | Yvette | |
| 1418 | Velasco | Josephine | |
| 1419 | Velasquez | Georgina | |
| 1420 | Velazco | Adolfo | |
| 1421 | Velazco | Bertha | |
| 1422 | Velazco | Carina | |
| 1423 | Velazco | Emmanuel | |
| 1424 | Velazco | Fernando | |
| 1425 | Velazco | Manuel | |
| 1426 | Velazco | Victor | |
| 1427 | Velazquez | Araceli | |
| 1428 | Velazquez | Wyatt | |
| 1429 | Velazquez- Jr.-Diaz | Vicente | |
| 1430 | Villarico | Ernie | |
| 1431 | Villavicencio | Cesar | |
| 1432 | Villegas | Arianne | |
| 1433 | Villegas | Christina | |
| 1434 | Villegas | Marty | |
| 1435 | Villegas | Robert | |
| 1436 | Villegas | Serene | |
| 1437 | Vinluan | Felisa | |
| 1438 | Vinluan III | Lorenzo | |
| 1439 | Vinluan IV | Lorenzo | |
| 1440 | Wabschall | Travis | |
| 1441 | Waight-Smith | Raquel | |
| 1442 | Ward | Myrna | |
| 1443 | Watanabe | Edward | |
| 1444 | Watanabe | Henry | |
| 1445 | Watanabe | Hisashi | Katsuko Watanabe |
| 1446 | Watanabe | Katsuko | |
| 1447 | Watts | Christina | |
| 1448 | Watts | Delmas | |
| 1449 | Weimer | Wanda | |
| 1450 | Wells | Darlene | |
| 1451 | Wells | Douglas | |
| 1452 | Williams | Faimalie | Christina Bird |
| 1453 | Williams | Gregory | |
| 1454 | Williams | Sandra | |

| 1455 | Wilson | Bobbie | |
| 1456 | Wilson Jr. | Norman | |
| 1457 | Wingert | Kathleen | |
| 1458 | Wingert | Kathleen H. | |
| 1459 | Wingert | Roger | |
| 1460 | Wingert | Thomas | |
| 1461 | Wirgart | Lennart | |
| 1462 | Wooldridge | Louis | |
| 1463 | Wooldridge | Mala | Louis Wooldridge |
| 1464 | Wooldridge | Matthew | Louis Wooldridge |
| 1465 | Yap | Richard | |
| 1466 | Ybarra | Claudio | |
| 1467 | Ybarra | Jonathan | Jessica A. Ybarra |
| 1468 | Ybarra | Patsy | |
| 1469 | Ybarra-Tialavea | Jessica | |
| 1470 | Yi | Alden | |
| 1471 | Yi | Edwin | |
| 1472 | Yi | Kyung | |
| 1473 | Yi | Sang | |
| 1474 | Yinger | Savannah | Corrina Mataalii |
| 1475 | Yniguez | Gilbert | |
| 1476 | Yniguez | Raymond | |
| 1477 | Yoshizawa | Arnold | Wendy K. Petrouski and Dorothy Kinuye Nelson |
| 1478 | Yracheta | Anita | |
| 1479 | Yracheta | Daniel | |
| 1480 | Yracheta | Danielle | Anita Yracheta |
| 1481 | Yracheta | Matthew | Anita Yracheta |
| 1482 | Zacarias III | Pedro | |
| 1483 | Zamora | Benjamin | |
| 1484 | Zamora | Blanca | |
| 1485 | Zamora | Leopoldo | |
| 1486 | Zamora | Lydia | |
| 1487 | Zamora | Mona | |
| 1488 | Zamora | Salvador A. | |
| 1489 | Zamora | Salvador H. | |
| 1490 | Zamora | Samuel | |
| 1491 | Zatarain-Madrid | Joseph | |

As appended to this Schedule B, Exhibit B-1, provided by TRANSFEROR to Jeff Huff, ADMINISTRATOR's Authorized Representative, during meeting with Tom Girardi at TRANSFEROR's offices on 2-23-18, a list of $9,562,560.78 Shell Oil Case expense reimbursements due TRANSFEROR from future Case settlement payments ($6,600,466.54 itemized by TRANSFEROR expense categories plus $2,962,094.24 Kurtzman Carson Consultants LLC invoice)

**Girardi & Keese**

**Case Cost Report - Summary**

Case ID:  0029357            Carson, CA vs Shell Oil

| | | |
|---|---|---:|
| 6101 | Court Fees | $14,510.20 |
| 6102 | Jury Fees | $150.00 |
| 6103 | Court Reporters | $161,684.06 |
| 6104 | Photocopy Expenses | $310,951.06 |
| 6106 | Attorney Services | $26,885.06 |
| 6107 | Associate Counsel Fees | $3,562.50 |
| 6108 | Travel Reimbursements | $96,142.99 |
| 6109 | Client Advances | $17,569.74 |
| 6110 | Investigation Services | $168,652.70 |
| 6113 | Arbitration Expenses | $26,526.95 |
| 6114 | Miscellaneous Charges | $55,203.44 |
| 6115 | Delivery - Case Cost | $66,181.06 |
| 6117 | Expert Witness Fees | $4,355,222.46 |
| 6118 | Medical Photocopies | $105,496.89 |
| 6119 | CASE'S RETAINER | $67,128.75 |
| 6120 | DOCUMENTS & SCANNING | $2,520.07 |
| 6122 | Common Case Costs | $604,072.29 |
| 6131 | Case Costs - Personnel | $515,679.82 |
| 6134 | Case Costs - Attorney Fees | $2,326.50 |
| | | **$6,600,466.54** |



Kurtzman Carson Consultants
P.O. Box 6191
Novato, CA 94948-6191
www.kccllc.com

# INVOICE

December 14, 2015

Girardi Keese
1126 Wilshire Blvd
Los Angeles, CA 90017

Re: Shell

Job Code: GKM

| | Total Plaintiffs | Costs per Plaintiff | Total Costs |
|---|---|---|---|
| **Shell Fees - Details Attached** | 1,077 | $ 2,750.00 | $ 2,961,750.00 |
| **Shell Expense** | | $ | 344.24 |

**Summary of Work**

    Claimant telephone calls to legal representatives to follow up on Guardian *Ad Litem* forms.
    Obtain missing death certificates and representative documents for Providio re lien resolution.
    Prepared and sent minor compromise forms .
        Claimant telephone calls to obtain these forms.
    Prepared and sent Shell release .
        Claimant telephone calls to obtain release.
        Town Hall meeting to obtain release.
        Door to door campaign to obtain release.
    Prepared and sent Statement and Narrative of Damages to claimants.
        Transcribed Statement and Narrative of Damages for claimants.
        Coded all injuries in excel sheet for point allocation purposes .
    Facilitated and coordinated scheduling of geotechnical survey/boring into claimants' land .
        Answered claimant phone calls regarding geotechnical survey .
        Reminder calls to claimants explaining the survey/boring process.
    Prepared and sent Medicare Information Declarations to claimants.
        Claimant telephone calls to obtain these declarations.
        Prepared and sent Covenant and Agreement for Access to claimants.
        Claimant telephone calls to obtain these agreements.
    Prepared and sent various update letters authored by GK to claimants .
    Notarized Shell releases .

**Balance Due**          **$ 2,962,094.24**

*6,600,466.54*

*Please Remit Payment to:*

**Mail**

Kurtzman Carson Consultants LLC.
Dept CH 16639
Palatine, IL 60055-6639

**Wire Transfer**

Kurtzman Carson Consultants LLC.
HSBC Bank, NA
452 Fifth Avenue
New York, NY 10081
Account # 000183571
Routing # 022000020

TERMS - Due upon Receipt
SERVICE CHARGE OF 1.5% PER MONTH WILL BE ADDED TO PAST DUE ACCOUNTS

Page 1 of 1

# EXHIBIT B-2 LIENS OR OTHER ENCUMBRANCES ON PAYMENTS DUE TO TRANSFEROR FROM CASES

For the purpose of TRANSFEROR's review, correction or addition to Schedule B, "Liens" includes not only liens perfected under federal and/or state law, but also any other claims, subrogation's, Assignments or other specific or general encumbrances of Proceeds or of other TRANSFEROR assets known to TRANSFEROR. It is not necessary to list TRANSFEREE liens. **Unless approved in writing by TRANSFEREE and ADMINISTRATOR, TRANSFEROR agrees not to request or approve changes to the below credit facilities, loans & assignment agreements; and to fully pay its obligations under and as required by such agreements.**

| List all encumbrances on Portfolio of Cases including but not limited to credit facilities, loans & assignments | Date Encumbered | Encumbered Amounts and Brief Description (attach copies of relevant agreements not already produced) |
|---|---|---|
| Purchase and Sale Agreement Between Girardi Keese as Seller Thomas V. Girardi, Esq., as Seller, and Law Finance Group, LLC, as Purchaser | 11-02-2015 | Adelina Acosta, et al., vs. Shell Oil Company, et al. Superior Court of California, County of Los Angeles Case No. NC, 053643, and any related case including Case Nos. NC053684, NC053766, BC433429, BC433430, BC433656, BC433657, BC454472, BC520744. The State of California, ex rel. City of Carson v. Shell Oil Company et. al. BC499369, and Shell Oil Company v. Barclay Hollander Corporation, BC544 786; If not paid by November of 2017. Law Finance appears to also restrict and/or have first right of refusal on additional TRANSFEROR fundings **Est. Amt. Due: $11,000,000** |
| Loan And Security Agreement between Comerica Bank, a Texas banking association ("Bank") as secured party, and Girardi & Keese, a California general partnership | 04-05-2011 | All personal property of Borrower, including without limitation each and all of the following: the Accounts; the Inventory; the General Intangibles; (Reference Agreement Collateral definition). **Est. Amt. Due: $8,000,000** |
| Second Amended And Restated Revolving Promissory Note between Girardi Keese a general partnership organized under California law and California Attorney Lending II, Inc., a New York corporation | 08-01-2013 | Right, title and interest in all Goods, Money, Instruments, Accounts, Deposit Accounts, Chattel Paper, Investment Property, Letter-of-Credit Rights, Documents and General Intangibles. SmithKline Beecham Corp d/b/a GlaxoSmithKline, Glaxo SmithKline PLC, Glaxo Wellpome UK Ltd., Glaxo SmithKline UK Limited Brentford, McKesson Corp; and Zimmer Inc., Zimmer Holdings Inc **Est. Amt. Due: $5,000,000** |
| None | | |

If none write the word "NONE".

Agreed and accepted on behalf of TRANSFEROR

_____   Date: 3/31/2016

**Signature of Thomas V. Girardi; its Authorized Representative to sign on behalf of Girardi & Keese, a California General Partnership dba Girardi/Keese**

Law Firm Legal Funding, Consensual Equitable Lien, Assignment And Security Agreement Page 27 of 41
Copyright © 2015 Amalfi Management, LLC & Neoconomy, LLC. All Rights Reserved

# SCHEDULE C - CLIENT FUNDING DISCLOSURE

**TRANSFEROR**
Girardi & Keese, a California General Partnership dba Girardi/Keese
1126 Wilshire Blvd, Los Angeles, CA 90017-1904

NOTE: The below table is provided to give TRANSFEROR an estimated statement of fees paid and/or payments being made on TRANSFEROR's behalf at TRANSFEROR's request, actual amount may vary. Amounts paid by TRANSFEREE at closing on behalf of TRANSFEROR from Legal Funding are pursuant to the instructions approved and given by TRANSFEROR to TRANSFEREE and ADMINSTRATOR.

| Summary of TRANSFEROR's Estimated Fees and Payments [2] | | | |
|---|---|---|---|
| **Allocation of Funding** | | **Costs Paid Prior to Closing** | |
| Legal Funding | **$5,110,440.38** | Expediting Costs | NONE |
| Less TRANSFEREE Origination Fee | $76,656.61 | Cashier's Check | NONE |
| Less Account Set-up and UCC1 Filings | $500.00 | Other Costs | NONE |
| Less Underwriting Travel Reimbursement | $3,283.77 | | |
| Less Legal and Advisory Costs | $30,000.00 | | |
| **Estimated Cash to TRANSFEROR** | **$5,000,000.00** | **Total Paid** | NONE |

The below signatory, on behalf of TRANSFEROR, confirms that upon issuance of the above funds as agreed to by TRANSFEROR and on the TRANSFEROR's behalf to other Persons, the TRANSFEREE's Legal Funding obligation to TRANSFEROR is completed. TRANSFEROR agrees to pay TRANSFEREE the total amount due TRANSFEREE in accordance with the Agreement, without delay, within five (5) business days receipt of Legal Fees disbursement. TRANSFEROR has reviewed and understands the potential fees involved, agrees to these amounts and understand that there will be NO REDUCTION in the total amount that will be due TRANSFEREE at the successful resolution of all Client Cases except as otherwise stated in the Agreement.

**Agreed and accepted on behalf of TRANSFEROR**

_____**Date:** _3_ / _3_ /2016
**Signature of Thomas V. Girardi; its Authorized Representative to sign on behalf of Girardi & Keese, a California General Partnership dba Girardi/Keese**

---

[2]Such fees and payments can be adjusted or corrected by ADMINISTRATOR with disclosure to TRANSFEREE prior to funding.

Copyright © 2015 Amalfi Management, LLC & Neoconomy, LLC. All Rights Reserved

## SCHEDULE D- CONFIRMATION OF LIEN AGREEMENT DISCUSSION

**This confirmation of the Agreement communications between the Parties is not intended to be all encompassing of the terms & conditions of the Agreement.**

Thomas V. Girardi representing himself as an individual and as the Authorized Representative of the TRANSFEROR Girardi & Keese, a California General Partnership dba Girardi/Keese hereby provides the response to statements relating their general and specific understanding of the Agreement.

**TRANSFEROR and Thomas V. Girardi, as individual acknowledge that he has had at least 10 days to review the Agreement or has voluntarily chosen to waive this review period and waive any possible rights of rescission in order to induce TRANSFEREE to expedite the Legal Funding. Irrespective of the review period, the responses below represent an accurate and factual representation of their understanding of what has been discussed and reviewed.**

☑Agree        ☐Disagree

**TRANSFEROR and SIGNATORIES** understand:

1. The Agreement with TRANSFEREE is a Law Firm Legal Funding, Consensual Equitable Lien, Assignment And Security Agreement("Agreement") of future Payment Intangible secured by obligations now existing or in the future, including future Proceeds with an unpredictable outcome.

☑Agree        ☐Disagree

2. I have the authority and believe that I am mentally capable of entering into this Agreement on behalf of TRANSFEROR and as an individual.

☑Agree        ☐Disagree

3. I, the sole owner and only general partner of the TRANSFEROR, have full authority to take any action on behalf of the TRANSFEROR, will cause the TRANSFEROR, until TRANSFEREE is paid in full, to (i) pay the TRANSFEREE in accordance with the Agreement and; (ii) to not accept or retain fees and expense payments due to TRANSFEROR in accordance with the Agreement, from Proceeds from Clients listed on Schedule B; and (iii) if requested by TRANSFEREE, provide third parties with Instructions to insure payments to TRANSFEREE in accordance with the Agreement are properly executed by such third party.

☑Agree        ☐Disagree

4. Having given prior Notice to TRANSFEROR, this Agreement is "Mature", "Legal" and "Enforceable" under basic contract law.

☑Agree        ☐Disagree

5. When a Client Case listed in Schedule B settles with court approval or is reduced to judgment, it then becomes a contractual right to payment and then converts from a general intangible to a Payment Intangible. TRANSFEROR has given to TRANSFEREE the absolute right to perfect UCC1 security interest in that right to payment.

☑Agree        ☐Disagree

6. The TRANSFEREE is relying on me and TRANSFEROR and me as an individual to truthfully and factually advise ADMINISTRATOR when Client Cases listed on Schedule B resolve. TRANSFEROR will be in

Copyright © 2015 Amalfi Management, LLC & Neoconomy, LLC. All Rights Reserved

material breach of the Agreement if I or the TRANSFEROR do not truthfully and factually advise the TRANSFEREE about Client Cases listed on Schedule B (i) which have resolved and reached an agreement for payment, (ii) where TRANSFEROR has been terminated from representation of any such Clients without replacement of a similar Client as required by the Agreement, unless such Client is specifically exempted in Schedule B from such requirement, or (iii) where upon request of TRANSFEROR, information on the status of Case Resolution negotiations and timelines is withheld.

☑Agree        ☐Disagree

7.  That TRANSFEREE is not obligated to take any TRANSFEREE Payment reduction unless (i) the total Legal Fees received from the Client Portfolio after all Client Cases have resolved is insufficient to fully repay the Legal Funding and accrued Premium, and (ii) the TRANSFEROR is not in Default of the Agreement.

☑Agree        ☐Disagree

8.  That TRANSFEREE takes a substantial risk in providing TRANSFEROR with Legal Funding since the TRANSFEREE has absolutely no control over the Client relationship, Case litigation and resolution, the claim amount or time that it takes to resolve such Cases and if successful, payment of such claims.

☑Agree☐Disagree

9.  That if TRANSFEROR is discharged from any Client for any reason including but not limited to Client abandoning or withdrawing their Case prior to resolution then TRANSFEROR understands that TRANSFEROR must in addition to notifying ADMINISTRATOR immediately, in accordance with the Agreement, replace such Clients with Clients satisfactory to TRANSFEREE and ADMINISTRATOR (unless the Agreement specifically exempts such Cases from such requirement), or TRANSFEROR will be in material breach of the Agreement.

☑Agree        ☐Disagree

10. TRANSFEROR understands and as required by the Agreement, shall assist the ADMINISTRATOR to file a UCC1 Financing Statements, Consent Judgment when included in Agreement as a Schedule and other documents as well as notifying defendants, any appropriate courts, counsels, insurance companies, settlement masters, third party administrators, bank escrow agents and all other interested Persons (as may be requested by ADMINISTRATOR) to perfect or protect TRANSFEREE's security interest in all such General Intangibles and Proceeds payable to the TRANSFEROR from resolution of any and all Cases in the Client Portfolio.

☑Agree☐Disagree

11. I or TRANSFEROR have not, nor plan to (i) to consult with counsel concerning personal or TRANSFEROR Bankruptcy, unless such consultation has been disclosed in writing to the TRANSFEREE prior to the Agreement Effective Date, (ii) attempt to assign rights in the Client Cases to any other Person, as I and TRANSFEROR fully understand that I or TRANSFEROR no longer have owner rights in the Proceeds from the Client Portfolio and have by this Agreement assigned those rights to TRANSFEREE.

☑Agree☐Disagree

12. TRANSFEROR and I understands and agree that, other than from TRANSFEREE, obtaining additional legal funding, financing or consideration of any kind from any source which encumbers Proceeds from the Portfolio of Cases will be considered a material breach of the Agreement. TRANSFEROR understands (i) TRANSFEROR shall not obtain additional funding from sources other than the TRANSFEREE if such funding shall, in any way, encumber or diminish the amount of Proceeds that may become available

Copyright © 2015 Amalfi Management, LLC & Neoconomy, LLC. All Rights Reserved

from the Clients Cases; and (ii) at any time, the TRANSFEROR may payoff the balance owed to TRANSFEREE in accordance with the Agreement and be fully relieved from Agreements obligations with TRANSFEREE except Section 12 which shall remain in force for the Parties until such information and material referenced in Section 12 is available in the public domain.

☑ Agree  ☐ Disagree

13. TRANSFEROR agrees that any and all disputes that may arise concerning the terms, conditions, interpretation or enforcement of this agreement shall be determined through arbitration pursuant to the commercial arbitration rules of the JAMS, or the NAF in Arizona. TRANSFEROR also agrees to the application of Arizona law to any such dispute. I and TRANSFEROR expressly waive my and TRANSFEROR's ability to arbitrate on a class action basis or to consolidate or join my claims with the claims of other persons that may have similar claims.

☑ Agree  ☐ Disagree

14. I and TRANSFEROR agree, until such time TRANSFEREE modifies such terms, conditions and Instructions in writing or TRANSFEROR has satisfied all TRANSFEOR's Agreement obligations, (i) to perform the terms and conditions of this Agreement (ii) not to revoke or modified in anyway Instructions the TRANSFEROR may provide to third parties in accordance with the Agreement and (iii) will continue to perform and take such actions that satisfy the terms and conditions of the Agreement and insure the execution of Instructions I and the TRANSFEROR may provide to third parties.

☑ Agree  ☐ Disagree

15. I and TRANSFEROR have read and understand this entire Agreement. I and TRANSFEROR have no further questions or concerns about the Agreement and agree that the Agreement constitutes the entire agreement between the Parties. There are no representations, warranties, covenants, or obligation except as set forth herein. This Agreement supersedes all prior agreements, understandings, negotiations and discussions, written or oral, of the Parties, relating to any transaction contemplated by this Agreement.

☑ Agree  ☐ Disagree

16. In accordance with Schedule A Exhibit A-2 Additional Fundings I and TRANSFEROR agree that no additional Legal Fundings beyond the Legal Funding herein have been committed by TRANSFEREE to TRANSFEROR, and if I or TRANSFEROR request any future Legal Fundings, such future request for Legal Funding must be reviewed, underwritten by ADMINISTRATOR and approved by the TRANSFEREE and ADMINISTRATOR in writing and such approval is at the sole discretion of TRANSFEREE.

☑ Agree  ☐ Disagree

17. TRANSFEROR has irrevocably subordinated my and TRANSFEROR's fees and reimbursement costs to TRANSFEREE in alignment with the repayment provisions of the Agreement until such time as TRANSFEREE is paid in full.

☑ Agree  ☐ Disagree

18. I and TRANSFEROR understand and agree that in the event TRANSFEROR defaults in its Agreement obligations, it shall be the option of TRANSFEREE to declare the terms of the Agreement to be in Default. In such an event, TRANSFEREE has the right to seek all remedies under the terms of the Agreement to make TRANSFEREE whole, including seeking payment from TRANSFEROR of amounts for cost, attorney fees, interest plus liquidated damages in the amount of 20% of the Schedule A amounts due to

Copyright © 2015 Amalfi Management, LLC & Neoconomy, LLC. All Rights Reserved

TRANSFEREE which shall be in addition to the total amount due to TRANSFEREE from TRANSFEROR as set forth in Schedule A. TRANSFEROR expressly acknowledges that in the event of termination or other breach of the covenants, conditions and terms of this Agreement, the anticipated loss and damages to TRANSFEREE in such an event set forth in the Agreement liquidated shall be considered reasonable and not imposed as a penalty.

☑ Agree          ☐ Disagree

19. TRANSFEROR agrees to notice ADMINISTRATOR of all mass tort or other court settlement events involving Client Cases within 5 business days after TRANSFEROR is aware of such events.

☑ Agree          ☐ Disagree

20. TRANSFEROR, if required by ADMINISTRATOR, agrees to establish, maintain and pay all expenses of an independent third party administrator approved by the TRANSFEREE, to receive and process Client Portfolio settlement payments such that the TRANSFEREE's interests and payments are administrated by such independent third party administrator for the benefit of the Parties in accordance with the Agreement.

☑ Agree          ☐ Disagree

21. TRANSFEROR understands and agree that if TRANSFEROR receives more than one Legal Funding, each Legal Funding will have the same Client Portfolio assigned, transferred, and conveyed to TRANSFEREE including all of TRANSFEROR'S control, right, title and interest in and to any and all obligations now existing or in the future including future Proceeds and Payment Intangibles of TRANSFEROR resulting from the Client Portfolio or Proceedings.

☑ Agree          ☐ Disagree

22. TRANSFEROR and I understand and agree that any Payment of fees or expenses due and paid to the TRANSFEROR from the Client Portfolio which are sent to TRANSFEROR are to be deposited into a controlled account which may be the TRANSFEROR's trust account if so stated in the Agreement. In the event Proceeds are not sent to the controlled account for any reason, I notify the ADMINISTRATOR and will cause a transfer in the amount of such Proceeds to be deposited into the controlled account no later than 5 business days after receipt of such Proceeds unless otherwise agreed to in writing by ADMINISTRATOR .

☑ Agree          ☐ Disagree

23. TRANSFEROR and I understand and agree that unless approved in writing by TRANSFEREE and ADMINISTRATOR, TRANSFEROR agrees not to request or approve changes to the credit facilities, loans & assignment agreements disclosed by TRANSFEROR in listed in Schedule B, Exhibit B-2; to fully pay its obligations under and as required by such agreements; and shall provide written notice to ADMINISTRATOR within five (5) business days if the such agreements (i) have been changed or modified; (ii) the TRANSFEROR requests or is made aware of a request to change or modify such agreements; (iii) TRANSFEROR does not pay amount due under and as required by such agreements; or commits an act that is a default of any such agreement.

☑ Agree          ☐ Disagree

24. TRANSFEROR and I understand and agree that in the event TRANSFEROR is in default of one or more Default provisions stated in the Default Definition sections I. through X. and XIV. through XVIII. of the Agreement; if after 10 days from the receipt of such written Default notice the TRANSFEROR fails to fully cure said Default then I, Thomas V.

Copyright © 2015 Amalfi Management, LLC & Neoconomy, LLC. All Rights Reserved

Girardi individually shall owe the amount which will make TRANSFEREE whole under the terms of the Agreement, plus an amount for TRANSFEREE attorney fees and cost to obtain a judgment, interest on all amounts due subsequent to judgment and liquidated damages as provided in the Agreement.

☑Agree ☐Disagree

25. TRANSFEROR and I understand and agree that the Legal Funding advanced by TRANSFEREE to TRANSFEROR has been provided for TRANSFEROR's business purposes and TRANSFEROR shall exclusively and only use such funding for its business purposes..

☑Agree ☐Disagree

**Agreed and accepted on behalf of TRANSFEROR**

_____ Date: 3 / 31 /2016
**Signature of Thomas V. Girardi; its Authorized Representative to sign on behalf of Girardi & Keese, a California General Partnership dba Girardi/Keese**

_____ Date: 3 / 31 /2016
**Signature of Thomas V. Girardi representing himself**

**NOTARY**

STATE _California_ COUNTY _Los Angeles_

On this _31st_ day of _March_, 2016, before me personally came, the person, Thomas V. Girardi, who signed the foregoing SCHEDULE D- CONFIRMATION OF LIEN AGREEMENT DISCUSSION known to me personally to be such, and acknowledged that the above is her act and deed and that the facts stated herein are true.

_Shirleen H. Fujimoto_ My Commission Expires: _May 15, 2019_
Notary Public

SHIRLEEN H. FUJIMOTO
COMM. # 2107442
NOTARY PUBLIC • CALIFORNIA
LOS ANGELES COUNTY
Comm. Exp. MAY 15, 2019

Copyright © 2015 Amalfi Management, LLC & Neoconomy, LLC. All Rights Reserved

## SCHEDULE E
## CONSENTS AND DECLARATIONS

## GIRARDI & KEESE, A CALIFORNIA GENERAL PARTNERSHIP DBA GIRARDI/KEESE
## APPROVAL OF AND CONSENT TO ACTIONS

The undersigned, Authorized Representative of Girardi & Keese, a California General Partnership dba Girardi/Keese (Company), in writing pursuant to the authority contained in Company's bylaws/operating agreement, without the formality of convening a meeting, do hereby adopt, approve, and consent to the actions of the Company set forth below:

> RESOLVED, that the Company hereby consents to the Law Firm Legal Funding, Consensual Equitable Lien, Assignment And Security Agreement between it and TRANSFEREE, including its Schedules and related documents (the "Agreement").A copy of the Agreement is attached hereto.

> RESOLVED, that Thomas V. Girardi, is the Company Authorized Representative with authority to enter into the Agreement on behalf of the Company and the signatures of Thomas V. Girardi on the Agreement, its Schedules or related documents will bind the Company to such executed Agreement and related documents.

**Agreed and accepted,**

_____Date: 3 / 3/ /2016
**Signature of Thomas V. Girardi; its Authorized Representative to sign on behalf of Girardi & Keese, a California General Partnership dba Girardi/Keese**

**IF OTHER GOVERNING MEMBERS APPROVAL IS REQUIRED BY THE COMPANY'S ORGANIZING AND MEMBER AGREEMENTS TO APPROVE ACTION FOR THE COMPANY,HAVE THEM SIGN BELOW SUCH THAT THE ACTION ARE APPROVEDAND BINDING ON THE COMPANY AS OF THE AGREEMENT EFFECTIVE DATE.**

**ADDITIONAL SIGNATURES AS REQUIRED APPROVING THE RESOLUTION
IF NOT APPLICABLE ENTER NONE**

**SIGNATURE**                          **PRINT NAME, TITLE AND DATE**

_____N/A_____

Copyright © 2015 Amalfi Management, LLC & Neoconomy, LLC. All Rights Reserved

# THOMAS V. GIRARDI APPROVAL OF AND CONSENT

The undersigned, Thomas V. Girardi, in writing does hereby adopt, approve, and consent to the actions set forth below:

RESOLVED, that Thomas V. Girardi hereby confirms that all amounts currently or in the future that are or may become owed by Girardi & Keese, a California General Partnership dba Girardi/Keese ("Girardi/Keese") to Thomas V. Girardi are not secured in any manner by Girardi/Keese Client Portfolio Legal Fees (the "Legal Fees") as defined by the Law Firm Legal Funding, Consensual Equitable Lien, Assignment And Security Agreement between Girardi/Keese and TRANSFEREE, including its Schedules and related documents (the "Agreement"). A copy of the Agreement is attached hereto.

RESOLVED, that the Thomas V. Girardi hereby acknowledges and agrees the Agreement provides TRANSFEREE with a secured claim to the Legal Fees such that all amounts due TRANSFEREE under the Agreement shall be paid from such Legal Fees to TRANSFEREE before any payment from such Legal Fees can be paid to Thomas V. Girardi. For the avoidance of doubt Thomas V. Girardi has no current rights to payment from the Legal Fees superior to TRANSFEROR, relinquishes and waives any future rights to payment from the Legal Fee, including any Bankruptcy proceeding claims, until such time that Girardi & Keese, a California General Partnership dba Girardi/Keese dba Law Offices of Thomas V. Girardi or its successor has fully satisfied all its Agreement obligations.

RESOLVED that the undersigned has authority to approve and consent to the above actions and all notices and further actions have been taken such that these resolutions are proper and binding.

**Agreed and accepted,**

⇨ _____ Date: 3 /31 /2016
**Signature of Thomas V. Girardi, representing himself**

⇨ _____ Date: 3 /31 /2016
**Signature of Thomas V. Girardi; its Authorized Representative to sign on behalf of Girardi & Keese, a California General Partnership dba Girardi/Keese**

Copyright © 2015 Amalfi Management, LLC & Neoconomy, LLC. All Rights Reserved

# THOMAS V. GIRARDI DECLARATION



GIRARDI | KEESE
LAWYERS

February 22, 2016

Jeff Huff                           *Via Email: jhuff@alfoperations.com*
President & Founder
American Law Firm Funding
17700 N. Pacesetter Way, Suite 104
Scottsdale, AZ  85255

**Re:   Declaration of Thomas V. Girardi**

Dear Jeff:

We had a meeting of the senior lawyers:  David Lira, Amy Solomon, Bob Finnerty, Jake Courtney and Jim O'Callahan; and it was agreed that if I'm unable to perform my duties of the firm, David Lira would be in charge.

We provided our cost summary.  This does  not include $4,000,000 in Carson costs.  The spread sheet also does not reflect approximately $10,000,000 in costs advanced on referred cases.

Over the past 10 years, the firm has recovered more than 95% of all costs advanced.  The defendant in the Avandia cases still owe $2,500,000 in costs incurred by our firm.

Looking at the past four years, net fees to the law firm have gone up from $40,000 to $52,000—up every year.

Conservatively, our fees for 2016 will be in excess of $110,000,000.  Fifty million dollars ($50,000,000) in fees will be received in the Carson case.  Thirty-six million dollars ($36,000,000) from Shell and $12,000,000 from Barclay Hollander.  A minimum of $10,000,000 net fees will be received on our Avandia cases and $12,000,000 will be received on our TXI cases.  These cases are already settled, however, the collection process can be a long way.  There are no conditions to our receiving the money.

My original line of credit with Comerica Bank was $27,700,000.  There's currently owed $7,723,934.  This is secured by cash collateral of $2,500,000 and stock I own in the Boyd Corporation which is worth $1,500,000.

1126 WILSHIRE BOULEVARD • LOS ANGELES, CALIFORNIA • 90017-1904
TELEPHONE: 213-977-0211 • FACSIMILE: 213-481-1554
WWW.GIRARDIKEESE.COM

Law Firm Legal Funding, Consensual Equitable Lien, Assignment And Security Agreement Page 36 of 41
Copyright © 2015 Amalfi Management, LLC & Neoconomy, LLC. All Rights Reserved

Jeff Huff
American Law Firm Funding
February 22, 2016
Page 2

The PacTen investment relates to 44 acres in Temecula. I own 45% of the project. I put $7,000,000 in cash into the project. I recently received an offer to sell 12 acres for a retail project. That sale would double my investment for the standpoint of cash and we would continue to own the majority of the acreage.

I believe that the Erika Jayne record sales and performances will be worth a large sum of money, but I believe it's a little too speculative to make it substantial factor.

This confirms I own 100% of Girardi|Keese and there are no general partners or operating agreements. I will execute all documents on behalf of Girard|Keese and I will personally guarantee the obligation as will Erika.

The $10,000,000 from Law Finance was used as an advance to referring attorneys on Avandia, TXI and Actos. Some of the funds were used to pay 25% of the costs we expended in Avandia. Initially, when we talked to Law Finance, we explained that situation. We also mentioned the Shell case which we will receive $46,000,000 shortly. The Law Finance group thought it would be easier (I just understood) to talk in terms of the Shell case rather than the others. I didn't realize this until we inspected the agreement today.

I declare under penalty of perjury the above is true and correct.

With kind regards,

THOMAS V. GIRARDI

TVG:sf

## SCHEDULE F
## SUCCESSION AGREEMENT

This agreement entered into between the undersigned parties is due to TRANSFEROR entering into the funding Agreement as of its Effective Date with TRANSFEREE and such relations is administered by the ADMINISTRATOR wherein there is pledged the TRANSFEROR Legal Fees and expense reimbursements that may come due from certain cases defined as the Client Portfolio as security to ensure payment pursuant to the Agreement with TRANSFEREE. The TRANSFEROR agrees that in the event of certain triggering circumstances occurring, the Client Portfolio shall be transferred to a Succession Attorney for future handling and representation of those affected cases. TRANSFEROR has identified David Lira, Esq., from Girardi/Keese as the Succession Attorney that has agreed to assume responsibility for taking control of and prosecuting to conclusion the Client Portfolio Cases. The TRANSFEREE and ADMINISTRATOR agree with TRANSFEROR's choice of David Lira, Esq as the Succession Attorney in accordance with and subject to terms and conditions of the Agreement.

The following circumstances occurring to the Thomas V. Girardi, TRANSFEROR sole owner and only general partner (the "Responsible Attorney") who is responsible for prosecuting the Client Portfolio Cases shall be considered a "triggering" event such that the Client Portfolio shall be automatically transferred to the succession lawyer/firm:

a.  Conviction of Responsible Attorney of any crime classified as a felony.
b.  The breach of any term of this funding contract, and the failure to correct said breach within ten days of receipt of written notice from TRANSFEREE or ADMINISTRATOR of a Notice of Breach. The Notice of Breach shall state the terms of the funding contract that were breached and the steps necessary for TRANSFEROR to take to correct said breach.
c.  Death of the Responsible Attorney.
d.  Disability of the Responsible Attorney. Disability shall be defined as any physical, medical, psychological, emotional, or legal circumstance that prevents Responsible Attorney from practicing law for 30 consecutive days or longer.
e.  Disbarment, resignation from the practice of law, or ethical sanction which results in the T Responsible Attorney being unable to practice law for 30 consecutive days or longer.

The Responsible Attorney has discussed with Succession Attorney the type of cases being pledged as cases for security and have entered into a satisfactory agreement regarding the division of attorney fees and responsibility for costs in the event pledged cases are transferred to Succession Attorney. Succession Attorney agrees to accept said cases from TRANSFEREE and to prosecute said cases to their conclusion. Succession Attorney, as and for consideration of being named Succession Attorney and in consideration of potential fees to be earned by Succession Attorney by entering into this arrangement with TRANSFEREE, ADMINISTRATOR and TRANSFEROR, and being advised that without said Succession Agreement being in place TRANSFEREE would not be able to enter into the Agreement with TRANSFEROR, agrees to pay from attorney fees generated by said cases, all amounts due TRANSFEREE under the terms of the Agreement entered into by TRANSFEROR with TRANSFEREE. Succession Attorney may review the proposed funding agreement prior to entering into this contract by requesting such review in writing directed to the ADMINISTRATOR at ALF Operations, ATTN: DGMGT AZ, LLC, 17700 N. Pacesetter Way, Phoenix, Arizona 85255. By agreeing to accept the responsibilities of Succession Attorney, Succession Attorney agrees to all terms and conditions of the Agreement entered into between TRANSFEROR and TRANSFEREE, regardless of whether Succession Attorney has reviewed and read said Agreement.

**[SIGNATURES ON FOLLOWING PAGES]**

Copyright © 2015 Amalfi Management, LLC & Neoconomy, LLC. All Rights Reserved

IN WITNESS WHEREOF, the parties hereto affix their signatures on the below written dates:

**Agreed and accepted on behalf of TRANSFEROR**

Date: 3 /31/2016

**Signature of Thomas V. Girardi; its Authorized Representative to sign on behalf of Girardi & Keese, a California General Partnership dba Girardi/Keese**

**Agreed and accepted on behalf of RESPONSIBLE ATTORNEY**

Date: ____/____/2016

**Signature of Thomas V. Girardi, RESPONSIBLE ATTORNEY**

**NOTARY**

STATE _California_   COUNTY _Los Angeles_

On this _31st_ day of _March_, 2016, before me personally came, the persons, Thomas V. Girardi who signed the foregoing SUCCESSION AGREEMENT is known to me personally to be such, and acknowledged that the above is her act and deed and that the facts stated herein are true.

_Shirleen H. Fujimoto_   My Commission Expires: _May 15, 2019_
Notary Public

SHIRLEEN H. FUJIMOTO
COMM. # 2107442
NOTARY PUBLIC • CALIFORNIA
LOS ANGELES COUNTY
Comm. Exp. MAY 15, 2019

**Agreed and accepted on behalf of SUCCESSOR ATTORNEY**

Date: 3 /31/2016

**Signature of David Lira, SUCCESSOR ATTORNEY**

**NOTARY**

STATE _California_   COUNTY _Los Angeles_

On this _31st_ day of _March_, 2016, before me personally came, the persons, ~~Thomas V. Girardi~~ David Lira who signed the foregoing SUCCESSION AGREEMENT is known to me personally to be such, and acknowledged that the above is her act and deed and that the facts stated herein are true.

_Shirleen H. Fujimoto_   My Commission Expires: _May 15, 2019_
Notary Public

SHIRLEEN H. FUJIMOTO
COMM. # 2107442
NOTARY PUBLIC • CALIFORNIA
LOS ANGELES COUNTY
Comm. Exp. MAY 15, 2019

**On behalf of TRANSFEREE**

_____Date: __04_/__01__/2016
    **Signature of Jay Holland, Member and Authorized Representative of Stillwell Madison, LLC**


**On behalf of ADMINISTRATOR**

_____Date: __04_/__01__/2016
    **Signature of Alan Hald, Authorized Representative of DGMGT AZ, LLC**

## SCHEDULE G
## PERSONAL DECLARATION OF THOMAS V. GIRARDI

Whereas Thomas V. Girardi practices law in the firm of Girardi & Keese, a California General Partnership dba Girardi/Keese ("TRANSFEROR");

Whereas Thomas V. Girardi is the controlling owner of TRANSFEROR and has authority to bind TRANSFEROR to agreements;

Whereas Thomas V. Girardi, has directed TRANSFEROR to enter into a funding agreement with the Stillwell Madison, LLC ("TRANSFEREE") where DGMGT AZ LLC agreed to be the relationship administrator between the parties (the "ADMINISTRATOR");

I, Thomas V. Girardi, agrees and consents in the event TRANSFEREE declares the that the TRANSFEROR is in default of one or more Default provisions stated in the Default Definition sections I. through X. and XIV through XVIII of the Agreement, and the following conditions are satisfied,

(i) ADMINISTRATOR notifies the TRANSFEROR in writing in accordance with the Agreement that the TRANSFEROR is in default of one or more Default provisions stated in the Default Definition sections I. through X. and XIV through XVIII of the Agreement;

(ii) after 10 days from the receipt of such written Default notice the TRANSFEROR fails to fully cure said Default;

then I, Thomas V. Girardi individually, as evidenced by my signature below, shall owe the amount which will make TRANSFEREE whole under the terms of the Agreement, plus an amount for TRANSFEREE attorney fees and cost to obtain a judgment, interest on all amounts due subsequent to judgment and liquidated damages as provided in the Agreement.

Date: 3 / 31 /2016

**Signature of Thomas V. Girardi, representing himself individually**

**NOTARY**

**STATE** California   **COUNTY** Los Angeles

**On this** 31st **day of** March , **2016, before me personally came, the person, Thomas V. Girardi , who signed the foregoing Schedule G - Personal Declaration of Thomas V. Girardi , on behalf of himself individually, who is known to me personally to be such, and he acknowledged that the above is his act and deed and that the facts stated herein are true.**

Shirleen H. Fujimoto   **My Commission Expires:** May 15 2019
**Notary Public**

SHIRLEEN H. FUJIMOTO
COMM. # 2107442
NOTARY PUBLIC • CALIFORNIA
LOS ANGELES COUNTY
Comm. Exp. MAY 15, 2019

SHIRLEEN H. FUJIMOTO
COMM. # 2107442
NOTARY PUBLIC • CALIFORNIA
LOS ANGELES COUNTY
Comm. Exp. MAY 15, 2019

Copyright © 2015 Amalfi Management, LLC & Neoconomy, LLC. All Rights Reserved